IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

| | |
|---|---|
| ELIZABETH NIBLOCK, Individually and on behalf of all those similarly situated,　Plaintiff,　vs.　UNIVERSITY OF KENTUCKY, BOARD OF TRUSTEES, MITCH BARNHART and ELI CAPILOUTO in their official capacities,　Defendants. | Case No: 5:19-cv-00394　REPLY BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION |

**I. Introduction**

Plaintiff Elizabeth Niblock has satisfied all four requirements under Federal Rule 23(a) to have the class certified in this matter. The fact that Niblock is the sole class representative at this time does not preclude the court from granting Plaintiff's motion for class certification. Niblock is not seeking relief for just herself, she is seeking to force the University of Kentucky (UK) to bring its athletic department into compliance with Title IX and as such, is seeking relief for all women at the university and female students who will attend the university for years to come.

**II. University of Kentucky is Not Compliance with Title IX**

UK claims that it is in compliance with Title IX because it is accommodating all of the interest and ability of its female students. UK admits that it is not meeting Prong One (participation) or Prong Two (history of adding women's sports) of the three-part test, so it is solely focusing on Prong Three. But as other courts have recognized "[i]nterest and ability rarely develop

1

in a vacuum; they evolve as a function of opportunity and experience. *Cohen v. Brown Univ.*, 101 F.3d 155, 179 (1st Cir. 1996). While UK does offer athletic opportunities to its women, it is in no way in compliance with Title IX. Part three of the three-part test states that "Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as cited above, whether it can be demonstrated that the interests and abilities of the members of the sex have been *fully and effectively accommodated* by the present program." 44 Fed. Reg. 71413, 71418 (Dec. 11, 1979). "Subsection (3) sets a high standard: it demands not merely some accommodation, but full and effective accommodation. If there is sufficient interest and ability among members of the statistically underrepresented gender, not slaked by existing programs, an institution necessarily fails this prong of the test." *Horner v. Kentucky High Sch. Athletic Ass'n*, 206 F.3d 685, 696 (6th Cir. 2000) (internal quotation marks omitted). UK cannot demonstrate compliance with this prong by merely asserting that it sent an annual survey, particularly when the university knows that women's club teams have been asking for varsity status for years to no avail.

To begin the survey itself has many issues which cannot be overlooked. Students are asked to take this survey before being allowed to register for classes. As Niblock testified in her deposition students are highly focused on getting into the classes they need or the professors they want, which results in many students simply clicking through survey quickly. (Niblock Dep. 31-34, 57, 63). Moreover, UK does very little to stress the importance of this survey. (Niblock Dep. 63). Rather than informing students that the survey will help the school determine whether it needs to add additional women's varsity sports the opening of the survey simply says,

> You are being asked to complete a short survey about student athletics interests before registering for classes through my UK. This new survey is designed to gather information so that UK Athletics,

2

> UK Club Sports, and UK Intramurals can determine whether students' interests and abilities are being met.
>
> This survey is being administered by UK Institutional Research on behalf of UK Athletics.

2018 and 2019 Interest Survey Questions, Exs. 1, 2. This opening does not convey to students that the results of the survey could result in additional varsity athletic opportunities prompting students to spend more time carefully filling out the survey. The most recent surveys, which Defendants referred to as "revamped" only asked:

**Varsity interest check**

${e://Field/varsity1}

○ Yes, I would be interested in competing in an NCAA-regulated men's sport
○ Yes, I would be interested in competing in an NCAA-regulated women's sport
○ No
○ Choose Not to Answer

2018 Interest Survey Questions, Ex. 1 The survey then went on to list "varsity" sports, a huge portion of which were not even varsity sports UK offered.

