IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

| | |
|---|---|
| ELIZABETH NIBLOCK and ALA HASSAN, Individually and on behalf of all those similarly situated<br><br>Plaintiffs,<br>v.<br><br>UNIVERSITY OF KENTUCKY, MITCH BARNHART and ELI CAPILOUTO in their official capacities,<br><br>Defendants. | CIVIL ACTION NO. 5:19-CV-00394-KKC<br><br><br><br><br>TRIAL BRIEF |

### Introduction

The Plaintiff Class asserted claims against University of Kentucky ("Kentucky") for violations of Title IX. At trial, Plaintiffs anticipate the main issue to be whether Kentucky is fully and effectively accommodating the interest and ability of its female students with the current offering of varsity sports for women. Plaintiffs' evidence will demonstrate that Kentucky is not accommodating the interest and ability of its female students and in turn is violating all aspects of Title IX.

**I. Courts Have Consistently Upheld the Three-Part Test**

Defendants will likely argue that the Court should abandon the Three-Part Test when it comes to Title IX participation cases. The Three-Part Test has been well litigated across the country, and no Circuit Court has ever struck down this Three-Part Test. It is well grounded in law and has support from every Circuit around the country. [1]

---

[1] *McCormick v. School Dist. Mamaroneck*, 370 F.3d 273, 288 (2d Cir. 2004); *Miami Univ.*

In 1979, the OCR issued a policy interpretation of Title IX and its Regulations. This policy interpretation is found at 44 Federal Register 71,413 (1979) (the "Policy Interpretation").[2] The Policy Interpretation provides that, in order to comply with Title IX and 34 C.F.R. § 106.41(c), schools must provide equal athletic opportunities in three general areas: (1) equal athletic participation opportunities; (2) equal athletic financial assistance, and (3) equal treatment and benefits. *See* 34 C.F.R. § 106.41(c)(1). The seminole 1979 Policy Interpretation remains the foundational basis for the Department's ongoing guidance disseminated to educational institutions (including Kentucky) over the last fifty years.

According to the Policy Interpretation, compliance in the area of equal athletic participation opportunities is determined by the following Three-Part Test:

> (1)   whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments;
>
> (2)   where the members of one sex have been and are under-represented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

---

*Wrestling Club v. Miami Univ. of Ohio*, 302 F.3d 608, 615 (6th Cir. 2002); *Chalenor v. Univ. of N.D.*, 292 F.3d 1042, 1046-47 (8th Cir. 2002); *Pederson v. La. State Univ.*, 213 F.3d 858, 877-879 (5th Cir. 2000); *Neal v. Bd. of Trustees*, 198 F.3d 763, 770-72 (9th Cir. 1999); *Boulahanis v. Bd. of Regents*, 198 F.3d 633, 637-39 (7th Cir. 1999); *Cohen v. Brown Univ.*, 101 F.3d 155, 172-73 (1st Cir. 1996) ("*Cohen II*"); *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 273, 274-75 (6th Cir. 1994); *Kelley v. Bd. of Trustees*, 35 F.3d 265, 270-272 (7th Cir. 1994); *Cohen v. Brown Univ.*, 991 F.2d 888, 895, 899 (1st Cir. 1993) ("*Cohen I*"); *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 828 (10th Cir. 1993); *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 170-71, 175 (3d Cir. 1993); *Equity in Athletics v. Dep't of Educ.*, 504 F. Supp. 88, 102-105 (W.D.Va. 2007), *aff'd* 291 2008 WL 4104235 (4th Cir. 2008); *Nat'l Wrestling Coaches Ass'n v. U.S. Dep't of Educ.*, 263 F. Supp. 2d 82 (D.D.C. 2003), *aff'd* 366 F.3d 930 (D.C. Cir. 2004); *Gonyo v. Drake Univ.*, 879 F. Supp. 1000, 1003, 1006 (S.D. Iowa 1995); *Favia v. Indiana Univ. of Pa.*, 812 F. Supp. 578, 584-585 (W.D. Pa. 1993), *aff'd* 7 F.3d 332 (3d Cir. 1993).

