UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| ELIZABETH NIBLOCK and ALA HASSAN, Individually and on behalf of those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNIVERSITY OF KENTUCKY, MITCH BARNHART, and ELI CAPILOUTO in their official capacities,<br><br>Defendants. | CIVIL ACTION NO. 5:19-394-KKC<br><br><br>OPINION & ORDER |

*** *** ***

By order dated July 31, 2023, the Court ordered that it would apply the Department of Education's 1979 Interpretation (Policy Interpretation, 44 Fed.Reg. 71,418 (1979) ("the three-part test") to this case and issue a separate opinion explaining its reasoning. (DE 130). The Court now explains its rationale behind the ruling.

I.

In 2002, the Sixth Circuit explicitly held that the 1979 Interpretation of Title IX and the three-part test for compliance are entitled to deference. *Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 615 (6th Cir. 2002) ("Consistent with the precedent of this court and various other courts, we conclude that the Policy Interpretation is entitled to deference . . . . We find, based upon our review of the regulations, the Policy Interpretation and established law, that neither the regulations nor the Policy Interpretation are unreasonable, arbitrary, capricious, or manifestly contrary to Title IX."). This holding was consistent with established circuit precedent. *See, e.g., Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 274–75 (6th Cir. 1994) ("The Policy

1

Interpretation's reading of the regulation draws its essence from the statute and stands upon a plausible, if not inevitable, reading of Title IX, and is thus entitled to enforcement.).

This is also consistent with rulings from sister circuits. *See McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 290 (2d Cir. 2004) (collecting cases). Courts from across the country have stated that the policy interpretations are persuasive and reasonable (*see id.*) and based on regulatory language "written at a high level of abstraction and, as a result . . . ambiguous." *Chalenor v. Univ. of N. Dakota*, 291 F.3d 1042, 1047 (8th Cir. 2002). Courts have "deferred substantially" because, "as here, [the interpretations] are effectively legislative, pursuant to a statutory delegation." *Roberts v. Colorado State Bd. of Agric.*, 998 F.2d 824, 828 (10th Cir. 1993).

UK does not dispute the weight of caselaw supporting deference to the three-part test. (DE 85-2 at 21 n.85). Its primary argument is that the three-part test should not control this case because the U.S. Supreme Court's decision in *Kisor v. Wilkie* altered the landscape of administrative deference. There, the Court "reinforced some of the limits inherent in the *Auer* doctrine." 139 S. Ct. 2400, 2415 (2019). The Court stated that, to afford an agency interpretation deference, the underlying regulation must be genuinely ambiguous. Next, if the regulation is ambiguous, the agency's interpretation must be "reasonable." Finally, a court must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight. *Id.* at 2415-16.

## II. The 1979 Interpretation post-*Kisor*

The Sixth Circuit has not directly addressed a challenge to the three-part test or the Title IX policy interpretations post-*Kisor*. It has, however, deferred to the policy interpretations and deployed the three-part test in a case similar to the one before this Court. In *Balow v. Michigan State University*, the Sixth Circuit applied the three-part test as the standard in an interest and

accommodation challenge to a college athletic program. 24 F.4th 1051, 1054 (6th Cir.), *reh'g denied*, No. 21-1183, 2022 WL 1072866 (6th Cir. Mar. 31, 2022), and *cert. denied*, 214 L. Ed. 2d 301, 143 S. Ct. 525 (2022).

The Court acknowledges that in *Balow*, the legal standard was not at issue. *See id.* at 1063 (dissent) ("All involved agree that the general legal framework is outlined in a 1979 Policy Interpretation and a 1996 Letter interpreting Title IX's implementing regulations."). After *Kisor*, the Circuit may provide guidance to the district courts. But as of now, this Court is following applicable precedent.

Moreover, the three-part test remains deserving of deference under the *Kisor* framework. UK argues that the 1975 implementing regulation is not ambiguous. But, like other courts, this Court finds that the regulation is in fact ambiguous. The term "equal athletic opportunity" is inherently ambiguous—so much so that the regulation then lists ten (non-exhaustive) factors that could help determine what "equal opportunity" even means. As to those factors, the terms "effectively accommodate the interests and abilities" offer further ambiguity. These are words "written at a high level of abstraction and, as a result . . . ambiguous." *Chalenor*, 291 F.3d at 1047; *see also Berndsen v. N. Dakota Univ. Sys.*, 7 F.4th 782, 795 (8th Cir. 2021) ("[The policy clarifications] represent authoritative interpretations of an ambiguous rule that are entitled to deference from the court."); *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 97 (2d Cir. 2012) ("[Later policy clarifications] reflect reasonable agency interpretations of ambiguities in its own regulation, and there is no reason to think that the agency's interpretations do not reflect its fair and considered judgment on the matter in question.") (cleaned up).

Next, UK argues that the 1979 policy interpretation is unreasonable for a myriad of reasons. For an agency interpretation to be reasonable, it must fall within the "zone of ambiguity" created

by the language of the regulation. *Kisor*, 139 S. Ct. at 2416. The agency's interpretation must be a reasonable one based on the text, structure, and history of the regulation. Put another way, to fall outside the zone of ambiguity, no reasonable person could define the ambiguities at issue in the way in which the agency's interpretation does. *See United States v. Phillips*, 54 F.4th 374, 385 (6th Cir. 2022).

