IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

| | |
|---|---|
| ELIZABETH NIBLOCK and ALA HASSAN, Individually and on behalf of all those similarly situated,<br><br>        Plaintiffs,<br>v.<br><br>UNIVERSITY OF KENTUCKY, MITCH BARNHART and ELI CAPILOUTO in their official capacities,<br><br>        Defendants. | **CIVIL ACTION NO. 5:19-CV-00394-KKC**<br><br><br><br>**PLAINTIFFS' FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 3

Background of Title IX. ................................................................................................... 5

Burden of Proof............................................................................................................... 7

Findings of Fact and Conclusions of Law...................................................................... 8

  A.   Background facts. ................................................................................................ 8

  B.   University of Kentucky fails Prong One of the Three-Part Test because it is not providing substantially proportional participation opportunities to female students. .............................. 15

    i.   Prong One requires the Court to measure substantial proportionality using the student population at the University of Kentucky. ............................................................................ 15

    ii.   Findings of fact proving the University of Kentucky has failed to provide female student-athletes with substantially proportionate participation opportunities since at least 2012. ....................................................................................................................... 17

  C.   University of Kentucky failed to meet its burden under Prong Two of the Three-Part Test because it does not have a history and continuing practice of program expansion that is demonstrably responsive to the developing interest and abilities of female students............... 19

    i.    Prong Two requires the Court to analyze any purported growth in women's participation opportunities beyond simply looking at the growth of the absolute number of women participating on varsity teams. ............................................................................... 19

    ii.   Findings of fact proving the University of Kentucky has failed to prove it has a history and continued practice of program expansion responsive to the interests and abilities of female students. ........................................................................................................... 21

D.   University of Kentucky fails Prong Three of the Three-Part Test because it is not fully and effectively accommodating the athletic interest and ability of female students ...................... 26

    i.    University of Kentucky cannot solely rely on the results of a survey to deny women participation opportunities, especially when the school is distorting the information it receives from the survey and has received repeated requests from female students to add varsity participation opportunities. ......................................................................... 26

    ii.   Findings of fact proving the University of Kentucky is not fully and effectively accommodating its female students by its current offering of varsity sports. ...................... 29

E.   The cheer squad, dance team, and women's junior varsity soccer team are not varsity sports under Title IX............................................................................................................. 43

    i.    Title IX requires participation opportunities to be sports, not merely activities requiring athleticism............................................................................................................. 43

    i.    Findings of fact proving UK cannot count its cheer, dance, and women's junior varsity soccer team as varsity sports under Title IX. ........................................................ 47

CONCLUSION ........................................................................................................... 51

## **INTRODUCTION**

Class Representative Ala Hassan is fighting for every current Wildcat and for every young girl that dreams of attending University of Kentucky that has the right to be free from discrimination and deserve the opportunity to play varsity sports for the college they love.

> Q. You don't attend UK anymore, correct? You're fully graduated?
>
> A. Yes, ma'am.
>
> Q. Do you still care if the university adds a women's sport?
>
> A. Yes.
>
> Q. Why?
>
> A. Because it doesn't just apply to me. It applies to all women that are currently at UK or any woman that could potentially go to UK, so any prospective female students.

(ECF 148, PageID#2905).

The University of Kentucky ("UK" or "University") is out of compliance with Title IX. UK admitted and it is undisputed that it does not provide substantially proportional athletic participation opportunities to its female student-athletes. UK's Executive Assistance Athletic Director in charge of Title IX compliance, Sandy Bell, was clear in her testimony that even using UK's own numbers, the University must add at least one varsity team to comply with Prong One.

The University also fails to meet Prong Two or Prong Three. Throughout trial UK attempted to undermine Plaintiffs' clear evidence that UK is not fully and effectively accommodating the athletic interest and ability of its female students by claiming that women within the current student body are not good enough to compete for UK, and therefore the University does not have to add a women's sport. UK recruits from all over the world, which makes the argument that it would not have interested and able women to fill varsity athletic teams entirely spurious. Moreover, testimony offered by Plaintiffs exposed the significant failings of UK's

interest survey and how the survey data is distorted by the athletic department to vastly underestimate the interest and ability already at UK. Powerful testimony of female UK students shows that women at UK are interested and possess the ability to play. Women at the University, women in the Commonwealth of Kentucky, women around the United States, and women all around the world are or will be interested in playing women's sports at UK.

Defendant also attempts to convince this Court that because it added stunt that it should be considered in compliance. However, it took this lawsuit and numerous women over the years requesting women's varsity sports be added before UK finally added stunt in 2021. Adding stunt is a great start towards achieving equality for women at UK, but without more, it is not sufficient to put the school in compliance with Title IX.

This Court presided over a three-day bench trial commencing August 7, 2023. The question before this Court is whether UK is in violation of Title IX's requirement to provide equal participation opportunities.[1] This Court heard live testimony from nine witnesses and received 119 exhibits containing thousands of pages of evidence. Plaintiffs' findings of fact and conclusions of law are set forth herein. The evidence presented at trial proves that UK discriminated on the basis of gender since at least the 2018-19 academic year by failing to provide equal athletic participation opportunities for women.

First, UK admitted at trial that it is not providing women with varsity athletic participation opportunities that are substantially proportionate to the fulltime undergraduate enrollment. (Trial Transcript, ECF 149, PageID#3058). Second, while UK has increased the total number of female participants on its varsity teams over the last ten years, it has not met its burden to demonstrate "a

---

[1] Plaintiffs initially alleged an Equal Protection Claim which was voluntarily dismissed at the conclusion of trial.

history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities" of women. 44 Fed. Reg. at 71,418. In 2021, the University added a new women's varsity sport during the pendency of this litigation, stunt, but that was the first women's varsity sport added to the athletic department since 1998. (ECF 149, PageID#3071). Third, UK is not fully and effectively accommodating the interest and ability of its female students. Plaintiffs' evidence demonstrates that at minimum there is sufficient interest and ability to field varsity teams in women's equestrian, field hockey, and lacrosse.

Finally, the evidence supports Plaintiffs' position that UK cannot count its cheer, dance, and junior varsity soccer teams as varsity participation opportunities. While the University does offer some financial support to the members of the coed cheer and women's dance squads, those activities do not qualify as a varsity sport for the purposes of Title IX. Additionally, by definition, UK's women's junior varsity soccer team is not a varsity sport, which is further underscored by the fact that UK does in fact sponsor a separate women's varsity soccer team. Based on all these facts presented over the course of the trial, the Court finds in favor of the Plaintiffs.

## **Background of Title IX.**

In 1972, Congress enacted Title IX to address the profound gender inequities that existed throughout nearly all areas of educational institutions, including intercollegiate athletics. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). In passing Title IX, Congress intended to encourage women to participate in all sports and "to remedy the discrimination that results from stereotyped notions of women's interests and abilities." *Neal v. Bd. of Trustees*, 198 F.3d 763, 768 (9th Cir. 1999). In 1975, the United States Department of Education ("DOE") (formerly the Department of Health, Education, and Welfare) adopted

regulations interpreting Title IX. *See* 34 C.F.R. Part 106 (the "Regulations"). The Regulations require all educational institutions that accept federal funds to provide equal athletic opportunities to male and female students. *See* 34 C.F.R. § 106.41(a). To assess whether an institution is providing equal athletic opportunities, the Regulations look at "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c) (emphasis added). Post-secondary schools had three years to fully comply with this requirement. 34 C.F.R. § 106.41(d).

In response to nearly 100 complaints of gender discrimination received by the end of July 1978, the DOE determined that additional guidance would assist post-secondary institutions in complying with Title IX. *See* Title IX of the Education Amendments of 1973; a Policy Interpretation; Title IX and Intercollegiate Athletics, 44 Fed. Reg. 71,413 (Dec. 11, 1979) (the "Policy Interpretation"). In 1979, DOE's Office of Civil Rights ("OCR") issued a policy interpretation of Title IX and the Regulations. *See id*. "Following the publication of the proposed Policy Interpretation, [DOE] received over 700 comments and visited eight universities to see how the proposed policy and other suggested alternatives would apply in practice." *Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 612 (6th Cir. 2002) (citing 44 Fed. Reg. 71,413). "On December 11, 1979, [DOE] published a final Policy Interpretation, which clarified the meaning of "equal opportunity" in intercollegiate athletics and explained the factors considered when determining compliance." *Id.* (citing 44 Fed. Reg. 71,414).

Pursuant to the Policy Interpretation, Title IX athletic participation compliance is determined by a three-part test:

> (1)   whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

> (2)     where the members of one sex have been and are under-represented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

> (3)     where the members of one sex are under-represented among intercollegiate athletes and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

44 Fed. Reg. at 71,418.[2]

These are the tools that this Court and schools around the country use to determine whether the institution is providing equal athletic opportunities to male and female students. Unfortunately, despite fifty years passing since Title IX's enactment, colleges are still failing to provide equal athletic opportunities to women. The University of Kentucky is among those failing schools, giving rise to the present class action.

### Burden of Proof.

The first question this Court asked the parties to clarify is which party has the burden of proof under Title IX's three part test. The Sixth Circuit has provided clear guidance on this issue Plaintiffs bear the burden of proof on prong one "substantial proportionality" and prong three—fully and effectively accommodating the athletic interest and ability of women. Defendants bear the burden of proof on prong two—proving a history and continued practice of program expansion in response to women's athletic interest and ability. *Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 275 (6th Cir. 1994) ("The plaintiffs bear the burden of proof on subsection (1), that of showing statistical disparity…. If the plaintiffs prove disparity, then the institution must show that it satisfies subsection (2). If it fails here, the plaintiffs may prevail by sustaining their burden

---

[2] OCR issued a clarification regarding the three-part test in 1996. *See* Office of Civil Rights, U.S. DOE, *Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test* (Jan. 15, 1996) ("1996 OCR Guidance").

of proof under subsection (3) and demonstrating an unmet interest on the part of the underrepresented sex.") (cleaned up). It is important to remember that prong three "sets a high standard: it demands not merely some accommodation, but full and effective accommodation. If there is sufficient interest and ability among members of the statistically underrepresented gender, not slaked by existing programs, an institution necessarily fails this prong of the test." *Id.* (cleaned up).

### Findings of Fact and Conclusions of Law.

**A.   Background facts.**

1.  The University of Kentucky receives federal funding and therefore, is subject to Title IX.

2.  UK is a Division I college member of the National Collegiate Athletic Association ("NCAA"). (ECF 148, PageID#2739–40).

3.  UK sponsors ten men's varsity sports—baseball, basketball, cross country, football, golf, rifle, soccer, swimming and diving, tennis, indoor track and field, outdoor track and field— and thirteen women's varsity sports—basketball, cross country, golf, gymnastics, rifle, soccer, softball, swimming and diving, stunt, tennis, indoor track and field, outdoor track and field, volleyball. (Jt. Exs. 34, 70).

4.  UK competes in the Southeastern Conference, one of the preeminent conferences in the county, for all but three of its varsity teams. (ECF 148, PageID#2754). UK's men's soccer team competes in the Sunbelt Conference, the coed rifle team competes in the Great America Rifle League, and the stunt team competes independent of a conference. (ECF 148, PageID#2743).

5.  Participating in varsity college sports provides student-athletes with invaluable experience. It teaches students discipline, teamwork, accepting victory and defeat. (ECF 148, PageID#2736). It gives students self-confidence and a sense of pride. (*Id.*). "Great leaders

in our country, great leaders in business, many, many, many of them have come through competitive varsity sports." (*Id.*).

6. UK recruits its student-athletes from all over the world. (ECF 148, PageID#2776).

7. UK does not regularly recruit student-athletes from its current student body. (ECF 148, PageID#2765).

8. In the past five years, UK has never had a coach not be able to fill out their varsity roster because they could not recruit students to play for the school. (ECF 148, PageID#2763).

9. Women's varsity lacrosse is an NCAA sponsored sport. (P. Ex. 55). In 2021-22, there were 119 Division I women's lacrosse teams in the U.S. (*Id.*). The same year, girl's lacrosse was the tenth most popular high school sport in the country. (P. Ex. 53). The number of students playing Division I women's lacrosse increased by over 400 participants between 2018 and 2022, making it the second fastest-growing women's sport offered in Division I college athletics. (P. Ex. 55). In the same period, the number of high schools in the United States sponsoring girls' lacrosse teams grew from 2,877 to 3,028. (P. Ex. 53, 54).

10. Women's varsity equestrian is an NCAA emerging sport and SEC sponsored sport. (P. Ex. 27, 55) (ECF 148, PageID#2796). In 2021-22, there were nineteen Division I women's equestrian teams in the country. (P. Ex. 55). The number of students riding Division I equestrian increased between 2018 and 2022 by almost forty women. (*Id.*). Between 2018 and 2022, the number of high school's sponsoring teams increased from 214 to 401 and the number of girls riding equestrian for school sponsored teams increased from 1,176 to 3,783. (P. Ex. 53, 54).

11. Women's varsity field hockey is an NCAA sponsored sport. (P. Ex. 12, 55). In 2021-22, there were seventy-seven Division I women's field hockey teams in the country, many of

which are located near UK. (P. Ex. 12, 55). Girls field hockey is growing in Kentucky, middle school field hockey is starting in spring 2024. (ECF 148, PageID#2843).

12. Approximately twenty years ago women on the club lacrosse team at UK met with Athletic Director Mitch Barnhart about elevating their club sport to a varsity sport. (ECF 148, PageID#2776-77). The female students were unsuccessful in getting their program elevated to varsity status. (*Id.*).

13. In 1972, UK started a women's varsity field hockey team, which was eliminated in 1976. (ECF 148, PageID#2832–33).

14. In November 2016, members of the former UK women's varsity field hockey team held a reunion. (ECF 148, PageID#2835–36).

15. The 1970's team members invited student officers of UK's current women's club field hockey team. (*Id.* at PageID#2835). During the reunion the student club officers asked the women if they thought it would be possible to get a women's varsity field hockey team back at UK. (*Id.*). Former UK field hockey coach Suzie Stammer, and former UK assistant athlete director Sue Feamster agreed to help the students research the process and approach administration about adding field hockey as a varsity sport. (*Id.* at PageID#2836).

16. On March 30, 2017, Amelia Metz, Morgan Rapson, and Emily Weismiller, student members on the women's club field hockey team sent a memorandum to the University requesting that women's field hockey be elevated to varsity status. (ECF 148, Page ID#2837) (Pl. Ex. 45). Mr. Barnhart forwarded the request to Executive Associate Athletic Director, Sandy Bell. (ECF 148, PageID#2781).

17. On May 3, 2017, Ms. Bell responded to the students and set up a meeting with the students and their supporters. (Pl. Ex. 50, p. 2–3). In subsequent emails, the students indicated that

they wanted to invite Suzie Stammer, a former UK women's varsity field hockey coach, and Chip Rogers, Chair of the Collegiate Development Committee for the USA Field Hockey Association, to the meeting because those individuals were helping the students gather information about varsity field hockey. (*Id.*)

18. On June 14, 2017, Ms. Rapson, Mr. Rogers, and Mr. Stammer met with Ms. Bell, Executive Associate Athletic Director Rachel Baker, and faculty representative Dr. Joe Fink. (ECF 148, PageID#2838–39; ECF 149, PageID#3128). Unfortunately, because the meeting was not scheduled until after the end of the spring semester, Ms. Metz and Ms. Weismiller had already returned to their home states for the summer. (ECF 148, PageID#2839).

19. During the meeting Ms. Rapson, Mr. Rogers, and Ms. Stammer presented a brochure outlining the history of women's field hockey at UK as a varsity and club sport, the popularity of the sport at the high school and college level, letters of interest from UK alumnus, and other relevant information the athletic administration would need about the sport including information about nearby varsity competition opportunities, facilities, coaches, etc. (Pl. Exs. 1–5, 12) (ECF 148, PageID#2839–47).

20. At the conclusion of the meeting Ms. Bell thanked the group for all the information and informed them that UK would have to do an interest and ability survey before making a final determination regarding elevating women's field hockey to varsity status. (ECF 148, PageID#2848).

21. On July 17, 2017, Ms. Stammer reached out to UK to inquire about the status of the survey and the athletic department's decision. (Pl. Ex. 15). On July 18, 2017, Ms. Baker responded that UK was in the process of updating its interest and ability survey which would be distributed to the students in the fall. (*Id.*).

22.  On October 26, 2017, the UK student members of the field hockey club team emailed UK again to follow up on their request. (Pl. Ex. 50, p. 8–9, Pl. Ex. 10). When Ms. Baker responded the next day, the students found out that the interest and ability survey would not take place until spring 2018. (*Id.*).

23. The students, including new students Brennan Tucker and Audrey Sterpka, continued to email the athletic department over the course of the next year asking for updates regarding their request for a varsity team. (Pl. Ex. 50; ECF 149, Page ID#3129; ECF 148, PageID#2851–54).

24. Finally, on November 5, 2018, Ms. Bell emailed the students denying their request for a varsity team, indicating in her email the decision was made because the interest and ability survey results only identified three female students with interest and ability. This is despite the fact that at that point at least five female students had approached UK regarding their interest in a women's varsity field hockey team. (Pl. Exs. 11, 50; ECF 149, PageID#3130–31).

25. The students did not give up after that rejection, on November 28, 2018, a parent and two students requested a meeting with Martha Alexander, the Executive Director of UK's Office of Institutional Equity and Title IX Coordinator. (Pl. Exs. 16, 22, 50).

26. Ms. Alexander cancelled the first scheduled meeting because the students wanted to bring three non-student supporters to the meeting and Ms. Alexander would not permit the students to do so. (Pl. Exs. 22, 50). Ms. Alexander met with the students on January 17, 2019. (*Id.*; ECF 148, PageID#2856–57). Ms. Alexander informed the students that she would not be able to begin looking into their concerns until after spring break. (Pl. Ex. 34).

27. After learning that it would be months before Ms. Alexander would even begin investigating the students' complaint that the athletic department was not offering equal varsity athletic participation opportunities to women, several students sent a formal request to University President Eli Capilouto. (Pl. Exs. 34, 42).

28. On January 30, 2019, eight student members from three different club teams—field hockey, lacrosse, and triathlon—drafted a request to President Capilouto for UK to elevate their club sports to varsity status because there was interest and ability among the women at UK to play at a varsity level. (*Id.*).

29. On February 19, 2019, when the students did not receive a response from President Capilouto, they sent an email to the UK Board of Trustees again requesting the University address their concerns regarding gender equity and elevate women's teams to varsity status. (Pl. Ex. 41). However, the Board rejected the students' request to meet. (ECF 148, PageID#2860).

30. In 2019, AD Barnhart and members of the Board of Trustees also received letters from parents of high school students in the Commonwealth expressing their support and interest in UK adding a women's varsity field hockey team. (P. Ex. 19); (D. Ex. 22, 25); (ECF 148, PageID#2781–85); (ECF 149, PageID#3136–38). Trustee Barber sent AD Barnhart an email clearing stating, "I was not aware that we might be adding a field hockey program, but there *appears to be a lot of interest in it.*" (D. Ex. 25 (emphasis added).

31. Over the last six years members of various sports governing bodies, such as stunt, triathlon, and equestrian have also reached out to UK to advocate for the addition of new women's varsity teams. (ECF 149, PageID#3145) (P. Ex. 43) (ECF 150, PageID#3494) (Pl. Ex. 56) (D. Ex. 10).

32. Of the myriad of student requests and outreach from the community to add women's varsity sports, none of them resulted in UK taking any action to add a new women's varsity team prior to the initiation of this litigation.

33. During the pendency of this litigation, additional students have made formal requests to UK to have their club team elevated to varsity status. (Pl. Ex. 44).

34. On January 3, 2023, four student members of UK's club hunt seat equestrian team, Grace Bieghler, Nicole Hensley, Elly Smith, and Georgia Murray, sent an email requesting UK start a women's varsity equestrian team because they all had interest and ability to compete in varsity equestrian and they knew there was interest and ability among the women at UK to play at a varsity level. (*Id.*).

35. On January 10, 2023, students Grace Bieghler, Elly Smith, and Georgia Murray met with Ms. Bell, Dr. Fink, and Ms. Baker. (*Id.*; ECF 149, PageID#2989).

36. During the meeting Ms. Bieghler, Ms. Smith, and Ms. Murray presented a PowerPoint presentation outlining the history of women's hunt seat equestrian club at UK, the popularity of the sport nationwide, the numerous accomplishments of the club team, information about other SEC varsity equestrian teams, facilities, and the extrinsic benefits a varsity equestrian team could bring to the University. (Pl. Ex. 27) (ECF 149, PageID#2988–97).

37. At the conclusion of the meeting Ms. Bell thanked the group for all the information and informed them that UK would take into consideration the information from the club team and the result from the interest and ability survey before making a final determination regarding adding a women's varsity equestrian team. (ECF 148, PageID#2848).

38. At the time of trial, UK had not added a women's varsity equestrian team.

14

39. At the time of trial, UK had not added a women's varsity lacrosse team.

40. At the time of trial, UK had not added a women's varsity field hockey team.

41. At the time of trial, UK had not added a women's varsity triathlon team.

**B.     University of Kentucky fails Prong One of the Three-Part Test because it is not providing substantially proportional participation opportunities to female students.**

      i.     Prong One requires the Court to measure substantial proportionality using the student population at the University of Kentucky.

Under the Three–Part Test, the first benchmark is "whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their *respective enrollments*." 44 Fed. Reg. 71,418 (emphasis added)., reh'g denied, No. 21-1183, 2022 WL 1072866 (6th Cir. Mar. 31, 2022). Substantially proportionate participation opportunities is reached "when the number of opportunities that would be required to achieve proportionality would not be sufficient to sustain a viable team." *Balow v. Michigan State Univ.*, 24 F.4th 1051, 1057 (6th Cir. 2022), *reh'g denied*, No. 21-1183, 2022 WL 1072866 (6th Cir. Mar. 31, 2022), *and cert. denied*, 143 S. Ct. 525 (2022).

At trial, for the first time in this case, UK proffered a new theory for determining substantially proportionality under Prong one. Relying upon the text of Title IX, UK argues that the University only needs to provide varsity athletic opportunities for women in numbers that are substantially proportionate to the county or state where the university resides. This position is unsupported by the Policy Interpretation and is an obvious distortion of the text and purpose of Title IX. The provision at issue reads:

      Nothing contained in subsection (a) of this section shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section,

or other area: *Provided*, That this subsection shall not be construed to prevent the consideration in any hearing or proceeding under this chapter of statistical evidence tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex.

20 U.S.C. § 1681(b)

Setting aside the fact that the Policy Interpretation—which this Court following precedent from the Sixth Circuit held applies to this case—clearly states that the relevant comparison is student-athletes to college enrollment; UK's novel position cannot withstand any level of careful scrutiny. (Order, ECF 134) *See Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 273 (6th Cir. 1994).

The statutory language of Title IX in §1681(b) does not prohibit proportionality between female student-athletes and female students enrolled at the college. *See Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 101–04 (4th Cir. 2011). Other courts have analyzed the statutory language UK attempts to rely upon in response to other challenges to the Policy Interpretation. In *Cohen v. Brown University*, the First Circuit found that "Title IX, like other anti-discrimination schemes, permits an inference that a significant gender-based statistical disparity may indicate the existence of discrimination." 101 F.3d 155, 170–71 (1st Cir. 1996). The Ninth Circuit has also held that Title IX "does not bar remedial actions designed to achieve substantial proportionality between athletic rosters and student bodies." *Neal*, 198 F.3d at 771. The Seventh Circuit found that the "policy interpretation does not. . . mandate statistical balancing. Rather the policy interpretation merely creates a presumption that a school is in compliance with Title IX and the applicable regulation when it achieves such a statistical balance." *Kelley v. Bd. of Tr., Univ. of Ill.*, 35 F.3d 265, 271 (7th Cir. 1994).

Title IX is designed to be a "strong and comprehensive measure [that would] provide women with solid legal protection from the persistent, pernicious discrimination which is serving

to perpetuate second-class citizenship for American women." 118 Cong. Rec. 5804 (statement of Sen. Bayh); *see also North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 526 (1982) ("Senator Bayh's remarks, as those of the sponsor of the language ultimately enacted are an authoritative guide to the statute's construction."). Congress was not blind to the fact that any effort to alleviate gender discrimination against women would have to take existing gender discrimination into account. Because gender discrimination in fact existed, Congress also knew that gender based remedial measures could be required. Section 1681(b) accordingly addressed that issue. In that section, Congress did not prohibit granting preferences for women to equalize their educational opportunities. Rather, Congress implicitly authorized gender based remedial measures by saying only that preferences were not required. *See Cohen II,* 101 F.3d at 170–72 & n.11. Nothing in section 1681(b) has any bearing on the numbers used to calculate substantial proportionality and it clearly does not alter the plain text of the Federal Regulations to permit UK to use the population of Lexington, Fayette County, the Commonwealth of Kentucky, or the country instead of the fulltime undergraduate enrollment numbers at the University of Kentucky to calculate the participation gap for female students.

ii.   Findings of fact proving the University of Kentucky has failed to provide female student-athletes with substantially proportionate participation opportunities since at least 2012.

1. Ms. Bell admitted that UK is not in compliance with Prong One of the Three-Part Test. (ECF 149, PageID#3060–61).

2. Specifically, the evidence shows that given the number of female student-athletes on UK's thirteen varsity teams, the participation gap in the 2022-23 academic year was well over 100 women. (J. Ex. 83, pp. 2) (showing participation gap using UK's self-reported participation counts was 116) (*Id.* at p. 4) (showing participation gap using UK's varsity sport squad lists without excluding any students was 125).

3. Further, regardless of which numbers the Court uses as the athletic participation numbers for UK, the massive female participation gap in 2022-23 is the smallest participation gap since 2012. (J. Ex. 83).

Joint Ex. 83, p. 2

| Participation Gap: UK Participation Counts w/o Cheer, Dance, and JV Soccer | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Univ. of Kentucky Full-Time Undergrad Enrollment | | | | | Univ. of Kentucky Student-Athlete Participation | | | |
| Year | Male | Female | Total | % female | Male Student-Athletes | Female Student-Athletes | % of Female Student-Athletes | Participation Gap |
| 2012-13 | 9,445 | 9,733 | 19,178 | 50.75% | 354 | 212 | 37.46% | 153 women |
| 2013-14 | 9,627 | 10,258 | 19,885 | 51.59% | 397 | 225 | 36.17% | 198 women |
| 2014-15 | 9,857 | 10,833 | 20,690 | 52.36% | 385 | 239 | 38.30% | 184 women |
| 2015-16 | 9,860 | 11,339 | 21,199 | 53.49% | 352 | 237 | 40.24% | 168 women |
| 2016-17 | 9,446 | 11,387 | 20,833 | 54.66% | 363 | 235 | 39.30% | 203 women |
| 2017-18 | 9,238 | 11,419 | 20,657 | 55.28% | 331 | 226 | 40.57% | 183 women |
| 2018-19 | 9,042 | 11,442 | 20,484 | 55.86% | 338 | 257 | 43.19% | 171 women |
| 2019-20 | 9,031 | 11,591 | 20,622 | 56.21% | 354 | 280 | 44.16% | 174 women |
| 2020-21 | 8,688 | 11,551 | 20,239 | 57.07% | 374 | 288 | 43.50% | 209 women |
| 2021-22 | 8,469 | 11,360 | 19,829 | 57.29% | 363 | 348 | 48.95% | 139 women |
| 2022-23 | 8,743 | 12,009 | 20,790 | 57.76% | 328 | 333 | 50.38% | 116 women |

*In 2022-23, 38 full-time undergraduate students identified as not male or female.

Joint Ex. 83, p. 4

| Participation Gap: All Student-Athletes on UK Squad Lists w/o Cheer, Dance, and JV Soccer | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Univ. of Kentucky Full Time Undergrad Enrollment | | | | | Univ. of Kentucky Student-Athlete Participation | | | |
| Year | Male | Female | Total | % female | Male Student-Athletes | Female Student-Athletes | % of Female Student-Athletes | Participation Gap |
| 2012-13 | 9,445 | 9,733 | 19,178 | 50.75% | 355 | 229 | 39.21% | 137 women |
| 2013-14 | 9,627 | 10,258 | 19,885 | 51.59% | 430 | 238 | 35.63% | 220 women |
| 2014-15 | 9,857 | 10,833 | 20,690 | 52.36% | 400 | 259 | 39.30% | 181 women |
| 2015-16 | 9,860 | 11,339 | 21,199 | 53.49% | 363 | 250 | 40.78% | 167 women |
| 2016-17 | 9,446 | 11,387 | 20,833 | 54.66% | 355 | 251 | 41.42% | 177 women |
| 2017-18 | 9,238 | 11,419 | 20,657 | 55.28% | 349 | 238 | 40.55% | 193 women |
| 2018-19 | 9,042 | 11,442 | 20,484 | 55.86% | 351 | 273 | 43.75% | 171 women |
| 2019-20 | 9,031 | 11,591 | 20,622 | 56.21% | 380 | 291 | 43.37% | 197 women |
| 2020-21 | 8,688 | 11,551 | 20,239 | 57.07% | 392 | 298 | 43.19% | 223 women |
| 2021-22 | 8,469 | 11,360 | 19,829 | 57.29% | 376 | 358 | 48.77% | 146 women |
| 2022-23 | 8,743 | 12,009 | 20,790 | 57.76% | 345 | 347 | 50.14% | 125 women |

*In 2022-23, 38 full-time undergraduate students identified as not male or female.

4. Ms. Bell admitted that a participation gap of 116 women is large enough to accommodate multiple women's teams that UK does not currently sponsor as varsity sports, such as field hockey, lacrosse, and equestrian. (ECF 149, PageID#3061–62).

5. As discussed infra, these teams are viable varsity teams at UK.

6. Plaintiffs have met their burden to prove that UK does not offer substantially proportionate athletic opportunities for its female students.

**C.    University of Kentucky failed to meet its burden under Prong Two of the Three-Part Test because it does not have a history _and_ continuing practice of program expansion that is demonstrably responsive to the developing interest and abilities of female students.**

      i.    Prong Two requires the Court to analyze any purported growth in women's participation opportunities beyond simply looking at the growth of the absolute number of women participating on varsity teams.

Title IX considers several factors when determining whether an institution has a history and continuing practice of program expansion. Of particular importance, the word "and" indicates an institution must demonstrate both a history and a continuing, ongoing program expansion. *See Cohen v. Brown Univ.*, 991 F.2d 888, 903 (1st Cir. 1993) (finding Brown University failed to show both a history and continued practice of expansion).

With respect to a history of program expansion, factors include: (1) an institution's record of adding women's varsity teams or upgrading women's teams to varsity status; (2) an institution's record of increasing the numbers of female participants in intercollegiate athletics; and (3) an institution's affirmative responses to requests by students or others for addition or elevation of sports. *Mansourian v. Regents of Univ. of California*, 602 F.3d 957, 969 (9th Cir. 2010). "A funding recipient can only satisfy [Prong] Two by showing an expansion of participation opportunities that is demonstrably responsive to women's developing interests and abilities ... includ[ing] interests that already exist at the institution." *Id.* at 972.

With respect to a continuing practice of program expansion, factors include: (1) an institution's current implementation of a nondiscriminatory policy or procedure for requesting the addition of sports (including the elevation of club or intramural teams) and the effective communication of the policy or procedure to students; and (2) an institution's current implementation of a plan of program expansion that is responsive to women's developing interests and abilities. *Id.* at 971. The Tenth Circuit, in *Roberts v. Colorado State Board of Agriculture*, held that universities may not read the words "continuing practice" out of the second part of the three-part test. 998 F.2d 824, 830 (10th Cir. 1993).

Universities have a high bar for demonstrating real, actual historical results, not merely illusory promises to improve or raw historical data showing an increase in female student-athletes. To push the bar even higher, universities are also required to show how their expansion efforts are "responsive to the developing interests and abilities of the underrepresented sex." *Id.* Universities must therefore demonstrate a record of gauging student interests in athletics throughout their expansion efforts while also keeping in mind the fluctuations in interests and abilities among the student body.

In *Mayerova v. Eastern Michigan University*, the district court for the Eastern District of Michigan rejected Eastern Michigan University's ("EMU") attempt to satisfy Prong Two of the three-part test. 346 F. Supp. 3d 983, 993–97 (E.D. Mich 2018). EMU argued it was able to demonstrate a history and continuing practice of program expansion because "the overall trend of female participation [grew] between 2003 and 2018." *Id.* at 993. In support of its contention, EMU offered historical participation rates and its roster management plans.

The district court rejected EMU's attempt to use increased female participation numbers. The court reasoned that the overall percentage of female athletes compared to the overall student

20

population largely remained the same throughout the years at issue, despite increases in female participation. *Id.* at 995 ("The court notes that increases in the number of female athletes at EMU have generally been accompanied by increases in the number of male athletes, resulting in little change in the percentage of female athletes over the years.").

ii. <u>Findings of fact proving the University of Kentucky has failed to prove it has a history and continued practice of program expansion responsive to the interests and abilities of female students.</u>

1. The only women's varsity team UK has added in the past twenty-five years is women's stunt. (ECF 149, Page ID#3071).

2. Throughout the trial UK attempted to convince the Court that it has a history of expansion because it has added more than one hundred women either to existing varsity teams or through the addition of women's varsity stunt. (ECF 148, PageID#2909–10; ECF 149, PageID#2950–52; ECF 150, PageID#3446).

3. UK did not present any evidence at trial of its practice of program expansion in response to interest and ability other than Ms. Bell reaching out in the fall of 2018 and 2019 to a handful of women each year who left their contact information on UK's interest and ability survey and offering them a tryout if UK sponsored the varsity sport. (D. Ex. 11)[3] (email chains to women offering tryouts for gymnastics, soccer, track, and volleyball); (ECF 150, PageID#3430).

4. In fact, Ms. Bell testified the more important consideration in determining what participation opportunities UK added was whether there were teams where the coaches indicated they could absorb more participants. (ECF 149, PageID#3074–75).

---

[3] Plaintiffs will note for the Court that this exhibit contains duplicate documents because it has email chains between the students and Ms. Bell, each page is not a separate email to a new student.

5. Ms. Bell testified that the sole justification for UK's belief that it is meeting Prong Two is the absolute number of women added to the program between 2012 and 2022.

> Q.     "But University of Kentucky believes that it has a history and continued practice of expanding women's opportunities, both participation opportunities on existing teams and in response to the interest and ability of the women at Kentucky?
>
> A. Well, based on the growth from 212 to about 333 or whatever it is, yes.

(ECF 149, PageID#3074).

6. However, UK's absolute number of student-athletes only tell part of the story. (J. Exs. 70, 83); (ECF 149, PageID#3062–74).

7. Ms. Bell admitted that in the past eleven years UK has only had four academic years of consecutive growth in the number of women participating in varsity sports, 2018-19 to 2021-22. (ECF 149, PageID#3066).

8. Ms. Bell admitted in 2022-23 women lost varsity participation opportunities. (ECF 149, PageID#3066).

9. Ms. Bell admitted the men's program has had years of growth in the past eleven years as well. (*Id.* at PageID#3067).

10. Since 2012 UK's percentage of female undergraduate enrollment has slowly increased, with the largest yearly increase being 1.17%. (J. Ex. 83).

| **Univ. of Kentucky Full Time Undergrad Enrollment** | | | | | |
|---|---|---|---|---|---|
| **Year** | **Male** | **Female** | **Total** | **% Female** | **Increase in % Female Enrollment** |
| 2012-13 | 9,445 | 9,733 | 19,178 | 50.75% | |
| 2013-14 | 9,627 | 10,258 | 19,885 | 51.59% | 0.84% |
| 2014-15 | 9,857 | 10,833 | 20,690 | 52.36% | 0.77% |
| 2015-16 | 9,860 | 11,339 | 21,199 | 53.49% | 1.13% |
| 2016-17 | 9,446 | 11,387 | 20,833 | 54.66% | 1.17% |
| 2017-18 | 9,238 | 11,419 | 20,657 | 55.28% | 0.62% |
| 2018-19 | 9,042 | 11,442 | 20,484 | 55.86% | 0.58% |
| 2019-20 | 9,031 | 11,591 | 20,622 | 56.21% | 0.35% |
| 2020-21 | 8,688 | 11,551 | 20,239 | 57.07% | 0.87% |
| 2021-22 | 8,469 | 11,360 | 19,829 | 57.29% | 0.22% |
| 2022-23 | 8,743 | 12,009 | 20,790 | 57.76% | 0.47% |

11. However, rather than evidencing a continued practice of expansion during that same time period when UK's athletic department had more than ample opportunity to increase women's participation in conjunction with women's increasing enrollment numbers, there are many years wherein the women's participation gap grew. (J. Ex. 83, p 2); (ECF 149, PageID#3062–67).

12. Further, there are years where men's opportunities increased and women's opportunities decreased; or men's opportunities increased more than women's opportunities for the same year. (J. Ex. 83, p 2); (ECF 149, PageID#3062–67).

Joint Ex. 83, p. 2 (UK Participation Counts w/o Cheer, Dance, and JV Soccer)

| Year | Male Student-Athletes | Annual Change in Male Student Athletes | Female Student-Athletes | Annual Change in Female Student Athletes | Net Additional Women | % of Female Student-Athletes | % Participation Gap | Participation Gap | Change in Gap |
|---|---|---|---|---|---|---|---|---|---|
| | | | Univ. of Kentucky Student-Athlete Participation | | | | | | |
| 2012-13 | 354 | | 212 | | | 37.46% | 13.30% | 153 women | |
| 2013-14 | 397 | 43 | 225 | 13 | -30 | 36.17% | 15.41% | 198 women | 45 |
| 2014-15 | 385 | -12 | 239 | 14 | 26 | 38.30% | 14.06% | 184 women | -14 |
| 2015-16 | 352 | -33 | 237 | -2 | 31 | 40.24% | 13.25% | 168 women | -16 |
| 2016-17 | 363 | 11 | 235 | -2 | -13 | 39.30% | 15.36% | 203 women | 35 |
| 2017-18 | 331 | -32 | 226 | -9 | 23 | 40.57% | 14.70% | 183 women | -19 |
| 2018-19 | 338 | 7 | 257 | 31 | 24 | 43.19% | 12.66% | 171 women | -12 |
| 2019-20 | 354 | 16 | 280 | 23 | 7 | 44.16% | 12.04% | 174 women | 4 |
| 2020-21 | 374 | 20 | 288 | 8 | -12 | 43.50% | 13.57% | 209 women | 35 |
| 2021-22 | 363 | -11 | 348 | 60 | 71 | 48.95% | 8.34% | 139 women | -70 |
| 2022-23 | 328 | -35 | 333 | -15 | 20 | 50.38% | 7.39% | 116 women | -23 |
| | | | | | | | | | Total Change in Gap |
| | | | | | | | | | -37 |

Joint Ex. 83, p. 4 (All Student-Athletes on UK Squad Lists w/o Cheer, Dance, and JV Soccer)

| Year | Male Student-Athletes | Annual Change in Male Student Athletes | Female Student-Athletes | Annual Change in Female Student Athletes | Net Additional women | % of Female Student-Athletes | % Participation Gap | Participation Gap | Change in Gap |
|---|---|---|---|---|---|---|---|---|---|
| | | | Univ. of Kentucky Student-Athlete Participation | | | | | | |
| 2012-13 | 355 | | 229 | | | 39.21% | 11.54% | 137 women | |
| 2013-14 | 430 | 75 | 238 | 9 | -66 | 35.63% | 15.96% | 220 women | 83 |
| 2014-15 | 400 | -30 | 259 | 21 | 51 | 39.30% | 13.06% | 181 women | -40 |
| 2015-16 | 363 | -37 | 250 | -9 | 28 | 40.78% | 12.71% | 167 women | -13 |
| 2016-17 | 355 | -8 | 251 | 1 | 9 | 41.42% | 13.24% | 177 women | 9 |
| 2017-18 | 349 | -6 | 238 | -13 | -7 | 40.55% | 14.73% | 193 women | 16 |
| 2018-19 | 351 | 2 | 273 | 35 | 33 | 43.75% | 12.11% | 171 women | -22 |
| 2019-20 | 380 | 29 | 291 | 18 | -11 | 43.37% | 12.84% | 197 women | 26 |
| 2020-21 | 392 | 12 | 298 | 7 | -5 | 43.19% | 13.88% | 223 women | 26 |
| 2021-22 | 376 | -16 | 358 | 60 | 76 | 48.77% | 8.52% | 146 women | -77 |
| 2022-23 | 345 | -31 | 347 | -11 | 20 | 50.14% | 7.62% | 125 women | -22 |
| | | | | | | | | | Total Change in Gap |
| | | | | | | | | | -12 |

24

13. A proper holistic review of the participation opportunities at UK reveals that the purported 121 women (using UK's participation numbers) or 118 women (using UK's full squad lists) actually amount to a *decrease in the participation gap over the past eleven years of at best thirty-seven women* using UK's participation numbers, or *twelve women* using UK's full squad lists. (J. Ex. 83).

14. Further, a review of each individual women's team clearly shows that the overall size of the women's team has remained mostly consistent and certainly has not expanded in response to expressed interest of female students. (J. Ex. 70); (ECF 149, PageID#3071–74).

15. Even those women's teams have had years of decreasing participation, rebutting UK's assertion that it has a history and continued practice of program expansion. (J. Ex. 70); (ECF 149, PageID#3071–74).

| Varsity Teams | Year | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2012-2013 | 2013-2014 | 2014-2015 | 2015-2016 | 2016-2017 | 2017-2018 | 2018-2019 | 2019-2020 | 2020-2021 | 2021-2022 | 2022-2023 |
| **Women's Teams** | | | | | | | | | | | |
| Basketball | 15 | 14 | 14 | 15 | 12 | 15 | 16 | 14 | 14 | 13 | 15 |
| Cross Country | 12 | 10 | 13 | 11 | 14 | 8 | 14 | 18 | 21 | 21 | 18 |
| Golf | 9 | 9 | 11 | 10 | 12 | 11 | 11 | 12 | 11 | 10 | 9 |
| Gymnastics | 20 | 18 | 17 | 24 | 19 | 20 | 20 | 20 | 24 | 21 | 23 |
| Rifle | 4 | 5 | 3 | 7 | 7 | 6 | 6 | 5 | 4 | 7 | 6 |
| Soccer | 32 | 36 | 32 | 31 | 29 | 29 | 29 | 30 | 29 | 35 | 33 |
| Softball | 24 | 19 | 23 | 23 | 27 | 24 | 26 | 21 | 21 | 25 | 25 |
| Swimming and Diving | 27 | 27 | 35 | 34 | 34 | 37 | 41 | 38 | 39 | 40 | 32 |
| Stunt | - | - | - | - | - | - | - | - | - | 45 | 56 |
| Tennis | 9 | 12 | 12 | 8 | 9 | 11 | 10 | 9 | 12 | 9 | 10 |
| Indoor Track | 31 | 36 | 42 | 37 | 37 | 29 | 42 | 54 | 53 | 58 | 54 |
| Outdoor Track | 31 | 36 | 42 | 37 | 37 | 29 | 42 | 54 | 54 | 58 | 51 |
| Volleyball | 15 | 16 | 15 | 13 | 14 | 19 | 16 | 16 | 16 | 16 | 15 |
| **TOTAL** | **229** | **238** | **259** | **250** | **251** | **238** | **273** | **291** | **298** | **358** | **347** |

16. Defendant has failed to meet its burden at trial to demonstrate that UK has a history of growth and constant expansion of athletic opportunities for female students. A few years

25

of consistent growth in light of the fifty years UK has had to grow its women's programs is not sufficient to prove Prong Two compliance.

17. Rather, the University experienced random years of growth in women's participation opportunities, while the percentage of women making up UK's undergraduate enrollment consistently increased. Moreover, before the addition of women's varsity stunt, the participation gap for women continuously hovered around 12% to 13%. UK has not met its burden to prove a continuous practice of expansion.

**D.     University of Kentucky fails Prong Three of the Three-Part Test because it is not fully and effectively accommodating the athletic interest and ability of female students.**

i.   University of Kentucky cannot solely rely on the results of a survey to deny women participation opportunities, especially when the school is distorting the information it receives from the survey and has received repeated requests from female students to add varsity participation opportunities.

To satisfy Prong Three "an institution must effectively accommodate the interests of both sexes in both the selection of the sports and the levels of competition, to the extent necessary to provide equal athletic opportunity." *Horner*, 43 F.3d at 273. "Subsection (3) 'sets a high standard: it demands not merely some accommodation, but full and effective accommodation. If there is sufficient interest and ability among members of the statistically underrepresented gender, not slaked by existing programs, an institution necessarily fails this prong of the test.'" *Id.* at 275 (internal citations omitted). "Thus, if female students are statistically underrepresented in athletics, their interests must be fully accommodated unless the institution in question can satisfy its burden of demonstrating a history and continuing practice of program expansion." *Id.*

The evidence proves that while Kentucky conducts a sports interest survey, the school is not meeting the expressed interest and ability of the female students. First, it is important to note that a survey cannot be the exclusive method for determining whether an institution is in

26

compliance with prong three. *See* Office of Civil Rights, U.S. DOE, Dear Colleague Letter (April 20, 2010). Additionally, the methods of assessing interest and ability must be "responsive to the expressed interest of [female] students capable of intercollegiate competition." 44 Fed. Reg. at 71,417. Notably, non-responses to surveys are not "evidence of lack of interest or ability in athletics. … regardless of whether students respond to a survey, …interest and abilities are assessed using the multiple indicators described above." 2010 Dear Colleague Letter.

Title IX assess the interests of the women by examining the following list of non-exhaustive indicators:

• requests by students and admitted students that a particular sport be added;

• requests for the elevation of an existing club sport to intercollegiate status;

• participation in club or intramural sports;

• interviews with students, admitted students, coaches, administrators and others regarding interests in particular sports;

• results of surveys or questionnaires of students and admitted students regarding interests in particular sports;

• participation in interscholastic sports by admitted students; and

• participation rates in sports in high schools, amateur athletic associations, and community sports leagues that operate in areas from which the institution draws its students.

Office of Civil Rights, U.S. DOE, *Dear Colleague Letter* (Apr. 20, 2010).

Title IX assess the abilities of women by looking at various indicators of ability such as:

• the athletic experience and accomplishments—in interscholastic, club or intramural competition—of underrepresented students and admitted students interested in playing the sport;

• opinions of coaches, administrators, and athletes at the institution regarding whether interested students and admitted students have the potential to sustain an intercollegiate team; and

• if the team has previously competed at the club or intramural level, whether the competitive experience of the team indicates that it has the potential to sustain an intercollegiate team.

Additionally, because OCR recognizes that students may have a broad range of athletic experiences and abilities, OCR also examines other indications of ability such as:

• participation in other sports, intercollegiate, interscholastic or otherwise, that may demonstrate skills or abilities that are fundamental to the particular sport being considered; and

• tryouts or other direct observations of participation in the particular sport in which there is interest.

*Id.*

Further, when looking at ability to play an intercollegiate sport,

neither a poor competitive record, nor the inability of interested students or admitted students to play at the same level of competition engaged in by the institution's other athletes, is conclusive evidence of lack of ability. For the purposes of assessing ability, it is sufficient that interested students and admitted students have the *potential* to sustain an intercollegiate team.

Office for Civil Rights, *United States Department of Education, Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test* (Jan. 15, 1996). Without the support of the entire college athletic department women do not have access to the resources that have made the men's varsity teams successful, and this reality should not be used against these women.

Lastly, when looking at adding women's varsity teams, it is necessary that the team is able to have an intercollegiate competition schedule that is similar to that of the other varsity sports offered by the institution. Title IX does not require colleges to field varsity teams that have no chance of being equal participation opportunities because competition does not exist for that sport.

*Id.*

      ii.    <u>Findings of fact proving the University of Kentucky is not fully and effectively accommodating its female students by its current offering of varsity sports.</u>

1. UK is home to many talented female students that have the interest and ability to be Division I varsity athletes. (J. Ex. 73). The Court had the opportunity to hear from just a few of these women, but it is not hard to understand that these three women are just a sampling of the students and potential students that UK is discriminating against.

2. Plaintiff Ala Hassan is a recently graduated UK student and current personal trainer at Proof Fitness and VFIT and a high school varsity lacrosse head coach. (ECF 148, PageID#2888). Ms. Hassan has lived in Kentucky her entire life. (ECF 148, PageID#2888).

3. Ms. Hassan graduated from UK in May of 2022 with a degree in kinesiology and health promotion. (ECF 148, PageID#2888).

4. Ms. Hassan loves sports, but her first love of sports came from playing lacrosse. (ECF 148, PageID#2891).

5. Prior to attending college, Ms. Hassan attended Tates Creek High School, where she participated in cross country and lacrosse for four years and archery for two. (ECF 148, PageID#2888–89). She is currently the varsity head coach of the women's lacrosse team at Tates Creek, her former high school. (ECF 148, PageID#2892).

6. During her time on the Tates Creek High School lacrosse team, she served as the team captain for two years, and was selected to play in the Commonwealth's all-star game at the end of the season during her senior year. (ECF 148, PageID#2889). The all-star game consists of the top three to four players from each team throughout the Commonwealth who come together for one big match and compete. (ECF 148, PageID#2889).

7. After high school, Ms. Hassan enrolled at Eastern Kentucky University to major in occupational therapy. (ECF 148, PageID#2889). While there, she participated in women's club rugby in the fall of 2019. (ECF 148, PageID#2889).

8. She wished to start a lacrosse program at Eastern Kentucky University, but COVID-19 had other plans in the spring of 2020. (ECF 148, PageID#2889).

9. Ms. Hassan transferred to UK in the spring of 2020. There, she tried out for the club lacrosse team, and earned her spot on the team. (ECF 148, PageID#2892).

10. After a successful season on the team, Ms. Hassan did not make the team her junior year despite being one of the best on the team. (ECF 148, PageID#2895).

11. Throughout her four years at UK, Ms. Hassan officiated, and still officiates to this day, high school and middle school lacrosse matches in the Commonwealth. (ECF 148, PageID#2895).

12. Ms. Hassan has great passion for the sport of lacrosse—as a player, a coach, and a referee. Her accolades show that.

13. Ms. Hassan had the interest to compete in Division I lacrosse at UK. (ECF 148, PageID#2897).

14. Ms. Hassan had the ability to compete in Division I lacrosse at UK. (ECF 148, PageID#2892).

15. Plaintiff Elizabeth Niblock is also a former student at UK. Ms. Niblock currently resides in Chicago and works as a CPA for a public accounting firm. (ECF 149, PageID#2928).

16. Ms. Niblock grew up in Louisville and attended Sacred Heart Academy for high school. She was a two-sport athlete, participating in field hockey and lacrosse in addition to a two week gander at cross-country. (ECF 149, PageID#2929).

17. Lacrosse was Ms. Niblock's passion. She started playing eighth grade. (ECF 149, PageID#2941). Her passion carried her to impressive accolades: she was an All-American her senior year of high school, All-State her junior and senior years, the Kentucky Attack Player of the Year, and led the Commonwealth in assists and other records. She was also the captain of her team. (ECF 149, PageID#2930). During high school, Ms. Niblock participated on an elite travel team in Louisville, in addition to her high school playing career. (ECF 149, PageID#2941).

18. Ms. Niblock's impressive high school tenure caused her to be recruited by five to ten Division I school across the country. (ECF 149, PageID#2931). Ultimately, Ms. Niblock landed at Furman University in South Carolina, where she was on a scholarship to play lacrosse at the Division I level. (ECF 149, PageID#2930).

19. During her first semester at Furman University, Ms. Niblock participated in varsity lacrosse competitions in South Carolina and North Carolina. (ECF 149, PageID#2931).

20. However, Ms. Niblock wanted to be closer to her home in Kentucky, so she applied to UK. (ECF 149, PageID#2932).

21. Ms. Niblock joined UK in the spring of her freshman year. (ECF 149, PageID#2935). She knew there was a lacrosse club team, so she reached out to the club president. However, tryouts had already occurred, and Ms. Niblock had no way of joining the team. (ECF 149, PageID#2934).

22. In lieu of joining the team, Ms. Niblock became an official and started refereeing lacrosse matches at the high school and college levels. (ECF 149, PageID#2938).

23. Ultimately, Ms. Niblock did not try out for the club lacrosse team because it was a student run club team that lacked support, structure, and regimen. (ECF 149, PageID#2948). She was a Division I player and she thrived on that level of play. (ECF 149, PageID#2948).

24. Ms. Niblock had the interest to compete in Division I lacrosse at UK.

25. Ms. Niblock had the ability to compete in Division I lacrosse at UK.

26. Class member Georgia Murray is a Kentucky native and current student entering her senior year at the UK. (ECF 149, PageID#2967). Ms. Murray is working toward a degree in biomedical engineering, with a minor in computer science. (ECF 149, PageID#2968).

27. Equestrian, specifically hunt seat equestrian is Ms. Murray's passion. (ECF 149, PageID#2969). She began her career at four years old. (ECF 149, PageID#2970).

28. Ms. Murray graduated from Ryle High School in 2020. (ECF 149, PageID#2968). While the high school did not have a school-sponsored equestrian team, Ms. Murray competed at the highest levels around the country during her high school years. (ECF 149, PageID#2972).

29. She competed in the Big Equitation—the highest level of national competition for riders under eighteen. (ECF 149, PageID#2972).

30. Ms. Murray was the Kentucky champion rider from 2017 to 2019 in the fifteen year-old age group. (ECF 149, PageID#2974). She also went to the National Collegiate Equestrian Association Midwest junior hunter finals where she placed third in the country. (ECF 149, PageID#2974).

31. During that same timeframe, Ms. Murray competed at the ASPCA Maclay finals in 2019— the most prestigious equitation finals riders can get an opportunity to compete in. (ECF 149, PageID#2974).

32. After high school, Oklahoma State, a Division I program, sought to recruit Ms. Murray. (ECF 149, PageID#2976). Unfortunately, they did not have a biomedical engineering major, which removed the school from consideration. Further, UK offered Ms. Murray a great academic scholarship, making UK the most financially feasible university for her to attend. (ECF 149, PageID#2968–69).

33. During her time at UK, Ms. Murray has competed in club team competitions for hunt seat.

34. Currently, she is the president of the hunt seat club team, and she was secretary for the group last year. (ECF 149, PageID#2978).

35. Ms. Murray has the interest to compete in Division I hunt seat equestrian at UK.

36. Ms. Murray has the ability to compete in Division I hunt seat equestrian at UK.

37. UK has many student-run club sport teams, generally around forty-five. (J. Ex. 81); (ECF 150, PageID#3459–60). UK's club teams compete against other colleges club teams and also have club national championships. (*See, e.g.*, ECF 149, PageID#2998).

38. UK has had women's club field hockey, lacrosse, and equestrian teams since at least 2004. (D. Ex. 2); (J. Ex. 81, 82). The club equestrian team split into two teams, hunt seat and equestrian in the 2014-15 academic year. (ECF 150, PageID#3466).

39. The only support UK offers to these club teams is the software students use to provide the necessary documents to the university to start a club team and provide a list of student participants and liability waivers; the ability to reserve the university's recreational facilities if they are available, and a small grant of approximately $500 to $1000 dollars to the club team. (ECF 150, PageID#3461–62).

40. UK does not provide its club teams with coaches, uniforms, nutrition support, academic support, medical and training benefits, university run publicity, proactive tracking of

competition results, financial aid, referees, scheduling for practices and competitions, travel accommodations to other colleges for competitions, or most of the benefits provided to varsity student-athletes. (ECF 150, PageID#3461–65).

41. Most of the club teams have to charge members to participate in the sport and the university does not regulate how much the dues are for students. (ECF 150, PageID#3463). For example, the members of the women's equestrian club team paid $650 a semester last year just to be able to participate on the team and the students had to fundraise as well to be able to afford to participate in the sport they love. (ECF 149, PageID#2879–80).

42. Despite this lack of support and structure, the women's club teams have no shortage of women who want to play (or ride). For example, last year the hunt seat equestrian club team at UK had ninety students try out for approximately twenty open spots on the team. (ECF 149, PageID#3015).

43. In 2019-20, the women's club field hockey team had twenty-two participants, the women's club lacrosse team had twenty-six participants, the club equestrian and western teams had thirty-six and twenty-seven participants respectively, and the club stunt team had seven participants. (D. Ex. 2). In 2020-21, field hockey was cancelled due to Covid; the lacrosse team had twenty participants, the equestrian and western teams had thirty and twenty-eight participants respectively, and the club stunt team had seventeen participants. (J. Ex. 82). UK did not track the number of participants on its club teams in 2021-22, but the total number of students participating in club sports increased from 889 in 2020-21 to 1,913 in 2021-22. (J. Ex. 81, 82). The hunt seat club team is a championship team. (ECF 149, PageID#2991).

44. No one in the athletic department has ever gone to watch the women's club field hockey, equestrian, western, or lacrosse teams' practices or competitions to assess ability, nor has athletic administration asked others to do so. (ECF 148, PageID#2770–72); (ECF 149, PageID#3128, 3134–35) (ECF 150, PageID#3449).

45. The student's consistent participation in these club sports and the fact that UK's club teams, like equestrian, continue to make it to the club national championships year after year, is a strong indicator of interest and ability to play the sport.

46. Instead of using multiple indicators to assess interest and ability as it should, UK relies almost exclusively on a survey.

47. UK has administered an athletic interest and ability survey to its students in some fashion almost every year since 2006. (J. Ex. 1, 2, 4, 7, 9, 10, 43, 44, 45, 63, 66, 72, 76, 80).

48. From 2006 to 2015, UK only administered its survey to incoming freshman. (ECF 149, PageID#3159). While not as relevant as more recent data, even these surveys showed the athletic department that the University consistently had a significant number of women just in the incoming freshman class that had the interest and ability to participate in varsity equestrian, field hockey, and lacrosse. (J. Ex. 10).

49. Ms. Bell admitted that since 2017, UK has done nothing to survey the interest and ability of incoming or admitted students. (ECF 149, PageID#149).

50. Ms. Bell admitted that she has not reviewed high school athletic participation data, which would demonstrate women's athletic interest, in three or four years. (ECF 149, PageID#3116).

51. In 2017, UK created a Sport Review Committee whose purpose was supposed to be to review information to determine if the University should expand women's varsity

participation opportunities. (ECF 149, PageID#3080). However, over the past six years the committee has not been provided with all of the data that it should have to be able to truly assess the interest and ability of female students.

52. In 2017, UK also developed a new interest and ability survey. (Pl. Ex. 57) (ECF 150, PageID#3427) (J. Ex. 1, 10).

53. The new survey was first administered in spring 2018 and the core content and logic flow of the survey has not changed significantly since 2018. (ECF 150, PageID#3523). The only substantive change since 2018, is the addition of a couple new varsity sport options, such as stunt and women's wrestling. (ECF 150, PageID#3523).

54. Ms. Bell admitted that UK does not have a written policy or any type of communication that informs students how to request that the university add a women's varsity sport. (ECF 149, PageID#3076–8080); (ECF 150, PageID#3460).

55. The Sport Review Committee improperly relies almost exclusively on the results of the interest and ability survey when deciding if there is sufficient interest and ability to add a new women's varsity sport. (J. Exs. 53, 55, 56); (D. Ex. 9). The notes from every committee meeting since 2018 clearly state that the reason women's varsity teams were not added was because the results of the survey did not indicate enough interest and ability. (*Id.*).

56. The deciding factor for adding women's varsity stunt in 2022 was the fact that in the 2021 survey nineteen women on the survey passed the interest and ability qualifiers in the survey metrics. (ECF 150, PageID#3379).

57. The varsity stunt team is quickly becoming a successful women's varsity team, but as Ms. Bell admitted the University was not able to sustain a varsity team field only from current UK students. (Def. Ex. 9) (ECF 149, PageID#3099–100). In fact, UK was able to recruit

twenty new women to the university to be part of the varsity stunt team, demonstrating that women will come to UK to play Division I sports if the opportunity is there. (ECF 149, PageID#3099–3102). Right now, only four Division I schools in the country sponsor varsity stunt teams. (ECF 149, PageID#3157).

58. In addition to students not fully understanding the purpose of the interest and ability survey until very recently and feeling rushed through the survey so that can register for classes, UK has created superficial measures of athletic ability. (ECF 148, PageID#2897–98); (ECF 149, PageID#2939). There are members of UK's current varsity teams, who obviously have the ability to play their sport, who cannot pass the survey's test for ability. (ECF 148, PageID#2802–2819).

59. AD Barnhart admitted that there is no list of accolades and credentials that define what type of player they are and there are student-athletes of varying skills levels on UK's varsity sports teams. (ECF 148, PageID#2815–16).

60. For example, for men's basketball the survey requires students to select that they were either recruited or competed for another Division I school for basketball and select at least two of the accomplishments from this list in order for the survey to indicate that they pass the criteria for able to play varsity:

☐    1st team All-State or All-American

☐    4 or 5 star recruit

**Display This Choice:**
 **If GENDER = F**

☐    Top 25-30 ranked in Hoop Gurlz or All-Star Girls Report

☐    High level of accolades from McDonald's All-American, Gatorade Player State

☐    Selected to tryouts for a USA basketball team

☐    Significant playing time on a top Elite Youth Basketball League, Nike team or
AAU team

☐    Other international equivalent, please list/describe:
 _____

(J. Exs. 74 (survey questions), 75 (survey flow with coding logic); (ECF 150, PageID#3534–35).

61. The athletic department maintains player bios for each of the varsity student-athletes on its website for information purposes, these bios are standardized and include information about the student's accomplishments in their sport before coming to UK. (ECF 148, PageID#2806–08) (Pl. Ex. 48).

62. These bios for the basketball team include the student's recruiting ranking if they have one, whether they were an All-State or All-American player, whether they were a member of the McDonald's All-American squad or the USA basketball team, as well as many other accomplishments. (Pl. Ex. 48).

63. A review of these bios quickly reveals that there are valued members of UK's basketball teams and very good basketball players that do not meet the arbitrary standards created by the athletic department to demonstrate they have the ability to play varsity basketball. (Pl. Ex. 48); (ECF 148, PageID#2803–2819).

64. The athletic department created the content of the survey, provided the list of "ability" criteria for each sport and dictate how the criteria should work in the coding logic of the survey or in other words what criteria must be selected for the survey to indicate the student has the ability to play at the varsity level. (ECF 150, PageID#3519–20, 3537).

65. While some sports have minimal criteria to demonstrate ability, such as football which only requires one box in the criteria to be checked; other sports, particularly women's sports, have very elaborate skill requirements to demonstrate ability. (J. Ex. 74, p. 25; J. Ex. 75).

66. For example, the criteria for lacrosse requires that in addition to being an All-American or internationally ranked, the student must also be able to run a 40-yard dash in under five second, run a mile in under 5 minutes and run two miles in under twelve minutes. (J. Ex. 74, p. 33–34; J. Ex. 75). The criteria for equestrian similarly requires being nationally or internationally ranked and be able to ride multiple horses at competition and jump fences over 3' 6". (J. Ex. 74, p. 19; J. Ex. 75).

67. In addition to being much more stringent than the requirements for some of the men's sports, these skills are not skills that are reasonable or required in these varsity sports. In lacrosse, players do not sprint a mile, instead it requires endurance to be able to stop and go the length of the field many times over. (ECF 149, PageID#2942–44, 2954). This is to say nothing of the fact that defenders and goalies in lacrosse need different skill sets, which are not reflected in the survey at all. (ECF 149, PageID#2954–55). For varsity equestrian women can ride either hunt seat or western style. These disciplines require different skill sets and most athletes at the varsity level specialize in one other. (ECF 149, PageID#2970–71, 2982–84). Women who compete in western style do not jump at all and have no reason to be able to jump over 3' 6". (ECF 149, PageID#2985, 3170–71).

68. UK's survey for these sports—which UK students have clearly expressed interest and ability in by requesting their sport be added as a varsity sport, competing in club sports, and participating in the sport before coming to UK—gives the athletic department exactly the result they were looking for, showing women do not have the ability to play.

69. Further, the athletic department only counts a student as having the ability to play if they respond "yes"—rather than "choose not to answer" or "no"—to questions asking if the student is willing to accept varsity requirements such as marketing and promotional activity commitments and adherence to a specific nutritional program. (J. Ex. 74). Unfortunately, UK does not provide the students with any type of explanation regarding these "requirements." (ECF 150, PageID#3503); (ECF 149, PageID#3172–75). Ms. Bell admitted that for some of these "requirements" the university could make exceptions. (ECF 149, PageID#3175). UK treats "choose not to answer" responses from a student as a no and as such deduces that the student does not have the interest and ability to play if they choose not to answer questions, even questions about social media monitoring. (ECF 149, PageID#3172).

70. The first question on the survey ask is whether the student has "a *serious* interest in competing in any sport at a varsity Division I level at UK." (J. Ex. 74, p. 1). If a student marks yes, they move on the next question. (J. Exs. 74, 75).

71. From this point the survey asks the student questions about the sport they indicated they are interested in playing. (ECF 150, PageID#3532–33) (J. Exs. 74, 75).

72. The next question asks students if they believe they have the ability to play the chosen sport at a Division I varsity level. (J. Exs. 74, 75). If the student does not respond "yes" they are

not able to see or respond to any of the questions regarding their objective ability to compete. (*Id.*).

73. For women's equestrian, field hockey, and lacrosse, the survey requires the student to have been recruited by or played at another Division I university as well as selecting a combination of both credentials and skills. (J. Exs. 74, 75). UK does not consider being recruited or playing at another Division I school demonstrative of the ability to play a sport.

74. If the student does not pass the entire credentials and accomplishments section they never see the questions regarding the additional requirements for student-athletes or playing without funding. (J. Exs. 74, 75).

75. AD Barnhart admitted that he would never prevent a coach from recruiting a student athlete to play at UK just because they were not recruited by other Division I schools. (ECF 148, PageID#2761).

76. A coaches' expertise is accessing athletic ability and recruiting those with the ability to play at the varsity level. (ECF 148, PageID#2765). If a coach has recruited a student to play a varsity sport, that student most certainly has the ability to play their sport.

77. Lastly, for women's equestrian, field hockey, and lacrosse the Sport Review committee only considers a student to have both the interest and ability to participate in a sport if they are willing to accept all of the additional requirements, play without funding, and leave their contact information on the survey.

78. Ms. Lacefield provides members on the Sport Review Committee from the university's research center with the complete output of every student's survey response. Those members then take that data and create a summary. (J. Ex. 10, 43, 44, 45, 63, 66, 72). The sport review committee and Ms. Bell could review the raw data if they wanted.

79. When the UK athletic department decided to add stunt to the survey as a possible varsity sport, they changed the criteria for a student to demonstrate ability. (ECF 150, PageID#3539–41); (J. Exs. 6, 8).

80. The athletic department removed the requirement that a student both be recruited by another Division I school (or competed at) and be able to perform selected skills for stunt. (ECF 150, PageID#3539–41); (J. Exs. 6, 8).

81. This change resulted in 39 of the 136 women who had interest in varsity stunt, being counted as having the ability to participate in varsity stunt. (J. Ex. 63) (ECF 150, PageID#3542–43). These women were then able to provide responses to the subsequent survey questions.

82. A deeper look at the students' responses to each individual question demonstrate those students that indicate they have a serious interest in participating in women's equestrian, field hockey, and lacrosse have similar if not higher levels of interest and ability as women's stunt. (J. Ex. 73). UK agreed that nineteen current students was enough unmet interest and ability to start a new women's varsity program, even though only four other Division I schools sponsor varsity stunt teams. (ECF 150, PageID#3379). UK's first two years of varsity stunt teams had 45 female participants. (D. Ex. 14).

83. For example, the detailed results of the 2022-23 interest and ability survey show (J. Ex. 73):

    a. 244 women were seriously interested in varsity equestrian and of those 44 women were either recruited/played at other Division I programs or could perform the skills—one of which is not a skill needed by any athlete that rides western

42

discipline—UK indicates are needed to demonstrate ability. The average size of a women's Division I varsity equestrian team is 40 women. (Pl. Ex. 27).

b.  60 women were seriously interested in varsity field hockey and of those 13 women were either recruited/played at other Division I programs or could perform the skills UK indicates are needed to demonstrate ability. The average size of a women's Division I varsity field hockey team is 25 women. (P. Ex. 55).

c.  136 women were seriously interest in varsity lacrosse and of those 19 women were either recruited/played at other Division I programs or could perform the skills UK indicates are needed to demonstrate ability. The average size of a women's Division I varsity lacrosse team is 35 women. (P. Ex. 55).

84. If 19 of a team of 45 women was sufficient unmet interest and ability among the female student for stunt, there is likewise interest and ability in equestrian, field hockey, and lacrosse that UK is not fully and effectively accommodating.

85. All of the sports that the women at UK and the plaintiffs in this case have been requesting to add since at least 2017 are played by colleges around the country, many of which already compete against other UK varsity sports. (P. Ex. 38); (J. Exs. 12–28). These sports are all played at the high school level, leaving no doubt that much like the varsity stunt team, UK will have no problem recruiting women to come to UK to receive a high quality education and top caliber athletic participation experience.

**E.     The cheer squad, dance team, and women's junior varsity soccer team are not varsity sports under Title IX.**

   i.   <u>Title IX requires participation opportunities to be sports, not merely activities requiring athleticism.</u>

Genuine athletic participation must be real, not illusory, and must take place in the context of a sport. *See Biediger v. Quinnipiac Univ.*, 728 F. Supp. 2d 62, 89 (D. Conn. 2010), *aff'd*, 691

F.3d 85 (2d Cir. 2012) ("[F]or an athletic participation opportunity to be counted in the substantial proportionality analysis, that participation opportunity must take place in the context of an intercollegiate varsity 'sport.'"). If the sport is recognized by an intercollegiate athletic organization, such as "sport" or "emerging sport" through the NCAA, a presumption exists in counting that team for Title IX purposes. *See Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 103 (2d Cir. 2012).

In the absence of this presumption, the OCR considers several factors to determine if an activity is a "sport":

I. Program Structure and Administration:

(A) Whether the operating budget, support services (including academic, sports medicine and strength and conditioning support) and coaching staff are administered by the athletics department or another entity, and are provided in a manner consistent with established varsity sports; and

(B) Whether the participants in the activity are eligible to receive athletic scholarships and athletic awards (e.g., varsity awards) if available to athletes in established varsity sports; to the extent that an institution recruits participants in its athletics program, whether participants in the activity are recruited in a manner consistent with established varsity sports.

II. Team Preparation and Competition: ....

(A) Whether the practice opportunities (e.g., number, length and quality) are available in a manner consistent with established varsity sports in the institution's athletics program; and

(B) Whether the regular season competitive opportunities differ quantitatively and/or qualitatively from established varsity sports; whether the team competes against intercollegiate or interscholastic varsity opponents in a manner consistent with established varsity sports;

When analyzing this factor, the following may be taken into consideration:

1. Whether the number of competitions and length of play are predetermined by a governing athletics organization, an athletic conference, or a consortium of institutions;

2. Whether the competitive schedule reflects the abilities of the team; and

3. Whether the activity has a defined season; whether the season is determined by a governing athletics organization, an athletic conference, or a consortium.

(C) If pre-season and/or post-season competition exists for the activity, whether the activity provides an opportunity for student athletes to engage in the pre-season and/or post-season competition in a manner consistent with established varsity sports; for example, whether state, national and/or conference championships exist for the activity; and

(D) Whether the primary purpose of the activity is to provide athletic competition at the intercollegiate or interscholastic varsity levels rather than to support or promote other athletic activities.

When analyzing this factor, the following may be taken into consideration:

1. Whether the activity is governed by a specific set of rules of play adopted by a state, national, or conference organization and/or consistent with established varsity sports, which include objective, standardized criteria by which competition must be judged;

2. Whether resources for the activity (e.g., practice and competition schedules, coaching staff) are based on the competitive needs of the team;

3. If post-season competition opportunities are available, whether participation in post-season competition is dependent on or related to regular season results in a manner consistent with established varsity sports; and

4. Whether the selection of teams/participants is based on factors related primarily to athletic ability.

*Biediger*, 728 F. Supp. 2d at 90–91 (citing Letter from Stephanie Monroe, Assistant Secretary for Civil Rights of the Department of Education (Sept. 17, 2008)).

Courts around the country that have considered the issue of whether spirit teams can be counted as a sport for purposes of Title IX compliance have considered the factors outlined by the OCR: structure, administration, team preparation, and competition. Based on these factors, cheerleading and dance programs have several factors that sufficiently distinguish them from traditional varsity sports. For example, in *Biediger*, the Second Circuit identified several circumstances distinguishing cheerleading from traditional varsity sports, including a lack of a uniform set of rules applied in competition, intercollegiate varsity competition, or a progressive playoff system leading to a championship. 691 F.3d at 103–5. As the party with the burden of proof, UK must offer "authority for counting participants in spirit teams as part of the total number

45

of athletic participants in assessing proportionality under Title IX." *Wieker v. Mesa County Valley School District #51*, No. 05-806, 2007 WL 595629, at *5 (D. Colo. Feb. 21, 2007). Because cheerleading and dance teams do not compete in circumstances indicative of varsity sports or give women genuine participation opportunities in a varsity sport, the participants cannot be counted for Title IX purposes.

Courts that have considered whether other activities qualify as a varsity sport under Title IX also examined the OCR's factors of structure, administration, team preparation, and competition. In *Navarro v. Florida Institute of Technology, Inc.*, the court examined whether the school's electronic sports ("esports") program could be counted as a sport for Title IX compliance purposes. No. 6:22-1950, 2023 WL 2078264, at *5 (M.D. Fla. Feb. 17, 2023).[4] After determining that esports were not presumed to qualify as a sport under Title IX, the court considered OCR's factors. *Id.* The court concluded that esports did not provide genuine participation opportunities under Title IX because the esports program did not require athletic ability, did not have a uniform game, did not have regulated rules, did not conduct off-campus recruitment, and did not compete in a progressive playoff system. *Id.*

While different from the cheer and dance squads, junior varsity teams similarly are not afforded the presumption of counting as sport under Title IX. *See Biediger*, 691 F.3d 85 at 103. In *Cohen v. Brown University*, the district court held, and the First Circuit agreed, that "positions on junior varsity squads do not qualify as 'intercollegiate competition' opportunities under the Policy Interpretation and should not be included in defendants' plan [because] 'intercollegiate teams' are those that 'regularly participate in *varsity* competition.'" 101 F.3d 155, 186 (1st Cir. 1996)

---

[4] "Esports describes the genre of competitive, organized video gaming." *Navarro*, 2023 WL 2078264, at *5.

(emphasis added). Further, "the quality of competition afforded to male and female athletes is an important factor in evaluating whether a university satisfies these requirements of Title IX." *Ohlensehlen v. Univ. of Iowa*, 509 F. Supp. 3d 1085, 1099 (S.D. Iowa 2020).

> i. <u>Findings of fact proving UK cannot count its cheer, dance, and women's junior varsity soccer team as varsity sports under Title IX.</u>

1. Cheer and Dance are not sponsored by the NCAA. (ECF 150, PageID#3418); (P. Ex. 55, pp. 79–88 (listing all NCAA sponsored sports for 2017-18 to 2021-22).

2. Junior varsity soccer is not sponsored by the NCAA. (P. Ex. 33); (P. Ex. 55, pp. 79–88 (listing all NCAA sponsored sports for 2017-18 to 2021-22).

3. UK athletics has five principals that guide its varsity sport programs and culture. (ECF 148, PageID#2734). The UK's athletic department revolves around the five principles. (ECF 148, PageID#2731).

4. One of those five principles is "competitive hearts." (ECF 148, PageID#2735–36).

5. The competition component of sports is very important to the athletic department. (ECF 148, PageID#2747). AD Barnhart admitted that competing is "what we do. There's no need to have athletics if you're not going to compete." (*Id.*).

6. Ms. Bell admitted that varsity team schedules are always on the athletic department's website. (ECF 150, PageID# 3385).

> Q. Do you normally allow the members of the team to decide whether or not they have a presence on the Athletic Department website?
>
> A. If they have an opinion. The varsity schedules are always there. That's traditionally been what's on the website.

(ECF 150, PageID# 3385).

7. Notably missing from these varsity competition schedules are cheer, dance, and junior varsity soccer. (P. Ex. 38); (ECF 50, PageID# 3385, 3393).

8. In 2019-20, the athletic department began providing some support to the cheer and dance ("pom") squads. (ECF 149, PageID#3070).

9. The cheer and dance squads existed at UK long before 2019-20. (ECF 149, 3070).

10. Ms. Bell admitted that the cheer and dance squads do not compete in a regular competition season. (ECF 150, PageID#3393, 3397).

11. Instead, both the cheer and dance squads only compete in one competition each year, which is the national championship run by one of the governing bodies of college cheer in the United States, U.S.A. Cheer. (ECF 150, PageID#3418).

12. Because there is no regular competition season, the dance squad has to submit a video to U.S.A. Cheer to be selected to compete in the one yearly competition for dance. (ECF 150, PageID#3393).

13. The fact that the national championship spans multiple days does not change the fact that it is only one competition, with only one winner at the end. (ECF 150, PageID#3394, 3397).

14. The dance squad's primary public facing time is performing during halftime for other varsity sports—not competing. (ECF 150, PageID#3394).

15. Similarly, the cheer team competes in only one competition during the season, a national championship. (ECF 150, PageID#3397).

16. The cheer squad's primary public facing time is "supporting" other UK varsity teams doing sideline cheer. (ECF 150, PageID#3397).

17. Ms. Bell admitted that no other varsity sports at UK participate in only one competition per season. (ECF 150, PageID#3398).

18. Every other varsity sport at UK has the opportunity to compete in both a conference and national championship if they perform well enough during the regular season to qualify for those competitions. (P. Ex. 38).

19. Further, no other sports at UK perform their athletic activity during the halftime of another teams' competition, only cheer and dance. (ECF 150, PageID#3411). As AD Barnhart acknowledged, if your sport is not competing what is the point? While the cheer and dance squads do attend practices, the primary purpose of these activities is to support other varsity teams, and not to engage in a sport with regular competitions.

20. UK's primary argument for why it should be permitted to count cheer and dance as varsity sports is because the athletic department financially supports the squads and provides them with the same benefits—with the glaring exception of pre-season competition, regular season competition, and championships that a team qualifies for based on their performance during the regular season—as its other varsity teams. (ECF 150, PageID#3393).

21. Importantly, other than scholarships there is no evidence that UK financially supported cheer, dance, or junior varsity soccer in fiscal year 2019-20. (J. Ex. 41, all sport budgets from 2006-2021) *but see* (D. Ex. 3, 2019-21 Cheer and Dance scholarship roster).

22. While the cheer and dance squads do receive athletic scholarships, the amount is nominal compared to other UK varsity sports, both men's and women's teams, even excluding summer aid which is granted to varsity sports but not cheer and dance. (J. Exs. 41, 59); (P. Ex. 30).

23. For example, the men's basketball team for the 2022–23 season received $667,507 in athletic financial aid. (ECF 150, PageID#3402); (P. Ex. 30). The football team received

$4,010,637 in financial aid. (ECF 150, PageID#3404); (P. Ex. 30). Meanwhile, the twenty-one member women's gymnastics team received $599, 845 and the women's eleven member golf team received $300, 818. (ECF 150, PageID#3406–07); (P. Ex. 30) (D. Ex. 14).

24. Even taking the roster size into account, the numbers for cheer and dance financial aid are still nominal. Dance received $10,403 in financial aid for the 2022–23 season. (ECF 150, PageID#3404–29); (P. Ex. 30). The dance team had 48 participants on its roster in 2022-23. (D. Ex. 14).

25. Cheer received around $124,940 in total financial aid and had twenty-two women on the squad that year. (ECF 150, PageID#3405–06) (Pl. Ex. 30) (D. Ex. 14).

26. Moreover, because the NCAA does not govern these activities, there are no limits on the amount of financial aid UK could give to the cheer and dance squads like other sports, and instead UK voluntarily gives them substantially less than other sports. (ECF 150, PageID#3407–32).

27. The same disparity is reflected in overall budgets. The dance team's overall budget for 2022–23 was $177,950.04. Cheer's budget was about $494,000. (ECF 150, PageID#3409) (P. Ex. 30).

28. The cheer and dance team do not receive the same level of support and benefits from UK as other varsity sports.

29. The women's varsity tennis team, in 2022-23 had a budget of $ 1,099,023. (P. Ex. 30). Women's varsity soccer had a budget of $2,083,200.04. (P. Ex. 30). UK even provided the marching band, which is not a sport, with a budget of $412,672.00 (P. Ex. 30); (ECF 150, PageID#3398).

30. The women on the junior varsity soccer team are not eligible for scholarships. (ECF 149, PageID#3106).

31. UK does not sponsor any men's junior varsity teams that would be competing at a comparable lower level as the women's junior varsity soccer team. (ECF 150, PageID#3387).

32. The purpose of the women's junior varsity soccer team is to act as a development team for the women's varsity team. (ECF 150, PageID#3388). None of the member of the junior varsity women's soccer team have moved up to the varsity team since its inception in 2020-21. (ECF 150, PageID#3390).

33. The women on the junior varsity team are not eligible to participate in any championship games. (ECF 149, PageID#3104.) They do not compete against any of the SEC teams that the varsity team does. (*Id.* PageID#3105). They are not always coached by the head coach like the varsity team. In 2021-22 the team was "coached by the volunteer coach" and in 2023-24 "it will be coached by two assistants." (ECF 149, PageID#3103). These critical differences prove the women's junior varsity soccer team does not provide varsity participation opportunities pursuant to Title IX.

34. These critical differences prove the cheer and dance squads and the women's junior varsity soccer team do not provide varsity participation opportunities pursuant to Title IX.

## **CONCLUSION**

Plaintiffs have proven that Kentucky has been denying women equal opportunities for participation in sports in violation of Title IX. This Court should grant Plaintiffs permanent injunctive relief preventing further violation of the women's civil rights and order UK to elevate to varsity status those women's teams with interest and ability to play, namely lacrosse, field

hockey, and/or equestrian. The Court should further order UK to undergo a full Title IX compliance review with neutral third-party, create a gender equity compliance plan, and implement said plan with the Court overseeing implementation of the plan and Title IX compliance for at least five years.

Respectfully Submitted,

_/s/Lori A. Bullock_____
Lori Bullock, *Pro Hac Vice*, AT0012240
lbullock@baileyglasser.com
Bailey & Glasser, L.L.P.
309 E 5th Street, Suite 202B
Des Moines, Iowa 50309
Telephone: 515-416-9051

NEWKIRK ZWAGERMAN PLC
Jill Zwagerman, *Pro Hac Vice*, AT0000324
jzwagerman@newkirklaw.com
521 E. Locust Street, Suite 300
Des Moines, IA  50309
Telephone:  515-883-2000
Fax:  515-883-2004

GATLIN VOELKER, PLLC
Barbara Bonar
bbonar@gatlinvoelker.com
50 E Rivercenter Boulevard, Suite 1275
Covington, Kentucky 41011
Office: (859) 781-9100

ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on October 14, 2023, a true copy of this document was delivered electronically using the CM/ECF system to all counsel of record.

<u>*/s/ Lori A. Bullock*</u>
Lori Bullock