UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON
CIVIL ACTION NO. 5:19-CV-00394-KKC
*-Electronically filed-*

ELIZABETH NIBLOCK and ALA HASSAN, Individually
and on behalf of all those similarly situated                                    **PLAINTIFFS**

v.          **THE UNIVERSITY OF KENTUCKY'S RESPONSE TO
PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

UNIVERSITY OF KENTUCKY, MITCH
BARNHART and ELI CAPILOUTO                                    **DEFENDANTS**

***** ***** *****

The University of Kentucky complies with Title IX. The University has built one of the premier women's athletic programs in the Country—not by focusing on quotas or technicalities— but by investing in and genuinely supporting its women athletes. That commitment was demonstrated at trial. Following trial, the University of Kentucky tendered proposed findings of fact and conclusions of law [DE 155], and now submits this response to the Plaintiff's proposed findings [DE 156], consistent with the Court's Order [DE 146].

**Introduction**

Title IX provides, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]"[1] The 1975 regulations implementing Title IX also prohibit, on the basis of sex, discrimination "in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient."[2] The 1975 Regulation provides a non-exhaustive list of ten factors to consider whether equal athletic opportunities are available

---

[1]      20 U.S.C. § 1681(a).
[2]      34 CFR 106.41(a).

1

to male and female students. Although *one* of those ten factors is "whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes," nothing in the regulatory text suggests this factor is determinative of compliance or this factor is more important than the other nine factors. Yet, the Department has issued non-binding guidance, and a series of non-binding reinterpretations, that emphasizes the first factor alone.

Under the Department of Education's 1979 Interpretation of the 1975 Regulation, the Department of Education opines an institution must do one of three things to comply with Title IX in the context of athletics participation and considers:

1.      Whether the intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments.

2.      Where the members of one sex have been or are underrepresented among intercollegiate athletes and the participation opportunities are not substantially proportionate to the enrollment rates, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interests and abilities of that sex.

3.      Where the members of one sex have been underrepresented among intercollegiate athletes, the participation opportunities are not substantially proportionate to the enrollment rates, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of that sex have been fully and effectively accommodated by the present program.[3]

If any *one* of the three parts is satisfied, a university complies with Title IX.

The Plaintiffs' trial presentation focused on the first factor alone. The Plaintiffs presented no evidence relating to the other nine factors --that the University fails to provide its female athletes: (1) equipment and supplies; (2) scheduling of games and practice time; (3) travel and per diem allowance; (4) the opportunity to receive coaching and academic tutoring;  (5) assignment

---

[3] 1979 Interpretation. The 1979 Interpretation is not a regulation. While it was published in the Federal Register for notice and comment, the 1979 Interpretation is a "Policy Interpretation." It did not replace or revise the Department's 1975 Regulation, nor is it entitled to the same weight as a regulation.

and compensation of coaches and tutors; (6) locker rooms, practice, and competitive facilities; (7) medical and training facilities and services; (8) housing and dining facilities and services; and (9) publicity. On that basis alone, the Court should enter judgment for the University. Yet the University also satisfies the Three Prong test in the 1979 Interpretation of the 1975 Regulation.

## I.   The University of Kentucky satisfies Prong I.

Under Prong I, the Court considers whether the intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments.[4] The burden of proving statistical disparity rests "squarely on the shoulders of the plaintiffs."[5] Under the 1996 Reinterpretation of the 1979 Interpretation, opportunities are substantially proportionate:

> when the number of opportunities that would be required to achieve proportionality would not be sufficient to sustain a viable team, i.e., a team for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team. As a frame of reference in assessing this situation, OCR may consider the average size of teams offered for the underrepresented sex, a number which would vary by institution.[6]

While there is no "magic number at which substantial proportionality is achieved,"[7] and "courts have not precisely determined how great the deviation need be before the ratios are no longer 'substantially proportionate,'" courts have coalesced on a few guideposts:

> When the female-to-male ratio in an athletics program deviates from the ratio in the student body by 10 or more percentage points, the two ratios are very rarely substantially proportionate. *See Pederson v. La. State Univ.*, 213 F.3d 858, 878–79 (5th Cir. 2000) (20% is unacceptable); *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 829–30 (10th Cir. 1993) (10.5% is unacceptable); *Cohen v. Brown Univ.*, 991 F.2d 888, 892, 903 (1st Cir. 1993) (11.4% is unacceptable). At the other end of the spectrum, a deviation of less than 3.5 percentage points typically keeps the ratios substantially proportionate. *See Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 109–10 (4th Cir. 2011) (less than 3% is acceptable); *Miami Univ.*

---

[4]   1979 Interpretation.
[5]   *Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 277 (6th Cir. 1994).
[6]   *Balow v. Michigan State Univ.*, 24 F.4th 1051, 1060 (6th Cir.).
[7]   Equity In Athletics, Inc. v. Dep't of Educ., 639 F.3d 91, 110 (4th Cir. 2011).

*Wrestling Club v. Miami Univ.*, 302 F.3d 608, 611, 615–16 (6th Cir.2002) (less than 2% is acceptable); *Boulahanis v. Bd. of Regents*, 198 F.3d 633, 636, 638–39 (7th Cir.1999) (less than 3.43% is acceptable). In between, things are less clear. *Compare Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 856–57 (9th Cir. 2014) (6.7% deviation is unacceptable), *and Biediger*, 691 F.3d at 105–08 (3.62% deviation is unacceptable), *with Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 765 (9th Cir. 1999) (discussing a case where the court permitted the entry of a consent decree where the university agreed to keep the deviation below 5%).[8]

Despite these guideposts, in *Balow v. Michigan State*, the court explained that while "the percentage gap may be relevant, substantial proportionality should be determined by looking at the gap in numerical terms, not as a percentage."[9]

For the 2022-23 academic year, the University had a total undergraduate student enrollment of 19,829.[10] Of that total, the female undergraduate student enrollment was 57.76%.[11] For the 2022-23 year, the University had 770 intercollegiate athletic participation opportunities.[12] Of those, 420 (54.55%) were allocated to females and 350 (45.45%) were allocated to males.[13] To achieve perfect proportionality would require that the University allocate an additional 3.21% of athletic participation opportunities to females, who are the majority sex at the University. But "[e]xact proportionality is not required."[14] Instead, "[s]ubstantial proportionality provides a safe harbor for recipients of federal funds."[15] It is the Plaintiffs' burden to establish that the University does not provide intercollegiate level participation opportunities for male and female students in numbers substantially proportionate to their respective enrollment.[16] For the reasons below, the

---

[8]   *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 976 (D. Minn. 2016).
[9]   *Balow v. Michigan State Univ.*, 24 F.4th 1051, 1059 (6th Cir.).
[10]  Joint Exhibit 83, at 1.
[11]  *Id*. That means the male undergraduate student enrollment was 42.24%.
[12]  *Id*.
[13]  *Id*.
[14]  Ollier v. Sweetwater Union High Sch. Dist., 768 F.3d 843, 856 (9th Cir. 2014).
[15]  *Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 275 (6th Cir. 1994) (citing *Roberts v. Colorado State Bd. of Agric.*, 998 F.2d 824, 901 (10th Cir. 1993)).
[16]  Plaintiffs' Proposed Findings, at 7 (quoting *Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 275 (6th Cir. 1994) ("The plaintiffs bear the burden of proof on subsection (1)[.]").

Plaintiffs have failed to prove that a 3.21% gap in female and male intercollegiate athletics participation is not substantially proportionate.

### A. The participants on the JV soccer, cheer, and dance teams count as participation opportunities under Prong I.

Before the Court may determine substantial proportionality under Prong I, it must determine whether to include the athletic opportunities provided by participation on the Cheer, Dance, and junior varsity ("JV") soccer teams. The Plaintiffs dispute that Cheer, Dance, and women's junior varsity soccer are intercollegiate sports under Title IX.[17] In its 1979 Interpretation of the 1975 Regulation, OCR defines participants as those athletes:

a. Who are receiving the institutionally-sponsored support normally provided to athletes competing at the institution involved, e.g., coaching, equipment, medical and training room services, on a regular basis during a sport's season; and

b. Who are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season; and

c. Who are listed on the eligibility or squad lists maintained for each sport, or

d. Who, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of athletic ability.

44 Fed. Reg. at 71415. OCR has explained that "[i]n determining participation opportunities, OCR includes, among others, those athletes who do not receive scholarships (e.g., walk-ons), those athletes who compete on teams sponsored by the institution even though the team may be required to raise some or all of its operating funds, and those athletes who practice but may not compete."[18]

**JV soccer**. "'Intercollegiate' refers to varsity and junior varsity teams, as opposed to club or intramural teams, which do not receive coaching or athletic scholarships and other benefits listed in the regulations."[19] The Plaintiffs claim that junior varsity participation opportunities "are not afforded the presumption of counting as sport under Title IX." Although the Plaintiffs rely on

---

[17] Plaintiff's Proposed Findings of Fact and Conclusions of Law, at 43 – 47.
[18] 1996 Guidance.
[19] *Mansourian v. Regents of Univ. of California*, 602 F.3d 957, 965 n.10 (9th Cir. 2010).

a case in which the court reflexively found that "positions on junior varsity squads do not qualify as 'intercollegiate competition,'"[20] OCR conducts a case-by-case evaluation of whether an activity can be counted as an intercollegiate or interscholastic sport for the purpose of Title IX compliance."[21]

OCR would count the junior varsity female soccer participants as athletic participation opportunities. The members receive coaching,[22] equipment,[23] and medical and training room services, as well as academic support.[24] They participate in organized practice sessions and other team meetings and activities on a regular basis during a sport's season. The women on the junior varsity team qualify to be on the varsity squad list and meet every requirement that every other player does.[25] Moreover, although OCR counts "those athletes who practice but may not compete,"[26] the members of the JV soccer team have competed against other varsity teams at smaller schools.[27] Although the members of the junior varsity team do not receive scholarships, that fact is not dispositive because not every varsity athlete is awarded a scholarship.[28] Thus, the junior varsity participation opportunities must be counted when evaluating Prong I.

**Cheer and Dance**. As the University explained in its Proposed Findings, participation on the co-ed cheerleading team qualifies as athletic participation opportunities under Title IX. "It is OCR's policy to encourage compliance with the Title IX athletics regulations in a flexible manner

---

[20]   Plaintiff's Proposed Findings of Fact and Conclusions of law, at p. 46.
[21]   2008 Guidance.
[22]   DE 150, at p. 2-177, l. 25 – p. 2-178, l. 16.
[23]   DE 150, at p. 2-178, ll. 17-19.
[24]   Defendant's Exhibit 9, at 1-2.
[25]   DE 150, at p. 2-178, l. 20 - p. 2-180, l. 15.
[26]   1996 Guidance.
[27]   DE 150, at p. 2-178, l. 20 - p. 2-180, l. 15.
[28]   *See*, *e.g.*, DE 148, at p. 1-66, ll. 12 ("A walk-on is simply a non-scholarship athlete."); DE 148, at p. 1-66, ll. 19 – 23 ("There's some sports that need additional roster spots for practice, so that's where walk-ons may fill in. Q. And like what sports are you talking about? A. Football is a big one. You may have some basketball that want some walk-ons. Track and field have a lot of walk-ons.").

that expands, rather than limits, student athletic opportunities."[29] In conducting a case-by-case evaluation of whether an activity can be counted as an intercollegiate or interscholastic sport for the purpose of *Title IX* compliance, OCR considers the program structure and administration and the team preparation and competition.[30]

Considering those factors, Cheer and Dance should be counted as an intercollegiate or interscholastic sport for the purpose of *Title IX* compliance. The operating budget, support services, and coaching staff are administered by the athletics department,[31] and are provided in a manner consistent with established varsity sports.[32] Participants in the activity are eligible to receive athletic scholarships and athletic awards.[33] Participants are recruited to the University, just as other athletes are recruited.[34] The "primary purpose" of both teams is to win the national championship—not provide support or promote other athletic activities.[35] Thus, the Court may count Cheer and Dance as intercollegiate sports for the purpose of *Title IX* compliance.[36]

### B.     The text of Section 1681(b) provides that the Court may rely on the population in Kentucky and Fayette County to assess substantial proportionality.

The Plaintiffs would like to cabin this Court's consideration of substantial proportionality to the undergraduate population alone. Although the Plaintiffs rely on the 1979 Policy Interpretation, the statutory text—which is always controlling—permits the Court to consider the state and local population. To explain, 20 U.S.C. § 1681(b) provides:

---

[29]    2008 Guidance.

[30]    2008 Guidance.

[31]    DE 149, at p. 2-145, ll. 13 – 16.

[32]    DE 150, at 3-35, ll. 3 – 10 ("[O]ur cheer team and dance team both receive the same benefits as our other teams.").

[33]    DE 150, at p. 3-24, ll. 4 – 17; *see also* Defendant's Ex. 3.

[34]    DE 150, at 3-41, ll. 22 – 3-42, l. 1.

[35]    DE 150, at p. 3-44, ll. 8 – 13 ("[T]hey [members of the Kentucky cheer team and Kentucky dance team] come to the University of Kentucky to be National Champions.").

[36]    To the extent the "quality of competition afforded to male and female athletes is an important factor in evaluating whether a university satisfies" the requirements of Title IX, as the Plaintiffs suggest, Proposed Findings at 47, at least in the Cheer context, the quality is the same. The team is co-ed. Thus, this factor further bolsters the University's position that Cheer may be counted as an athletic participation opportunity.

> Nothing contained in subsection (a) of this section shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area . . . .

Under § 1681(b), "*nothing* in subsection (a)"—the substantive provisions of Title IX that the 1979 Interpretation claims to interpret—shall require preferential or disparate treatment of one sex "in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area." The 1979 Interpretation, on the other hand, limits an assessment of "[w]hether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate *to their respective enrollments*."[37]

However, Congress commanded a different approach. First, Congress was clear that an imbalance between the sexes "in any community, State, section, or other area," cannot justify preferential or disparate treatment. Second, Congress did not limit the comparison only to a university population—but allows consideration of the "community, State, section, or other area" in which the University is situated. To the extent the 1979 Interpretation limits comparison of the proportion of females to the undergraduate population only, the 1979 Interpretation contradicts the explicit text of § 1681(b). Thus, consistent with the text of the statute, the Court may consider whether an imbalance exists as compared to the "community, State, section, or other area," including the population of Commonwealth of Kentucky and Fayette County. The Court may not, however, because of "an imbalance," "require [the University] to grant preferential or disparate treatment to the members of one sex."[38]

---

[37] 1979 Interpretation (emphasis added).
[38] § 1681(b).

The Plaintiffs argue that this "position is unsupported by the Policy Interpretation."  That is not the question. The question is whether the University's position is supported by the *statute*. As explained above, the statute is clear.

Alternatively, the Plaintiffs assert that other courts have "analyzed the statutory language ...in response to other challenges to the Policy Interpretation."[39] Yet the cases the Plaintiffs cite do not address the University's specific claim here—that the Court may rely on the population in Kentucky and Fayette County to assess substantial proportionality because the statute says it can. While in academic year 2022-23, 57.76% of the University's undergraduate student population was female, by contrast, data from the U.S. Census Bureau for 2022 indicates that only 50.3% of Kentucky's population is female. For Fayette County, where the University is located, 50.8% of the population is female. In academic year 2022-23, the University provided 54.55% of its athletic participation opportunities to females—a percentage that exceeds the percentage of females in the State and county.[40]

## II.      The University complies with Prong II.

Assuming the Court concludes the University does not comply with Prong I, then the University complies with Prong II.  Regardless of whether this Court considers JV soccer, cheer, and dance, the University has expanded participation opportunities for women. To explain, if JV soccer, cheer, and dance are excluded, then in the last decade the University has added 121 athletic opportunities for female students, a growth of 57%. Alternatively, if JV soccer, cheer, and dance are included (as this Court should), then the University has added 208 athletic opportunities for female students, a growth of 98%.

---

[39]      Plaintiffs' Proposed Findings, at 16.
[40]      Joint Exhibit 83, at 1. If the Court excludes Cheer, Dance, and JV soccer, there is a difference of only .16%, which is a difference of a little more than one athletic participation opportunity.

Even under the Plaintiff's proposed numbers, when an institution adds half of its number in a decade, it has to meet any definition of a history and continuing practice of program expansion. Compared to the increase in female undergraduate enrollment, the increase in athletic opportunities for females outpaced enrollment growth by either 2.5 times or 3 times the growth.[41] If ever an institution could show Prong II compliance, it is the University of Kentucky between 2012-2023.

Under Prong II, the Court considers, "[w]here the members of one sex have been or are underrepresented among intercollegiate athletes and the participation opportunities are not substantially proportionate to the enrollment rates, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interests and abilities of that sex."[42] In evaluating "history," the OCR looks at the institution's record for adding teams, the institution's record of increasing participants on existing teams, and the institution's response to requests to add teams. In assessing "continuing practice," the Department examines the institution's current policy for adding teams.[43] At Prong II, the University "is not required, as it is under part three, to accommodate all interests and abilities of the underrepresented sex," and "has flexibility in choosing which teams it adds for the underrepresented sex."[44]

---

[41]   Joint Exhibit 83. Including the JV soccer, cheer, and dance athletes: in 2012, the University provided 212 female and 354 male athletic opportunities while in 2023 UK provided 420 female and 350 male athletic opportunities. From 2012 to 2023 UK full-time undergraduate female enrollment increased by 13.8% (growing from 50.75% female to 57.76% female). Thus, UK athletics more than tripled that growth as the percentage of female UK athletic opportunities compared to males increased by 45.6% (growing from 37.46% female to 54.55% female). Excluding the jv soccer, cheer, and dance athletes: in 2012, UK provided 212 female and 354 male athletic opportunities and in 2023 UK provided 333 female and 328 male athletic opportunities. Again, in that time period, the University's full-time undergraduate female enrollment increased by 13.8% (growing from 50.75% female to 57.76% female). Thus, female athletic opportunities grew by 2-and-a-half times the enrollment rate as the percentage of female UK athletic opportunities compared to males increased by 34.5% (growing from 37.46% female to 50.38%).

[42] 1979 Interpretation. The 1979 Interpretation is not a regulation. While it was published in the Federal Register for notice and comment, the 1979 Interpretation is a "Policy Interpretation." It did not replace or revise the Department's 1975 Regulation, nor is it entitled to the same weight as a regulation.

[43]   U.S. Dep't of Educ., Office for Civil Rights, Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (Jan. 16, 1996) ("1996 Reinterpretation").

[44]   1996 Reinterpretation.

At trial, the University proved a history and continuing practice of program expansion for its female students that is demonstrably responsive to their developing interests and abilities. The history and continuing practice are addressed in turn below.

*History*. In assessing a university's history of program expansion, OCR has suggested that it considers "an institution's record of adding intercollegiate teams, or upgrading teams to intercollegiate status, for the underrepresented sex; an institution's record of increasing the numbers of participants in intercollegiate athletics who are members of the underrepresented sex; and an institution's affirmative responses to requests by students or others for addition or elevation of sports."[45] The University of Kentucky has a history of program expansion that is demonstrably responsive to the developing interests and abilities of its female students. That history is illustrated by its addition of a female junior varsity soccer team, the addition of varsity STUNT, and the addition of the equivalent of more than three female athletic teams. This program expansion was directly responsive to female student interest and abilities.

**STUNT**. In response to growing interest among female students and the emergence of the sport, the University added STUNT in 2021. STUNT has only existed for roughly ten years, was recently designated an emerging sport by the NCAA, and is offered at only four Division I schools.[46] STUNT existed at the University as a club team for roughly four years before it was elevated to a Division I sport.[47] The University's decision to add STUNT was demonstrably responsive to student requests from the University's club team to elevate the sport.[48] Female

---

[45]    1996 Guidance.
[46]    DE 149, at p. 2-232, ll. 4 – 20; *see also* Plaintiffs' Proposed Findings, at ¶ 57 ("Right now, only four Division I schools in the country sponsor varsity stunt teams.").
[47]    DE 149, at p. 2-232, ll. 4-6.
[48]    Defendant's Exhibit 10, at 14-15.

student interest and ability in the sport was confirmed in the University's 2021 interest and abilities survey.[49] On that basis, the University added STUNT.

**Junior varsity soccer**. The same is true for the University's decision to upgrade the level of competition for its female students interested in Division I soccer. In 2021, the University expanded the number of opportunities on the women's soccer team and played a junior varsity schedule in response to the level of interest and ability among the women's soccer club team participants. At trial, Sandy Bell testified that "there were some young women on the club team who requested more competition than what they were getting and asked if there would be an opportunity for them to play at a different level."[50] To accommodate that request, the University provided an upgraded level of competition by fielding a junior varsity soccer team. In doing so, the University provided additional intercollegiate athletic opportunities for a greater number of female students.

The Plaintiffs claim that "[a]pproximately twenty years ago women on the club lacrosse team at UK met with Athletic Director Mitch Barnhart about elevating their club sport to a varsity sport."[51] That claim is not consistent with the record established at trial. Director Barnhart testified that there were "a couple of student-athletes in the early 2000s from lacrosse that talked to me about just an informational piece on their sport."[52] There is no basis for the claim the University failed to act on a request to elevate lacrosse in 2003.

**Growth in female athletic opportunities**. Finally, the University's commitment to increasing female athletic participation opportunities is shown by the substantial growth in female

---

[49]   *See* University's Proposed Findings of Fact, at ¶ 63. The University's 2021 interest and ability survey results revealed 136 female students interested in STUNT. Of those, thirty-nine females self-identified as meeting the criteria to engage in the sport at the Division I level, thirty-one agreed to follow the relevant regulation criteria, and nineteen expressed interest regardless of whether they were eligible for or received a scholarship
[50]   DE 150, at p. 3-12, l. 18 – p. 3-13, l. 8.
[51]   Plaintiffs' Proposed Findings, at ¶ 12.
[52]   DE 148, at p. 1-84, ll. 15 – 21.

student athletes and the positive trajectory of the women's participation opportunities at the intercollegiate level. Even if the Court were to exclude from consideration the athletic participation opportunities that exist based on Cheer, Dance, and junior varsity soccer, since 2012 the University has added 121 athletic participation opportunities for its female students.[53] That is the equivalent of adding roughly three new women's teams since 2012,[54] and represents a greater than fifty-percent increase in athletic participation opportunities for females.

***Continuing Practice***. In assessing whether an institution has a continuing practice of program expansion that is demonstrably responsive to the developing interests and abilities of its female student, OCR considers "an institution's current implementation of a nondiscriminatory policy or procedure for requesting the addition of sports (including the elevation of club or intramural teams) and the effective communication of the policy or procedure to students; and an institution's current implementation of a plan of program expansion that is responsive to developing interests and abilities."[55]

As recounted in the University's Proposed Findings, the University uses and relies on a robust policy of assessing program expansion opportunities.[56] In making that assessment, the University conducts an annual interest and abilities survey; considers requests by students that a particular sport be added; considers requests for the elevation of existing club sports to intercollegiate status; monitors participation in club and intramural sports; and engages with students, coaches, administrators regarding interest in particular sports.[57] Moreover, any female

---

[53]   Considering the squad lists, the University has added 118 women's positions. Joint Exhibit 83, at 4. The Court, however, must consider the number of athletic opportunities added, which is 121.

[54]   Joint Exhibit 83, at 4. This calculation assumes the average women's roster at the University is thirty-two female student athletes. The University obtains this number by dividing the total number of female student athletes in 2022-23 (420) by the total number of women's teams at the University (thirteen).

[55]   1996 Guidance.

[56]   See University's Proposed Findings of Fact, at ¶ 55.

[57]   *Compare* University's Proposed Findings of Fact, at ¶ 55 *with* 2010 Guidance, at 4 (providing a non-exhaustive list of indicators assessed to evaluate interest).

undergraduate student who expresses the interest and ability to play an existing sport at the University is offered the opportunity to try out for that team.[58] The University's Sports Review committee meets annually to consider the results of the survey and developing interest and abilities among the University's students.[59]

In claiming the University is unable to satisfy Prong II, the Plaintiffs ignore the trial testimony and the guidance documents on which they claim to rely. For example, the Plaintiffs claim the University is unable to satisfy Prong II because "there are years where men's opportunities increased and women's opportunities decreased."[60] The Plaintiffs also argue that the University's "women's teams have had years of decreasing participation," which they claim rebuts the University's "assertion that it has a history and continued practice of program expansion."[61] The Plaintiffs even claim that the University experienced "random years of growth in women's participation opportunities, while the percentage of women making up UK's undergraduate enrollment consistently increased."[62] The Plaintiffs are incorrect.

First, nothing in Prong II, requires an institution to decrease the participation gap calculated under Prong I.[63] Instead, Prong II looks to whether an institution is *increasing* athletic opportunities. Presumably, an institution could expand opportunities for both men and women and meet Prong II.[64] Otherwise, Prong I non-compliance would always trump Prong II compliance.

---

[58] DE 149, p. 2-147, l. 17 – l. 22 (discussing the tryouts that are held when a student comes through the survey); *see also* Defendant's Exhibit 11 (including emails to students to offer tryouts following completion of the survey)
[59]   DE 149, at p. 2-155, l. 24 – p. 2-156, l. 4.
[60]   Plaintiffs' Proposed Findings, at ¶ 12.
[61]   Plaintiffs' Proposed Findings, at ¶ 15.
[62]   Plaintiffs' Proposed Findings, at ¶ 17.
[63]   If a decrease in the participation gap were sufficient to meet Prong II, then an institution could cut both men's opportunities and women's opportunities and achieve compliance with Prong II.  To illustrate, suppose that there are more men on the baseball team than there are women on the softball team. If an institution eliminated both men's baseball with women's softball team, it would eliminate more men's opportunities than women's opportunities and, thus, the participation gap would decrease.
[64]   For example, if an institution that did not have football were to add women's field hockey and women's lacrosse while also adding football, the institution would be expanding opportunities for women. However, because there are

Nothing in the statute, regulation, interpretation of the regulations, any re-interpretation of the interpretation, or any case ever gives this impression. Prong II is a separate and independent analysis from Prong I.

Second, the University's substantial growth in female athletic opportunities is the result of significant intentional planning.[65] Although there are many factors outside the University's control as it has sought to increase female participation opportunities,[66] the University focuses significant time and resources in assessing interest and abilities among its student population, adds or elevates teams when appropriate, and manages team rosters—all of which has helped to build one of the premier women's athletics programs.

Contrary to the Plaintiff's belief, there is no requirement that a university must demonstrate year-over-year growth in female athletic participation opportunities to satisfy Prong II. Indeed, if this were the case, then a slight dip in female participation due to one coach's decision to limit the roster would end a Prong II inquiry. No statute, regulation, or guidance document includes any such requirement. Moreover, the 1996 Reinterpretation refutes the Plaintiffs' claims. There, OCR counsels that "an institution that has eliminated some participation opportunities for the underrepresented sex can still meet part two if, overall, it can show a history and continuing practice of program expansion for that sex."[67] Instead, OCR "evaluate[s] the circumstances."[68] Thus, OCR recognizes that a university that has *chosen* to eliminate female athletic participation opportunities may still comply with Prong II.

---

more men on the football team than women on the field hockey and lacrosse teams, the participation gap between men and women would widen.

[65]    See University's Proposed Findings, at ¶ 53 – 59.

[66]    DE 149, at p. 2-144, ll. 14 – 19 ("So there are a lot of things that play into this, our efforts to get our women's numbers where we want them to be and percentages where we want to be, but there's also a lot of things that are just athletic -- normal athletic activities that are going on that do affect rosters and young people's decisions about transfer.").

[67]    1996 Guidance.

[68]    *Id*.

Despite factors outside of its control, the University has increased female athletic participation opportunities in a manner that is demonstrably responsive to the developing interests and abilities of its female students. The evidence at trial demonstrates an undeniable positive trend in growth in female participation opportunities since the 2012-2013 academic year.[69] At the same time and subject to exceptional circumstances, the male participation opportunities have plateaued. Indeed, the University explained that increases in male participation opportunities—which inversely affect female participation rates—were, in part, due to roster fluctuations associated with new a coaching staff. New coaches tend to recruit their own players while honoring the commitments made to student athletes by the previous coach who had recruited them. In that case, there is a "bump" in the roster.[70] As the University explained at trial, that happened at least twice during Ms. Bell's tenure and will likely happen again.[71] This issue has been magnified with recent NCAA rules changes relating to the transfer portal.[72]

The Plaintiffs make several misguided claims to allege that the University does not have a continuing practice of program expansion. For example, the Plaintiffs assert that the University does not have a written policy. Yet there is, again, no such requirement. Instead, OCR requires "effective communication of the policy or procedure to students." [73] That the University's policy is effectively communicated is demonstrated by the number of students who have successfully sought a meeting with the University's Athletics Department. In fact, representatives of the club

---

[69]  Joint Exhibit 83.
[70]  DE 149, at p. 2-144, ll. 2 – 19.
[71]  DE 149, at p. 2-144, ll. 2 – 19.
[72]  DE 149, at p. 2-141, ll. 1 – 6 ("You think you have a proportion you're going into for that year, but kids transfer, they quit, they do a lot of different things. And now with the Transfer Portal, that's going to be even more of an issue for us as we move forward and rosters change without us knowing. We've watched that this summer with rosters changing greatly.").
[73]  1996 Guidance.

equestrian, field hockey, and STUNT teams sought out Ms. Bell to discuss their interest in and request to elevate their club teams to Division I sports.[74]

The University's history and continuing practice of program expansion differs materially from *Mayerova v. Eastern Michigan University*. There, the university defended at Prong II by claiming it had "a history of program expansion because the overall trend of female participation ha[d] grown between 2003 and 2018"[75] and argued a history of program expansion based only on "the overall trend of female participation," which had "grown between 2003 and 2018."[76] The university tried to support its argument with reference to exhibits detailing historical participation gaps and an *aspirational* roster management plan.[77] Yet the university offered no proof to demonstrate the goals in its roster management plan had been met and "increases in the number of female athletes at EMU [had] generally been accompanied by increases in the number of male athletes, resulting in little change in the percentage of female athletes over the years."[78] Most importantly, however, *Mayerova* addressed the university's history and continuing practice where the university had just eliminated women's softball and tennis in 2018 and had not added a women's team since 2000.[79] The university also offered no evidence of a policy for requesting new sports or that such policy was effectively communicated to students.[80]

There are material differences between the University of Kentucky's history and continuing practice of program expansion and the record litigated in *Mayerova*. Unlike the

---

[74]   DE 149, at p. 2-151 ("I mean, we've had two or three groups in the last few years that have had no problem getting to us. So there's a clear understanding of you can reach us through -- contact us directly, and we are more than happy to meet with any group that calls."); *see also* DE 149, at p. 2-218 (discussing equestrian meeting with Ms. Bell); Defendant's Exhibit 10, at 14-15 (discussing meeting STUNT club president); DE 149, at p. 2-198 – 2-299 (discussing field hockey meeting);

[75]   346 F. Supp. 3d 983, 993 (E.D. Mich. 2018).

[76]   *Mayerova v. E. Michigan Univ.*, 346 F. Supp. 3d 983, 993 (E.D. Mich. 2018).

[77]   *Id.*

[78]   *Id.* at 994.

[79]   *Id.* at 995.

[80]   *Mayerova v. E. Michigan Univ.*, 346 F. Supp. 3d 983, 995.

institution in *Mayerova*, the University has not eliminated a women's team.[81] Unlike the institution in *Mayerova*, the University has added two teams—STUNT and junior varsity soccer. Unlike the institution in *Mayerova*, the University has documented growth in its women's athletics program that is demonstrably responsive to student interest and ability. Both STUNT and junior varsity soccer were added based on requests from students and developing interests in those sports. Unlike the institution in *Mayerova*, the University has a policy to request new sports and that policy is effectively communicated to students as demonstrated by the number of meetings the Athletics Department has fielded for requests to add sports. Finally, unlike the institution in *Mayerova*, the University has increased the number of female athletic opportunities, held steady male participation opportunities, and not eliminated any women's teams in the history of its athletic program. In fact, the University has increased female participation opportunities in such a manner that it now allocates the majority of its athletic opportunities to female student athletes.[82]

Similarly, *Roberts v. Colorado State Board of Agriculture* is easily distinguishable.[83] There, Colorado State University eliminated both the women's softball and men's baseball teams.[84] In finding that the institution had not met Prong II, the Court focused on eliminations of women's teams and the resulting thirty-four percent decline in women's participation opportunities during the 1980s and early 1990s.[85] The court declined to find the institution had complied with Prong II where it had "increased the relative percentages of women participating in athletics by

---

[81]   The Plaintiffs wrongly claim that "[i]n 1972, UK started a women's varsity field hockey team, which was eliminated in 1976." Plaintiffs' Proposed Findings, at p. 10. At trial, it was established that field hockey was never a varsity sport as that term is used in the context Title IX intercollegiate sports and this litigation. In fact, Ms. Stammer testified as much. *See* DE 148, at p. 1-171, l. 17 – p. 1-172, l. 3.

[82]   Joint Exhibit 83, at 4. If, however, the Court consider Cheer, Dance, and JV Soccer as providing athletic participation opportunities, the University's efforts have resulted in a greater than seventeen percent increase in the percentage of female athletes over the years. Joint Exhibit 83, at 1. Under either approach, the University allocates the majority of its athletic opportunities to female student athletes.

[83]   *Roberts v. Colorado State Bd. of Agric.*, 998 F.2d 824, 826 (10th Cir. 1993).

[84]   *Id.* at 826

[85]   *Id.*

making cuts in both men's and women's sports programs."[86] Unlike *Roberts*, this is not a case in which the University has cut any women's teams. Instead, the University has documented a robust policy of assessing program expansion opportunities,[87] increasing female athletic participation opportunities without cutting men's teams or participation opportunities, and adding two new sports in response to students' requests.

The University has met its burden to demonstrate that it has a history and continuing practice of program expansion which is demonstrably responsive to the developing interests and abilities of its female students.

## III.    The University complies with Prong III.

Assuming the Court concludes the University does not comply with Prongs I & II, then the University complies with Prong III. Under Prong III, OCR determines whether an institution is fully and effectively accommodating the interests and abilities of its students who are members of the underrepresented sex.[88] "In making this determination, OCR will consider whether there is (a) unmet interest in a particular sport; (b) sufficient ability to sustain a team in the sport; and (c) a reasonable expectation of competition for the team. If all three conditions are present OCR will find that an institution has not fully and effectively accommodated the interests and abilities of the underrepresented sex."[89] An "institution is not required to field a team in response to, e.g., the pleas of 'one talented softball player,' if sufficient numbers of individuals to form teams to compete do not exist."[90] "Although the full-and-effective-accommodation standard is high, it is not absolute. . . . Rather, the institution can satisfy the third benchmark by ensuring participatory

---

[86]    *Id.* at 830.
[87]    *See* University's Proposed Findings of Fact, at ¶ 55.
[88]    1976 Interpretation.
[89]    1996 Guidance.
[90]    *Horner v. Kentucky High Sch. Athletic Ass'n,* 43 F.3d 265, 275 (6th Cir. 1994) (citing *Roberts,* 998 F.2d at 831 n. 10; *Cohen,* 991 F.2d at 898).

opportunities at the intercollegiate level when, and to the extent that, there is 'sufficient interest and ability among the members of the excluded sex to sustain a viable team and a reasonable expectation of intercollegiate competition for that team . . . .'" As one court observed, "the full and effective accommodation of athletic interests is likely to be a complicated issue where allegedly underrepresented plaintiffs sue to force a university to create a neoteric team or upgrade the status of a club team."[91] At Prong III, the Plaintiff have the burden of proof the burden.[92]

In an attempt to demonstrate the University is not fully and effectively accommodating the interests and abilities of its female students, the Plaintiffs focus on three club teams offered at the University: (1) hunt seat equestrian, (2) lacrosse, and (3) field hockey. The Plaintiffs showed subjective interest and ability in three sports by three individuals: Georgia Murray (hunt seat equestrian) and class representatives Ala Hassan (field hockey) and Elizabeth Niblock (lacrosse). The subjective interest of three female students in three disparate sports is insufficient to prove that the University has failed to effectively accommodate interest *and* ability of its female students to sustain a viable team.

For the purposes of assessing Prong III, the University's experience with STUNT is instructive. The addition of STUNT as a Division I sport was demonstrably responsive to the developing interests and abilities of female students. The club team had existed at the University for at least four years before its president asked the University to elevate the sport to Division I. The results of the University's interest and ability survey confirmed female interest and ability to sustain a varsity team.[93] In 2021, the survey revealed the following:[94]

---

[91]   *Cohen v. Brown Univ.*, 991 F.2d 888, 904 (1st Cir. 1993).
[92]   *Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 275 (6th Cir. 1994) (citing *Roberts*, 998 F.2d 824, 901 (10th Cir. 1993)).
[93]   DE150, at p. 3-4, l. 5 – p. 3-5, l. 15. *See also* Joint Exhibit 63, at 2; Defendant's Exhibit 9 at 4 ("With the exception of Stunt, every other sport listed that is not currently offered did not have sufficient interest and ability to pursue it as a varsity sport at the university.").
[94]   Joint Exhibit 63, at 2.

| SPORT | Interest | Varsity Athlete @ UK Interested | Non-Varsity Student Interest | Criteria | Regulations | Funding | Contact Info |
|---|---|---|---|---|---|---|---|
| Stunt | 136 | 0 | 136 | 39 | 31 | 19 | 14 |

In short, 136 female students expressed an interest in the sport and 39 females self-identified as having the ability to compete at the Division I level. Ultimately, the University chose to offer STUNT because there was an unmet interest and ability among female students.

By contrast, the Plaintiffs presented no similar evidence to support their claim that there is sufficient interest *and* ability among the University's female student population to sustain Division I teams in equestrian, lacrosse, and field hockey. Compare the STUNT results with survey data for equestrian, lacrosse, and field hockey:[95]

| SPORT | Interest | Varsity Athlete @ UK Interested | Non-Varsity Student Interest | Criteria | Regulations | Funding | Contact Info |
|---|---|---|---|---|---|---|---|
| Equestrian | 222 | 2 | 220 | 14 | 11 | 9 | 6 |
| Lacrosse | 111 | 0 | 111 | 1 | 1 | 1 | 0 |
| Field Hockey | 44 | 0 | 44 | 3 | 3 | 2 | 2 |

At most, these survey results show *interest* in each sport among female students. That is, 222 female students expressed interest in equestrian; 111 female students expressed interest in lacrosse; and forty-four female students expressed interest in field hockey. Interest alone, however, does not sustain a Division I team. The average squad size for a Division I equestrian team is forty female athletes; for lacrosse, thirty-five female athletes; and for field hockey, twenty-five female

---

[95]    Joint Exhibit 63, at 2.

athletes.[96] Yet there were, at most only fourteen female students with the self-identified ability to compete in equestrian at a Division I level. There was only one such student for lacrosse, and only three such students for field hockey. That is not sufficient ability to sustain a team a varsity team in these sports.

Regardless, the University's assessment of student interest and ability is not limited to its survey alone. Rather, the University also consults its coaches to assess interest and ability.[97] For example, following the equestrian team's expression of interest in competing at the Division I level, the chair of the University's Sports Review Committee, through Sandy Bell, consulted the equestrian coaches to determine the skill and abilities of the club team equestrians. In the assessment of the equestrian coach for the western discipline, there "was no one on the Western team that he felt could make the transition to collegiate equestrian." Likewise, in the assessment of the equestrian coach for the hunt seat discipline, there were three student athletes who could compete at the Division I level.[98] Those are not sufficient numbers to sustain a Division I equestrian team, despite the pleas of "one talented [rider]."[99]

There is not sufficient interest and ability among female students to add a Division I equestrian team. The Plaintiffs claim, however, that if "19 of a team of 45 women was sufficient unmet interest and ability among the female student [sic] for stunt, there is likewise interest and ability in equestrian, field hockey, and lacrosse that UK is not fully and effectively accommodating."[100] Yet the University did not add STUNT based on the interest of only nineteen female students or the results of the survey alone. Instead, the University did so after the president

---

[96]    2021-22 Participation Student – Women's Sports, NCAA Sports Sponsorship and Participation Rates Report, Plaintiffs' Exhibit 55, at 88; *see also* Plaintiffs' Proposed Findings, at ¶ 83.
[97]    DE 149, at p. 2-222, ll. 2 – 21.
[98]    DE 149, at 2-228, ll. 18-24.
[99]    *See Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 275 (6th Cir. 1994) (citing *Roberts,* 998 F.2d at 831 n. 10; *Cohen,* 991 F.2d at 898).
[100]   Plaintiffs' Proposed Findings of Fact and Conclusions of law, at ¶ 84.

of the STUNT club team expressed interest in elevating the team to the Division I level,[101] *and
after observing that thirty-nine*—not nineteen, as the Plaintiffs suggest—female students had both
the interest and ability to compete at the varsity level.[102]

Consider further the University's field hockey club experience. Just as the University's
survey results demonstrates a lack of interest among female students, so too does the club team
experience. The executive director for campus recreation, who oversees club teams, testified that
"over the years, field hockey has not been particularly well-organized."[103] Moreover, the club team
report revealed that in 2022 field hockey averaged one one-hour practice per week. Even then,
however, the campus recreation staff would wonder "whether they were going to show up or what
was going on with their daily operation."[104] Over a twenty-year period, the campus recreation
director recalled years in which the team was completely inactive.[105] Although they have since
2016 scheduled four tournaments, they have cancelled one of those tournaments and reported no
field accomplishments to the recreation department in the last ten years.[106] This record does not
suggest there is an unmet interest and ability to sustain a varsity field hockey team.

Attempting to discredit the survey results, the Plaintiffs claim that the survey is flawed. For
example, the Plaintiffs suggest that the University's survey blends skills questions for the
equestrian disciplines. The Plaintiffs point out, for instance, that "[w]omen who compete in
western style do not jump at all and have no reasons to be able to jump over 3'6"."[107] Yet the
Plaintiffs offered no proof that there is the requisite interest or ability among female students to

---

[101]   Defendant's Exhibit 10, at 14-15.
[102]   Joint Exhibit 63, at 2.
[103]   DE 150, at p. 3-98, ll. 2 – 4.
[104]   DE 150, at p. 3-103, ll.23 – 24.
[105]   *See generally* DE 150, at p. 3-103, l. 4 – p. 3-105, l. 13.
[106]   See Plaintiffs' Exhibit 20, at 2.
[107]   Plaintiffs' Proposed Findings, at ¶ 67.

compete in Division I western and the ability to jump over three and a half feet is required for the hunt seat discipline.[108]

The Plaintiffs also complain that the skills requirements for women are "very elaborate."[109] Despite the Plaintiffs suggestions about which skills are necessary for which sports, the University relies on the relevant experts to construct the skills portion of the interest and ability survey—those experts who are qualified to assess ability.[110] That means for those varsity sports the University offers, the University relies on its coaches.[111] For those varsity sports the University does not offer, like lacrosse, field hockey, and equestrian, the University relies on the relevant governing body.[112]

To the extent the Plaintiffs imply that these alleged flaws have hidden from the University's consideration additional female students with the interest and ability to complete at the varsity level, there is no basis in the record for that conjecture. Moreover, the University does not rely on survey results alone. As mentioned above, in the assessment of the coach for the western club team, there "was no one on the Western team that he felt could make the transition to collegiate equestrian."[113]

The Plaintiffs also complain that the University's interest and ability survey progresses differently for those students interested in STUNT when compared to the progression for those students interested in lacrosse, field hockey, and equestrian.[114] In particular, the Plaintiffs complain

---

[108]   DE 149, at p. 2-80, ll. 1 – 7.
[109]   Plaintiffs' Proposed Findings, at ¶¶ 65, 67.
[110]   *Cf.* DE 150, at p. 3-147, ll. 7 – 14 (Virginia Lacefield, designer of the survey, agreeing that "determining if a student has the ability to play a sport" is "better left to coaches").
[111]   DE 149, at p. 2-244, ll. 12 - 18 ("So we're trying to find out do we have enough people already on our campus in our student body that have the level of talent to build a team around a Division 1 -- a major Division 1 program. So these are the -- these questions were given to us by the national governing body if we don't have the sport. They were given to us by our head coach if we do have the sport. So we did not write these questions."); *see also* Plaintiffs' Proposed Findings, at
[112]   DE 149, at p. 2-244.
[113]   DE 149, at 2-228, ll. 18-24.
[114]   Plaintiffs' Proposed Findings, at ¶ 79 - 81.

that to proceed within the survey, a female student interested in STUNT was not required to have certain credentials. The Plaintiffs compare that requirement to lacrosse, field hockey, and equestrian.[115] But the Plaintiffs make too much of too little. STUNT is relatively a new sport. In 2019, the NCAA was still considering whether to add STUNT as an emerging sport.[116] Moreover, as of trial, there were only four Division I schools that offered STUNT at the varsity level.[117] Compare that with lacrosse, field hockey, and equestrian. Lacrosse and field hockey have been varsity sports for decades,[118] and equestrian has been an emerging varsity sport for nearly twenty years.[119]

To require a female student interested in STUNT to have been recruited to a Division I team would have foreclosed athletic opportunities for females based only on the short history of the sport. Put simply, the fact that so few Division I universities have a STUNT team necessarily means that fewer female students could possibly be recruited to a Division I team. While recruitment is one way to measure ability, the use of such a metric in the context of STUNT would have severely and artificially limited the University's ability to identify female students with the ability to compete at the Division I level.

## CONCLUSION

For these reasons and the reasons stated in the University's proposed findings of fact and conclusions of law, the University complies with Title IX and the Three Prong test in the 1979 Interpretation of the 1975 Regulation.

---

[115]   Compare
[116]   Joint Exhibit 55, at 2.
[117]   DE 149, at p. 2-232, ll. 13 – 20.
[118]   *See generally* Plaintiffs' Ex. 55, at 8 (listing lacrosse and field hockey as Division I sports since 1981).
[119]   DE 149, at p. 2-182, ll. 10 – 18.

Respectfully submitted,

/s/ *Bryan H. Beauman*

| | |
|---|---|
| Bryan H. Beauman | William E. Thro |
| Carmine G. Iaccarino | General Counsel |
| Sturgill, Turner, Barker & Moloney, PLLC | University of Kentucky |
| 333 West Vine Street, Suite 1500 | 301 Main Building |
| Lexington, Kentucky 40507 | Lexington, Kentucky 40506 |
| Telephone: 859.255.8581 | William.Thro@uky.edu |
| Facsimile: 859.231.0851 | Telephone: (859) 257-2936 |
| bbeauman@sturgillturner.com | |
| carmine@sturgillturner.com | |

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 10, 2023, the foregoing document was filed using the Court's CM/ECF system which will send electronic notice to all counsel of record registered to receive electronic filings.

/s/ *Bryan H. Beauman*
ATTORNEY FOR DEFENDANTS