3

**Varsity interests**

${e://Field/varsity2}

- ☐ Acrobatics & Tumbling
- ☐ Baseball
- ☐ Basketball
- ☐ Bowling
- ☐ Cross Country
- ☐ Diving
- ☐ Equestrian
- ☐ Fencing
- ☐ Field Hockey
- ☐ Football
- ☐ Golf
- ☐ Gymnastics
- ☐ Ice Hockey
- ☐ Lacrosse
- ☐ Rifle
- ☐ Rugby
- ☐ Soccer
- ☐ Softball
- ☐ Swimming
- ☐ Tennis
- ☐ Track and Field
- ☐ Triathlon
- ☐ Volleyball - Indoor
- ☐ Volleyball - Beach/Sand
- ☐ Water Polo
- ☐ Wrestling
- ☐ Choose not to answer

*Id.* Prior to the "revamp" the survey specifically asked if the student would try out if the sport was offered at UK. *See* ECF 36–6, PageID 537–40, 544–47, 551–54, 655, 659, 663, 667, 857–58. This at least gave the students the knowledge that UK might offer the sport. In 2019, UK even dropped the question regarding "Varsity Interest Check" and just listed out the sports. UK has gone out of its way to gloss over the significance of the survey. By not providing the students with the necessary information, UK has ensured students had no clue that a sport could actually be added. (Niblock Dep. 63).

Additionally, the OCR guidance clearly acknowledges that while survey results from students is one way to access athletic interest and ability, it is not determinative. In its 1996 Dear Colleague Letter the OCR provides clear guidance on how to access both interest and ability.

> **a) Is there sufficient unmet interest to support an intercollegiate team?**
>
> OCR will determine whether there is sufficient unmet interest among the institution's students who are members of the underrepresented sex to sustain an intercollegiate team. OCR will

> look for interest by the underrepresented sex as expressed through the following indicators, among others:
>
> - *requests by students and admitted students that a particular sport be added;*
> - *requests that an existing club sport be elevated to intercollegiate team status;*
> - participation in particular club or intramural sports;
> - interviews with students, admitted students, coaches, administrators and others regarding interest in particular sports;
> - results of questionnaires of students and admitted students regarding interests in particular sports; and
> - participation in particular in interscholastic sports by admitted students.
>
> In addition, OCR will look at participation rates in sports in high schools, amateur athletic associations, and community sports leagues that operate in areas from which the institution draws its students in order to ascertain likely interest and ability of its students and admitted students in particular sport(s). For example, where OCR's investigation finds that a substantial number of high schools from the relevant region offer a particular sport which the institution does not offer for the underrepresented sex, OCR will ask the institution to provide a basis for any assertion that its students and admitted students are not interested in playing that sport. OCR may also interview students, admitted students, coaches, and others regarding interest in that sport.

Office of Civil Rights, U.S. Department of Education, Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (Jan. 15, 1996) ("1996 Clarification") (emphasis added). UK wants to rely exclusively on its interest survey to claim compliance.

UK argues that the survey demonstrates that the female students do not have the ability to play varsity sports at the Division I level. However, the real question is do the female students have the potential to sustain a team at the varsity level, not whether they will be champions in a particular sport. For field hockey, lacrosse, and equestrian the questions which Plaintiff assumes are related to ability to play are whether the student was recruited by or played at a Division I college and then whether the student was nationally recognized in their sport. This hardly seems

5

like the determinative factor in whether a student athlete has the ability to play as it is contemplated by the guidance. Just a quick review of the publicly available rosters on UK's website shows that there are male athletes who do not have national accolades.[1] Some played on conference championship teams or state championship teams and some only qualified for state finals but never won. Some tout that they have a brother who was named player of the year in their personal bio information, but they were not named player of the year. Additionally, some are junior conference transfers, suggesting they were not of the caliber to play Division I when they graduated from high school. Specifically, a baseball player who transferred to UK has stated on his biography, "…Did not receive significant recruiting interest out of high school before becoming a prospect in junior college…"

The point is not to discredit these male student athletes as they have all worked very hard to get where they are today. They are well-deserving of their positions on their Division I teams. The point is that national recognition or being recruited by other Division I institutions is not the standard to determine if there is enough interest or ability to field a team. UK does not actually require this high of a standard for a student athlete to come play at UK, but UK is trying to hold Plaintiff Niblock, a female athlete, to a higher standard than it clearly holds its male athletes to when determining if they have the interest and ability to play. Regardless, Plaintiff Niblock more than met that standard. She was recruited by several Division I institutions and played Division I

---

[1] This is merely a sample of the first four teams listed on the website. These athletes are all worthy of being Division I athletes at UK. *See*
https://ukathletics.com/sports/baseball/roster/chase-bryan/8148
https://ukathletics.com/sports/mens-basketball/roster/jacob-toppin/8492,
https://ukathletics.com/sports/mens-cross-country/roster/gabriel-szalay/8321,
https://ukathletics.com/sports/football/roster/abule-abadi-fitzgerald/8687

lacrosse at Furman, and she was a two-time All American in lacrosse in high school and many other impressive accolades. (Niblock Dep. pp.13-15).

The OCR guidance makes it clear that requests by students and even what sports are played at high schools where its students come from are highly relevant to the determination of *fully and effectively* accommodating the interest and ability of female student athletes.

> **b) Is there sufficient ability to sustain an intercollegiate team?**
>
> Second, OCR will determine whether there is sufficient ability among interested students of the underrepresented sex to sustain an intercollegiate team. OCR will examine indications of ability such as:
>
> - the athletic experience and accomplishments--in interscholastic, club or intramural competition--of students and admitted students interested in playing the sport;
> - opinions of coaches, administrators, and athletes at the institution regarding whether interested students and admitted students have the potential to sustain a varsity team; and
> - if the team has previously competed at the club or intramural level, whether the competitive experience of the team indicates that it has the potential to sustain an intercollegiate team.
>
> *Neither a poor competitive record nor the inability of interested students or admitted students to play at the same level of competition engaged in by the institution's other athletes is conclusive evidence of lack of ability. It is sufficient that interested students and admitted students have the potential to sustain an intercollegiate team.*

1996 Guidance (emphasis added). Being recruited by other colleges or being a nationally recognized athlete is not necessary to sustain an intercollegiate team at UK or any other institution and should not become a shield to avoid expanding opportunities for female student athletes and fulfill the purpose of Title IX. As the Court in *Cohen* recognized, using this type of evidence to justify denying women equity perpetuates the discrimination that Title IX sought to eradicate.

> Thus, there exists the danger that, rather than providing a true measure of women's interest in sports, statistical evidence purporting to reflect women's interest instead provides only a measure of the very discrimination that is and has been the basis for

7

> women's lack of opportunity to participate in sports. Prong three requires some kind of evidence of interest in athletics, and the Title IX framework permits the use of statistical evidence in assessing the level of interest in sports. Nevertheless, to allow a numbers-based lack-of-interest defense to become the instrument of further discrimination against the underrepresented gender would pervert the remedial purpose of Title IX. We conclude that, even if it can be empirically demonstrated that, at a particular time, women have less interest in sports than do men, such evidence, standing alone, cannot justify providing fewer athletics opportunities for women than for men.

*Cohen*, 101 F.3d at 179–80. Looking at the whole picture—the number of women each year who express interest in playing a varsity sport, the number of sports offered at local high schools, how many women participate in a club sport at the university, and the number of times women have approached administration requesting the university add opportunities for women—it becomes that UK is not in compliance with prong three of the three-part test of Title IX.

**III. The Named Plaintiff is an Adequate Representative Under Rule 23(a)**

First to address the issue of mootness, Niblock's claims are not moot. As she testified, she still has eligibility to play an intercollegiate sport and she has not graduated from UK. (Niblock Dep. 87-88). Further, Niblock has moved for class certification now to avoid mootness, which courts have recognized is appropriate in cases involving students' challenges to a university's discrimination. *See Ollier v. Sweetwater Union High Sch. Dist.*, 251 F.R.D. 564, 566 (S.D. Cal. 2008) (granting class certification and noting "Because this case concerns students who may, *inter alia*, move, transfer or graduate, mootness is an important and real concern."); *see also Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 943 (D. Minn. 2018) ("[C]lass certification is appropriate to avoid mootness that may arise from students transferring or graduating from SCSU."). The constant matriculation of students in college is indeed a reason to grant class certification.

> The danger of mootness is great enough in the instant litigation to necessitate class certification. Students graduate, transfer, drop out,

> move away, grow disinterested, fall in love. Certainly, if a concern arises early enough in a claimant's educational odyssey, it may be heard court. However, all too often student-initiated disputes escape review. *See, e.g., Fox v. Bd. of Trustees of the State Univ. of N.Y.*, 42 F.3d 135, 137 (2nd Cir.1994), *cert. denied*, 515 U.S. 1169, 115 S. Ct. 2634, 132 L.Ed.2d 873 (1995); *Mincone v. Nassau County Community College*, 923 F.Supp. 398, 404 (E.D.N.Y. 1996). The class action mechanism solves this potential mootness problem. *See Sosna v. Iowa*, 419 U.S. 393, 402, 95 S. Ct. 553, 559, 42 L.Ed.2d 532 (1975) (holding that a class action may continue "even though the claim of the named plaintiff has become moot"). Certification is appropriate in this case.

*Guckenberger v. Bos. Univ.*, 957 F. Supp. 306, 326–27 (D. Mass. 1997). Niblock's impending graduation does not harm her ability to certify a class to seek injunctive relief ending UK's violations of Title IX.

UK also illudes that because Niblock did not participate in efforts to have women's sports added or play a club sport at UK that she is not an adequate class representative for all women at UK and prospective students coming to UK who are continuing to be denied equitable athletic participation. This desperate characterization of Plaintiff is nothing more than a bald attempt to undermine Niblock's fight for equity. When Niblock became aware of the efforts of other students to add women's varsity teams at UK, the university had already refused to add teams on more than one occasion. (Niblock Dep. 35-36). Instead Niblock decided to seek court intervention to force UK to comply, as it was apparent it was not going to do on its own. Further, in response that Niblock is not on a club team, she is not required to be on a club team. To join a club team it requires the student to pay dues, which is not something that a Division I athlete has to do. (Niblock Dep. 111). Specifically, Niblock would have been required to pay $350 to play a club sport. (Niblock Dep. 27, 111). This is to say nothing of the fact that Niblock had no interest in playing a club sport that is coached by students, has limited structure, has to schedule their own competitions, and is nothing like a varsity intercollegiate sport. (Niblock Dep. 26-28). The fact that club sports

9

are not varsity sports is exactly why Niblock filed the instant action on behalf of herself and other women that are similarly situated, so they would not have to settle for playing club sports and not have equitable opportunities to play varsity sports at UK.

### A. Niblock's claims are typical of the class claims

Niblock's claims more than meet the standard for showing that her claims are typical of the class claims: (1) she has been denied and will continue to be denied an equal opportunity to participate in varsity intercollegiate athletics at UK; (2) she has been denied or imminently will be denied an equal allocation of athletic financial assistance because of the inequitable allocation of participation opportunities; and (3) she has been denied or imminently will be denied an equal allocation of the treatment and benefits provided to varsity athletes at UK because of the inequitable allocation of participation opportunities. Niblock and all members of the proposed class are subject to or soon will be subjected to and harmed by the same systemic, ongoing sex discrimination in UK's athletic department. All women at UK have Title IX claims based upon the same legal theories and all seek and will benefit from injunctive relief. The women at UK want to participate in varsity intercollegiate athletics, receive athletic scholarships, and receive the same athletic benefits that the men's teams already receive.

### B. Niblock is an adequate class representative for women seeking to add participation opportunities at University of Kentucky

UK argues that while Niblock has affirmatively stated that she has interest and ability to play varsity lacrosse and field hockey, UK claims she is not an adequate class representative for any other women who would be interested in participating in other sports. In support of this argument UK cites, *Miller v. University of Cincinnati,* 241 F.R.D. 285 (S.D. Ohio 2006). However, *Miller* involved women on the rowing team only and the court, arguably incorrectly, determined

that because the university could take resources away from another women's sport to provide more to the rowing team that the named plaintiffs in that action were not able to represent a larger class of all female student athletes. *Id.* at 290. Additionally, while Plaintiff does not accept the premise that Title IX is a zero-sum game and one women's sport gaining more would result in another women's team receiving less, it is important here to note that Niblock is not a member of a varsity team. This is exactly the point. Niblock like many other women, is being denied the opportunity to play a varsity sport at UK because Defendants are not providing adequate participation opportunities for women. This includes current female student athletes who may be able to participate in more than one sport if UK offered more varsity opportunities for women. Niblock does not care if the sport is one that she believes she excels at, such as field hockey or lacrosse, she only wants UK to comply with Title IX and add more opportunities. (Niblock Dep 68-69). Niblock's interest is not in playing a particular sport, it is in having more varsity participation opportunities for women like herself, which will in turn result in more athletic financial aid for women and equitable treatment and benefits for female student athletes.

> Q. So then would you be satisfied in this action if UK did add sports even if it weren't field hockey or lacrosse?
>
> A "Yeah, I mean, it's not about me. It's about just, the future of girls. I mean, I understand that. And that's -- like when I said my voice has weight, not specifically pertaining to field hockey, lacrosse, it's any female sport, give them the opportunity and, you know, let's have this equality and let's be in compliance. I don't think it's specifically towards field hockey and lacrosse, no. I don't care. I just want any female sport.

(Niblock Dep. 69).

### C. Prospective Students and Deterred Students are Appropriate Class Members

UK also argues that prospective students and students deterred from enrollment should not be included the class definition. First, the fact that the proposed class includes prospective female

11

students at UK, is also not dispositive to granting class certification. Courts have routinely recognized the inherently class-based nature of Title IX claims for injunctive relief and have certified classes including present, prospective, future, and deterred female students in part because of the transient nature of college and the conflicting remedies that could result from every new student seeking their own redress. *See, e.g., Cohen v. Brown Univ.*, 991 F.2d 888, 893 (1st Cir. 1993) (class of "all present and future Brown University women students and potential students who participate, seek to participate, and/or are deterred from participating in intercollegiate athletics funded by Brown"). Additionally, as it comes to deterred students the fact each female student may or may have been deterred solely because of UK's failure to comply with Title IX, the subjective state of mind of any potential or actual class member is not dispositive of whether the class may be certified. "[I]t is not fatal if some members of the class prefer not to have violations of their rights remedied." *Lanner v. Wimmer,* 662 F.2d 1349, 1357 (10th Cir. 1981). Further, while Plaintiff believes the class as defined is appropriate and only addresses Plaintiff's remaining claims, Plaintiff recognizes the Court's authority to redefine the class under Federal Rule 23(c)(1).

**IV. Conclusion**

Plaintiff has satisfied all requirements under for class certification and respectfully request this Court certify this litigation as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of a class defined as follows:

> All present, prospective, and future female students at University of Kentucky (UK) who are harmed by and seek change of UK's policies and practices in its Athletic Department as it relates to female athletes: (a) the allocation of athletic participation opportunities; (b) the allocation of athletic financial assistance; (c) the allocation of benefits provided to varsity athletes; and all females who are deterred from enrolling at UK because of alleged sex discrimination in its athletic program

Plaintiff has shown that she is an adequate class representative, despite Defendants trying to discredit her. She is as qualified as male student athletes who are currently on teams participating and receiving the benefits that being a student athlete at UK offers. Defendants have not shown through their interest surveys that field hockey, lacrosse, or equestrian are not viable sports. Defendants also completely ignore the fact that they have been asked several times over the years to add sports by multiple individuals, including club members of lacrosse and field hockey. This was addressed in Plaintiff's briefing to certify the class, and Defendants have failed to acknowledge or address those communications. Rather, they try to pretend the communications did not exist because Niblock did not make them, which is not the standard of why they have not added a sport when they clearly know there has been interest. Instead, Defendants rely solely upon a flawed survey that does not properly address the interests and abilities of student athletes and specifically chooses to ignore blatant factors showing that there is interest in and ability that Defendants should be relying upon to determine if women's sports should be added.

Plaintiff also requests the Court appoint the undersigned counsel as class counsel, pursuant to Federal Rule of Civil Procedure 23(g) and appoint the named Plaintiff as representative of the class.

Plaintiff again requests expedited relief to ensure the rights of the class are not adversely affected by the graduation of Plaintiff at the end of June.

                                              Respectfully Submitted,

                                              NEWKIRK ZWAGERMAN, P.L.C.

                                              _____/s/ Lori A. Bullock_____
                                              Jill Zwagerman AT0000324
                                              Lori Bullock AT0012240
                                              521 E. Locust Street, Suite 300
                                              Des Moines, IA 50309

Telephone: 515-883-2000
Email: jzwagerman@newkirklaw.com
Email: bmate-kodjo@newkirklaw.com
Email: lbullock@newkirklaw.com

BONAR, BUCHER & RANKIN, PSC
Barbara Bonar
3611 Decoursey Avenue
Covington, KY 41015
Telephone: 859-431-3333
Email: bdbonar@lawatbdb.com
ATTORNEYS FOR PLAINTIFFS

14

## **CERTIFICATION OF SERVICE**

I hereby certify that on May 7, 2021, a true copy of this document was delivered electronically using the CM/ECF system to all counsel of record.

*/s/ Lori A. Bullock*

Lori Bullock