[2] "The Federal Register contains rules and regulations which are regulatory documents having general applicability and legal effect. Most rules are codified in the Code of Federal Regulations (CFR)." See https://www.govinfo.gov/help/fr.

>   (3)   where the members of one sex are under-represented among intercollegiate athletes and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

*See* Policy Interpretation, Section VII.C.5.a., 44 Fed. Reg. 71,418. The Three-Part Test is a compromise and provides institutions with three distinct and separate way to comply with Title IX. There is not one prong that is favored, so the school has its choice for how it would like to comply and which of the three prongs best suits its needs. *See* 2003 Clarification. Given the relatively simple methods to meet Title IX compliance, with three different options, it seems unusual Defendants would be arguing that the Three-Part Test should not apply, and they only make that argument because they know they fail all three prongs.

      Defendants have never in this litigation offered an alternative theory or test to apply. It is nonsensical for Defendants to make up a new test when there is guidance from the Office of Civil Rights dictating how the law should be interpreted, especially when that law favors institutions.

      As Plaintiffs see it, if the Three-Part Test does not apply, then Defendant are required to simply be in compliance with Title IX and the plain meaning of the statute. No more showing they are working towards compliance. No more showing that there is interest or ability to play. They simply must be providing equitable opportunities, or they are violating the law. If Defendants do not want to utilize the well-established Three-Part Test of Title IX, then the plain letter of the law makes clear they are not in compliance with Title IX, and the Court should order them to add women's sports.

      Title IX clearly states that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ..." 20 U.S.C. § 1681(a).

As this Court held on page five of its Ruling Denying Defendants' Motion to Dismiss, the regulation further provides that a university "shall provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c). If Defendants are providing more athletic opportunities for men than they are for women based on their student body population ratios of males to females, then they are out of compliance.

> [B]ecause gender-segregated teams are the norm in intercollegiate athletics programs, athletics differs from admissions and employment in analytically material ways. In providing for gender-segregated teams, intercollegiate athletics programs necessarily allocate opportunities separately for male and female students, and, thus, any inquiry into a claim of gender discrimination must compare the athletics participation opportunities provided for men with those provided for women. . . . Rather than create a quota or preference, this unavoidably gender-conscious comparison merely provides for the allocation of athletics resources and participation opportunities between the sexes in a non-discriminatory manner.

*Cohen v. Brown Univ.*, 101 F.3d 155, 177 (1st Cir. 1996) (Cohen IV).

Regardless, the Sixth Circuit has held that the policy interpretations "must" be provided deference. *Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 273 (6th Cir. 1994). Over the years, the federal government has provided policy interpretations allowing institutions different mechanisms for complying with the statute through the Three-Part Test, rather than holding them to the strict interpretation of the law. The Sixth Circuit has held that the Three-Part Test applies. "The Policy Interpretation's reading of the regulation draws its essence from the statute and stands upon a 'plausible, if not inevitable, reading of Title IX,' and is thus entitled to enforcement." *Id.* at 274–75 (citing *Cohen*, 991 F.2d at 899).

> In assessing whether an institution has met its effective accommodation obligations, **reference must be made to the Policy Interpretation** originally issued by the Department of Health, Education and Welfare in 1979. Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics, 44 Fed.Reg. 71,413 (Dec. 11, 1979). The Policy Interpretation states that its general principles will often apply to interscholastic athletic programs, and has been held to apply to such programs. *Id*. at 71,413; *Williams*, 998 F.2d at 171. The Policy Interpretation is a "considered interpretation"

> of the applicable regulations, and is entitled to substantial deference by the courts. *Cohen*, 991 F.2d at 896–97; *Williams*, 998 F.2d at 171.

*Horner*, 43 F.3d at 273 (emphasis added). The *Horner* court applied the Three-Part Test in reversing the district court's granting of summary judgment. *Id.* at 275. There is no reason to think that the Sixth Circuit or any other circuit would not apply the Three-Part Test.[3]

Institutions like Kentucky have benefitted from the Three-Part Test and have avoided being forced to offer *equal opportunities* in athletics to female student athletes over the last 50 years. Defendant do not get it both ways. They have never been in compliance with Title IX and have always provided less opportunities for women, who have always been the underrepresented sex. To claim the Three-Part Test does not apply to Kentucky is disingenuous. If Defendants are offering some other test, Plaintiffs have yet to be apprised of it, and would be prejudiced if some new test was presented by Defendants so close to trial.

**II. Applying the Three-Part Test to University of Kentucky.**

To comply with Title IX's dictates, Kentucky must satisfy at least one of the OCR's three requirements—"substantially proportionate" participation by female student-athletes (in keeping with their numbers in the general student body), "a history and continuing practice of program

---

[3] Defendants relied on *Kiser v. Wilke*, 139 S. Ct. 2400 (2019) in their motion to dismiss to claim that this Court should not have to follow federal guidance. Defendants' reliance on that case is confusing. As explained in Plaintiffs' resistance to the motion to dismiss, *Kiser* specifically held The Supreme Court was affirming its duties to rely upon federal guidance with ambiguous regulations. For Defendants to argue that the *Auer* deference (deference provided to the federal agency) does not apply, Defendants have to claim the regulations are not ambiguous. If the regulation that a university "shall provide equal athletic opportunity for members of both sexes." is not ambiguous, then Defendants must show they are in compliance by proving they are not providing more opportunities in sports to men than to women. Again, they cannot show this. Additionally, because of the complicated nature of what defines a sport, what the NCAA considers sports verses non-sports, and how individuals can be counted for participation, it is likely there is enough ambiguity that the guidance from the federal agency is important and useful to the courts. This makes the *Auer* deference on agency interpretation reasonable and appropriate for Title IX cases on participation.

expansion" for female student-athletes that is "demonstrably responsive" to their interests and abilities, or a program that "fully and effectively accommodate[s]" female student-athletes' interests and abilities. 44 Fed. Reg. 71,418. Kentucky cannot satisfy any prong, and thus it cannot establish Title IX compliance.

### A. Kentucky is Not Meeting Prong One of the Three-Part Test.

The first prong of OCR's Three-Part test requires Kentucky to provide substantially proportionate participation opportunities for its female students. *Balow v. Michigan State Univ.*, 24 F.4th 1051, 1057 (6th Cir. 2022), reh'g denied, No. 21-1183, 2022 WL 1072866 (6th Cir. Mar. 31, 2022). A school is providing substantial proportionate participation opportunities "when the number of opportunities that would be required to achieve proportionality would not be sufficient to sustain a viable team" *Id.* at 1060–61.

Kentucky cannot establish that it is providing substantially proportionate participation opportunities. Pursuant to the data Kentucky produced the school needed to add 92 women in 2021-22 and 175 women in 2020-21 to be in compliance Title IX under prong one. *See* UK 5077–78. Kentucky has multiple varsity teams, such as lacrosse, field hockey, or equestrian—all of which have successful club teams and all of which have an interest and ability to be a varsity sport. At trial, Plaintiffs will demonstrate that Kentucky is not in compliance with prong one.

| Univ. of Kentucky Full Time Undergrad Enrollment | | | | | Univ. of Kentucky Student Athlete Participation | | | |
|---|---|---|---|---|---|---|---|---|
| Year | Male | Female | Total | % female | Male Student Athletes | Female Student Athletes* | % of female Student Athletes | Participation Gap |
| 2020-21 | 8688 | 11551 | 20,239 | 57.07% | 399 | 355 | 47.08% | 175 |
| 2021-22 | 8469 | 11360 | 19,829 | 57.29% | 388 | 428 | 52.45% | 92 |
| *Univ. of Kentucky includes in its count of female student athletes Cheer and in 2021-22 a junior varsity soccer team. These teams do not count as varsity participation opportunities. The participation gap as calculated in this chart are using the participation counts Univ. of Kentucky produced. | | | | | | | | |

6

Additionally, Kentucky cannot include cheer and junior varsity soccer as varsity participation opportunities for women. The cheer program is not a varsity team that is afforded the same participation opportunities as any men's varsity team. They only compete at one competition each year and no men's teams only compete once per year. *See* Barnhart Depo. p.45. The remainder of the school year the cheer team does sideline cheer for other varsity sports. *Id.* This is not genuine varsity participation opportunities. *See Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 103–05 (2d Cir. 2012) (explaining how sideline cheer is not a varsity participation opportunity). Lastly, Kentucky already sponsors a women's varsity soccer team, which provides women with participation opportunities. *See* UK 5077–78. There are no men's program that sponsor a junior varsity team and the women will not compete with the varsity soccer team. *See* Barnhart Depo. p. 141. The women on the junior varsity soccer team are not receiving a genuine participation opportunity that is equivalent to any men's teams. Because Kentucky cannot count cheer and junior varsity soccer as varsity sports providing female opportunities, the numbers they provided are inflated and not reflective of the actual participation numbers that can be counted. This means there is an even bigger gap than 175 women and 92 women.

**B. Kentucky Cannot Carry its Burden that it is Meeting Prong Two of the Three-Part Test.**

The second prong of OCR's Three-Part test examines a school's "past and continuing remedial efforts to provide nondiscriminatory participation opportunities through program expansion." 1996 OCR Clarification at 5. The assessment of a school's compliance with prong two requires a review of an athletic program's entire history. *Id.* Prong two was devised to measure schools' "good faith remedial efforts" and to account for Congress's expectation that women's interest in athletic participation would expand as discrimination and stereotypes decreased. It is

Kentucky's burden at trial to prove that they have a history of expanding opportunities for women. *Mayerova v. E. Michigan Univ.*, 346 F. Supp. 3d 983, 992 (E.D. Mich. 2018) (explaining it is the university's burden to prove, "a history and continuing practice of program expansion which is demonstrably responsive to the developing interests and abilities of [female athletes].").

Three elements should be considered when evaluating if continued expansion has taken place: 1) the institution's record of adding intercollegiate teams, or upgrading teams to intercollegiate status, for the underrepresented sex; 2) an institution's record of increasing the number of participants in intercollegiate athletics who are members of the underrepresented sex; and 3) an institution's affirmative response to requests by students or others for additional or elevation of sports. OCR Clarification, p. 6. Here, the evidence will show that Kentucky cannot establish a "history and continuing practice of program expansion" for female student-athletes.

As to the first of the foregoing three elements, Kentucky cannot show a record of adding or upgrading teams to intercollegiate teams. Kentucky's Executive Associate Athletic Director and Senior Woman Administrator, Sandy Bell, confirmed that Kentucky has not added a women's team since the addition of women's softball in 1998 almost twenty-five years ago. (Bell Depo., p. 31); *see also* (Barnhart Depo., pp. 42). Only this past year, during litigation, did Kentucky add a new women's sport. In the 2021-22 academic year, Kentucky added women's varsity stunt. Adding one team in twenty-five years does not constitute a "history and continuing practice of program expansion. . .."

Similarly, and pertaining to the second element, Kentucky does not have a record of increasing the number of female participants in intercollegiate athletics. The evidence at trial will show that the squad sizes of both men's and women's teams have grown and that women's teams have not grown in such a way that it creates a record of increasing opportunities to the

8

underrepresented gender—here women.

Pertaining to the third element, women at Kentucky have been trying for almost eighteen years to get Kentucky to add women's opportunities and provide equity with the men's athletic program. (ECF Dkt. 8, ¶ 62). Instead, Kentucky has gone out of its way to deny expansion of women's programs and has snubbed every chance it has been given to bring its program into compliance with Title IX. (ECF Dkt. 8, ¶¶ 53–86).

In 2004, members of the women's club lacrosse team met with Defendant Athletic Director ("AD") Barnhart to plead their case about why lacrosse was deserving of varsity status. (ECF Dkt. 8, ¶ 62). These pleas fell on deaf ears and despite having women with the interest and ability to play, lacrosse was not added as a varsity sport at Kentucky. (ECF Dkt. 8, ¶¶ 63–65). Defendant AD Barnhart admitted that he did not even evaluate whether lacrosse would be a good fit at Kentucky. (Barnhart Depo., p. 68). This is just one of the teams that approached Defendant AD Barnhart regarding adding women's participation opportunities.

In 2018, several members of the women's club field hockey team met with the athletic department to demonstrate why field hockey should be added as a varsity sport, this time the players even had the fact that they had gone undefeated and had won club-level championships supporting their arguments that there was interest and ability for field hockey. (ECF Dkt. 8, ¶¶ 69–72); (Bell Depo., pp. 199-207); (Barnhart Depo., pp. 111; 161-162). However, again they were denied the opportunity to play at the varsity level. (ECF Dkt. 8, ¶ 73).

Finally, non-profit organizations even went so far as to offer funds to add Triathlon and Equestrian as a varsity sport, but Kentucky turned down the opportunity to add these women's participation opportunities. (ECF Dkt. 8, ¶¶ 75–78); (Bell Depo., pp. 226; ll.18-24). Defendant AD Barnhart never had a conversation with anyone about adding Triathlon as a sport, despite requests

9

from students and the non-profit. (Barnhart Depo., p. 123). The evidence will show that AD Barnhart did not seriously look into elevating equestrian to varsity status even though individuals from the governing body provided clear evidence that the sport would be successful as a varsity sport at Kentucky. Indeed, since 2004 AD Barnhart has not met with a single women's team regarding elevation to varsity status at Kentucky. (Barnhart Depo., p. 153, ll. 12-20).

Kentucky has female student-athletes with the interest and ability to play several sports, including lacrosse, field hockey, and equestrian. Despite this, Kentucky refuses to elevate any of these sports or even consider elevating any of these sports. The evidence at trial will show that Kentucky is not in compliance with prong two of the three-part test.

**C. Kentucky is Not Meeting Prong Three of the Three-Part Test.**

To satisfy prong three "an institution must effectively accommodate the interests of both sexes in both the selection of the sports and the levels of competition, to the extent necessary to provide equal athletic opportunity." *Horner*, 43 F.3d at 273. "Subsection (3) 'sets a high standard: it demands not merely some accommodation, but full and effective accommodation. If there is sufficient interest and ability among members of the statistically underrepresented gender, not slaked by existing programs, an institution necessarily fails this prong of the test.'" *Id.* at 275 (internal citations omitted). "Thus, if female students are statistically underrepresented in athletics, their interests must be fully accommodated unless the institution in question can satisfy its burden of demonstrating a history and continuing practice of program expansion." *Id.*

The evidence shows that while Kentucky conducts a sports interest survey each year, the school is not meeting the expressed interest and ability of the female students. First, it is important to note that a survey cannot be the exclusive method for determining whether an institution is in compliance with prong three. The administrative guidance evaluates the interests of the

10

underrepresented sex by examining the following list of non-exhaustive indicators:

> • requests by students and admitted students that a particular sport be added;
> • requests for the elevation of an existing club sport to intercollegiate status;
> • participation in club or intramural sports;
> • interviews with students, admitted students, coaches, administrators and others regarding interests in particular sports;
> • results of surveys or questionnaires of students and admitted students regarding interests in particular sports;
> • participation in interscholastic sports by admitted students; and
> • participation rates in sports in high schools, amateur athletic associations, and community sports leagues that operate in areas from which the institution draws its students.

Office of Civil Rights, U.S. DOE, *Dear Colleague Letter* (April 20, 2010). However, when it comes to express interest by the students at Kentucky, the evidence at trial will show that the school does not give student requests or expressed interest any weight.

In the 2021-22 Kentucky once again conducted its interest and ability survey, which shows that 198 women indicated they were interested in competing in varsity equestrian at Kentucky, 59 women were interested in competing in varsity field hockey, and 112 women were interested in competing in varsity lacrosse. *See* UK5069. In the year prior the survey results indicated 222 women were interested in competing in varsity equestrian, 44 women were interested in competing in varsity field hockey, and 111 women were interested in competing in varsity lacrosse. *See* UK4736. The results of Kentucky's surveys consistently demonstrate there is unmet interest at the school for women to participate in varsity sports, but Kentucky has chosen not to take any steps to seriously explore adding any or all of these sports to its varsity sports program. This inaction in light of women at the university asking to have their sport elevated to varsity status is clear evidence that Kentucky is not meeting the interest and ability of its female students.

Further, at trial the evidence will show that Kentucky crafted and interpreted the results of their survey in such a way that it would appear that almost no team is viable. Plaintiffs' expert will

11

demonstrate that the survey itself cannot gauge athletic ability and cannot be the basis for determining that if Kentucky added a women's sport it would not have the ability to field a varsity team. The questions Kentucky asks in the survey are tailored to intimidate women, and the survey is structured in such a manner that the women do not progress through the survey unless they answer affirmatively to a host of questions regarding their ability to play and drug testing, things that would normally be assessed by a coach and conversations that would typically occur in person with a prospective student athlete. *See* Lopiano Depo. pp. 35-58. The administrative guidance makes it clear that,

> neither a poor competitive record, nor the inability of interested students or admitted students to play at the same level of competition engaged in by the institution's other athletes, is conclusive evidence of lack of ability. For the purposes of assessing ability, it is sufficient that interested students and admitted students have the potential to sustain an intercollegiate team.

2010 Dear Colleague Letter. The women at Kentucky have more than demonstrated that they are interested in participating in varsity sports that are not currently offered by the school. Furthermore, the level of participation of females in Kentucky club sports shows that there would be potential to sustain a team in at least field hockey, lacrosse, and equestrian. The evidence at trial will show that Kentucky is not in compliance with prong three of the three-part test.

## Conclusion

At trial, Plaintiffs will show that Kentucky has been denying women equal opportunities for participation in sports in violation of Title IX. The relief that should be afforded to Plaintiffs is injunctive relief preventing further violation of the women's civil rights and ordering Kentucky to elevate to varsity status those women's teams that there is interest and ability to play, namely lacrosse, field hockey, and/or equestrian. The Court should further order Kentucky to undergo a full Title IX compliance review with an individual or company agreed upon by the parties, create

12

a gender equity compliance plan, and implement said plan with the Court overseeing implementation of the plan and Title IX compliance for at least five years.

Respectfully Submitted,

 /s/Lori A. Bullock
Lori Bullock, *Pro Hac Vice*, AT0012240
lbullock@baileyglasser.com
Bailey & Glasser, L.L.P.
309 E 5th Street, Suite 202B
Des Moines, Iowa 50309
Telephone: 515-416-9051

Jill Zwagerman, *Pro Hac Vice*, AT0000324
jzwagerman@newkirklaw.com
521 E. Locust Street, Suite 300
Des Moines, IA  50309
Telephone:  515-883-2000
Fax:  515-883-2004

Bonar, Bucher & Rankin, PSC
Barbara Bonar
bbonar@gatlinvoelker.com
Dominic Capano
dcapano@gatlinvoelker.com
GATLIN VOELKER, PLLC
50 E Rivercenter Boulevard, Suite 1275
Covington, Kentucky 41011
Office: (859) 781-9100

ATTORNEYS FOR PLAINTIFF

<u>CERTIFICATION OF SERVICE</u>

I hereby certify that on July 11, 2022, a true copy of this document was delivered electronically using the CM/ECF system to all counsel of record.

*/s/ Lori A. Bullock*
Lori Bullock