Here, the three-part test reasonably expounds on the ambiguities in the phrase "effectively accommodates" by offering three ways in which accommodation can be adjudged effective. UK offers many reasons why it believes the 1979 interpretation is unreasonable, including that it is a "one-size-fits-all approach" that "encourages discrimination against the overrepresented sex" and "limits the inquiry into an elite group." It argues that the three-part test is unfair, unusual, or flat-out wrong. But UK does not flesh out exactly how the 1979 Interpretation falls outside the "outer bounds of permissible interpretation." UK makes many arguments as to why the policy interpretation leads to what it feels are negative outcomes, but it does not cite to any caselaw that has ever questioned the reasonableness of this interpretation nor any precedent that would suggest it falls outside the bounds of reason.

Finally, UK argues that the 1979 Interpretation is not entitled to deference based on the non-exhaustive considerations outlined in *Kisor*. But the Court finds that the character and context of the interpretation entitles it to controlling weight. For one, the interpretation is long-standing official department policy and not merely an "ad hoc statement reflecting the agency's views." *See Kisor*, 139 S. Ct. at 2416. UK does not dispute this and instead argues that the 1979 Interpretation does not involve the Department of Education's substantive expertise, nor does it reflect the Department's fair and considered judgment.

According to UK, the Department of Education "has expertise in why participating in competitive athletics is educationally beneficial, it has no expertise in running an intercollegiate athletics program." (DE 85-2 at 29). But this misses the point of the "substantive expertise" inquiry. The *Kisor* court noted that, between agencies and courts, "to decide whose reasonable interpretation of a rule controls, we presume Congress intended to invest interpretive power in whichever actor was best position[ed] to develop expertise about the given problem." *Kisor*, 139 S. Ct. at 2416 (cleaned up). When a rule is technical or implicates "prosaic-seeming questions," an agency is in a better position to interpret. *Id.*

"When the agency has no comparative expertise in resolving a regulatory ambiguity, Congress presumably would not grant it that authority". *Id.* Here, Congress delegated authority and "the degree of deference is particularly high in Title IX cases because Congress explicitly delegated to the agency the task of prescribing standards for athletic programs under Title IX." *Mayerova v. E. Michigan Univ.*, 346 F. Supp. 3d 983, 989 (E.D. Mich. 2018) (citing *Cohen v. Brown University*, 991 F.2d 888, 895 (1st Cir. 1993)).

Finally, the 1979 Interpretation does reflect a "fair and considered judgment." The fact that the Interpretation has received clarifications over the years is not evidence to the contrary, as UK argues. "Fair and considered" means an interpretation that is not merely a "convenient litigating position or post hoc rationalizatio[n] advanced to defend past agency action against attack." *Kisor*, 139 S. Ct. at 2417 (cleaned up). This analysis is all about whether the agency interpretation at issue is "a new interpretation . . . that creates 'unfair surprise' to regulated parties." *Id.* The 1979 Interpretation and the three-part test does not suffer from these deficiencies. The 1979 Interpretation was adopted as a flexible approach to a regulation, after the agency at issue did not

5

find explicit guidance in the text. *See Audi v. Barr*, 839 F. App'x 953, 963 (6th Cir. 2020). It was not a post hoc rationalization, nor does it now create "unfair surprise" to regulated parties.

The Sixth Circuit has not abandoned the three-part test in *Kisor*'s wake. Accordingly, the Court will defer to the 1979 Policy Interpretation and the three-part test as the governing standard in this matter.

### III. The Major Questions Doctrine

UK also argues that the 1979 Interpretation violates the major questions doctrine. Put simply, the major questions doctrine requires Congress to speak clearly if it wishes to assign to an executive agency decisions "of vast economic and political significance." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 142 S. Ct. 661, 667 (2022) (Gorsuch, J., concurring) (quoting *Alabama Assn. of Realtors v. Department of Health and Human Servs.*, 141 S.Ct. 2485, 2489 (2021)). In other words, "we typically greet assertions of extravagant statutory power over the national economy with skepticism. *W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2609 (2022) (cleaned up).

The Court finds that the 1979 Interpretation and specifically the three-part test at issue in this case do not implicate the major questions doctrine. This doctrine is only applicable in "extraordinary cases." *Id.* at 2595. But the Court need not assess the 1979 Interpretation's scope or impact on the nation (whether it involves a matter of great political significance, vast economic regulation, or intrusion upon state sovereignty, *see id.* at *16-23). Congress explicitly delegated to the agency the task of prescribing standards for athletic programs under Title IX. *Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993); Pub.L. No. 93–380, § 844, 88 Stat. 612 (1974). UK again argues that the Department of Education's expertise is education, not athletic regulation. But Congress clearly wanted the Department to promulgate regulations in the Title IX athletic arena—

one that, from its origins, was always intended to have a sweeping scope. See *Cohen*, 991 F.2d at 897 (citing *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982). And the 1979 Interpretation did not create new rights, impose new obligations, or change the existing law—it simply "supplie[d] crisper and more detailed lines than the authority being interpreted." *Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 106 (4th Cir. 2011).

IV.

Accordingly, the Court will defer to the 1979 Policy Interpretation and the three-part test as the applicable standard in this case.

August 4, 2023

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY