## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF KENTUCKY
### CENTRAL DIVISION
### LEXINGTON

| | |
|---|---|
| **ELIZABETH NIBLOCK and ALA HASSAN, Individually and on behalf of those similarly situated,** | **CIVIL ACTION NO. 5:19-394-KKC** |
| **Plaintiffs,** | |
| **v.** | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| **UNIVERSITY OF KENTUCKY, MITCH BARNHART, and ELI CAPILOUTO in their official capacities,** | |
| **Defendants.** | |

**\*\*\* \*\*\* \*\*\***

Plaintiffs Elizabeth Niblock and those similarly situated allege that defendant University of Kentucky ("UK") has violated Title IX of the Education Amendments of 1972. (DE 72 Complaint ¶ 6.) Plaintiffs allege that the number of opportunities for women to participate in varsity sports at UK is not substantially proportionate to the percentage of women enrolled as students. (DE 72 Complaint ¶ 58.) Further, Plaintiffs allege that UK does not have a history or continuing practice of expanding intercollegiate athletic opportunities for female students to accommodate their existing or developing interests and abilities. (DE 72 Complaint ¶ 59.) Finally, Plaintiffs allege that UK has not fully and effectively satisfied the interests and abilities of female students in intercollegiate varsity athletic opportunities. (DE 72 Complaint ¶ 60.)

The Court conducted a three-day bench trial on the matter, at which it heard from nine witnesses and received over 100 exhibits, consisting of thousands of pages of evidence.

The Court now issues its findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a)(1).

## I.   Title IX and the Three-Part Test

"Title IX prohibits sex discrimination under any education program or activity receiving federal funds." *Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 271 (6th Cir. 1994) (citing 20 U.S.C. § 1681(a)). The statute delegated to the Secretary of the Department of Health, Education, and Welfare ("HEW") responsibility for promulgating regulations implementing Title IX. 20 U.S.C. § 1682.

Title IX did not explicitly provide that it applies to athletic programs. In 1974, however, Congress enacted the Javits Amendment, which directed HEW to promulgate regulations implementing Title IX including "with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports." *Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 95 (4th Cir. 2011) (quoting Education Amendments of 1974, Pub. L. No. 93-380, § 844 (1974)). The regulations require all educational institutions that accept federal funds and that operate or sponsor interscholastic, intercollegiate, club or intramural athletics to "provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c). This means that a recipient educational institution must provide "gender-blind equality of athletic opportunity to its students." *Horner*, 43 F.3d at 273. "[A]n institution must effectively accommodate the interests of both sexes in both the selection of the sports and the levels of competition, to the extent necessary to provide equal athletic opportunity." *Id.*

In 1979, Congress split HEW into the Department of Health and Human Services and the Department of Education ("DOE"). *Equity In Athletics*, 639 F.3d at 96 (citing 20 U.S.C. §§ 3401-3510, Pub. L. 96–88 (1979)). The DOE assumed HEW's functions regarding educational programs, including the administration of Title IX. *Id.*

There is no dispute that UK receives federal funding and is, therefore, subject to Title IX. (DE 155 Br. 8.) UK is a member of the National Collegiate Athletic Association ("NCAA"), participates as a Division 1 school, and is a member of the Southeastern Conference ("SEC"). (DE 155 Br. 8.) A varsity sport at UK is "recognized by the NCAA as a Division 1 scholarship-providing sport and recognized through a championship process." (DE 148 Tr. 78.) UK currently offers 25 varsity teams: 13 for women, ten for men, and two are co-ed. (DE 155 Br. 9; DE 156 Br. 8; Jt Ex. 70.) All UK's varsity teams except three compete in the SEC. The men's soccer team competes in the Sunbelt Conference, the coed rifle team competes in the Great American Rifle League, and the stunt team competes independent of a conference. (DE 148 Tr. 51.) Students at UK may also participate on club teams. These teams are not governed by the UK Athletic Department, and the Athletic Department does not provide club teams with any benefits or amenities. (DE 148 Tr. 77.) Varsity teams play at a higher level of competition than club teams. (DE 148 Tr. 78.)

The Title IX regulations set forth the following non-exhaustive list of factors relevant to determining whether a university like UK provides equal athletic opportunities for males and females:

(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
(2) The provision of equipment and supplies;
(3) Scheduling of games and practice time;
(4) Travel and per diem allowance;
(5) Opportunity to receive coaching and academic tutoring;
(6) Assignment and compensation of coaches and tutors;
(7) Provision of locker rooms, practice and competitive facilities;
(8) Provision of medical and training facilities and services;
(9) Provision of housing and dining facilities and services;
(10) Publicity.

34 C.F.R. § 106.41(c).

Gender discrimination claims in college athletics fall into two categories based on the § 106.41(c) factors: effective accommodation claims focus on the first factor, and equal treatment claims focus on the other nine factors. *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 92 (2d Cir. 2012); *Roberts v. Colorado State Bd. of Agric.*, 998 F.2d 824, 828 (10th Cir. 1993) ("Although § 106.41(c) goes on to list nine other factors that enter into a determination of equal opportunity in athletics, an institution may violate Title IX simply by failing to accommodate effectively the interests and abilities of student athletes of both sexes.")

Plaintiffs assert an effective accommodation claim against UK. In 1979, HEW issued a policy interpretation, providing a means to assess such a claim through a three-part test:

> (1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or
>
> (2) Where the members of one sex have been and are under-represented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or
>
> (3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

1979 Policy Interpretation, 44 Fed. Reg. at 71,418 (Dec 11, 1979).

"The 1979 Policy Interpretation thus affords a school three safe harbors in defending against an effective accommodation claim under § 106.41(c)(1)." *Biediger*, 691 F.3d at 93. It provides universities with "three distinct opportunities to demonstrate that its sex-based treatment of athletes [is] not unlawful." *Id*. at 98. Each prong is "independently sufficient to defeat a claim of unlawful disparate treatment in accommodating athletic interests of both

male and female students." *Id*. Universities must comply with only one prong of the three-part test. *Mayerova v. E. Michigan Univ*., 346 F. Supp. 3d 983, 989 (E.D. Mich. 2018) (quoting Office for Civil Rights, U.S. Dep't of Educ., *Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test* (Jan. 16, 1996), https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html, (the "1996 Clarification")).

Plaintiffs allege that UK fails to meet each of the three prongs. (DE 72, Complaint, ¶ 108.) They bear the burden of proving that UK fails to meet Prong One: "showing statistical disparity." *Horner*, 43 F.3d at 275. If Plaintiffs fail to meet that burden, then their Title IX claim fails (since a university must comply with only one of the three prongs). If, however, Plaintiffs show a statistical disparity under Prong One, UK has the burden on Prong Two of proving a history and continuing practice of program expansion. *Id*. If UK meets that burden, then Plaintiffs' Title IX claim fails. But if the university fails to meet its burden on Prong Two, then Plaintiffs may prevail by proving under Prong Three "an unmet interest on the part of the underrepresented sex." *Id*.

UK spends a good portion of its 99-page opening brief arguing that the Court should not apply the three-part test. (DE 155 Br. 34-78.) The Court addressed the applicability of the three-part test in a prior opinion in this case. (DE 134.) There, the Court explained that it would follow well-established Sixth Circuit precedent applying the test. *See, e.g, Miami Univ. Wrestling Club v. Miami Univ*., 302 F.3d 608, 615 (6th Cir. 2002); *Horner*, 43 F.3d at 274 -75. The Court further explained that the Sixth Circuit had applied the three-part test even after the Supreme Court's decision in *Kisor v Wilkie*, 139 S.Ct. 2400 (2019). *See Balow v. Michigan State Univ*., 24 F.4th 1051, 1054 (6th Cir. 2022).

Moreover, the Court determined that, even under *Kisor*, the three-part test is entitled to deference because the term "equal athletic opportunity" in 34 C.F.R. § 106.41(c)

is inherently ambiguous; the three-part test is reasonable; and Congress expressly

delegated to the agency the task of issuing implementing regulations for Title IX, including

regulations applicable to athletic programs.

Finally, the Court found in its prior opinion that the three-part test does not

implicate the major questions doctrine as UK continues to argue in its post-trial brief. (DE

155 Br. 44-51.) This is because Congress explicitly delegated to an administrative agency

the task of prescribing standards for athletic programs under Title IX, and the three-part

test does not create new rights, impose new obligations or change existing law. Instead, it

simply "supplie[d] crisper and more detailed lines than the authority being interpreted."

*Equity In Athletics, Inc*, 639 F.3d at 106.

As to whether the three-part test violates Title IX itself, UK relies on the following

portion of § 1681(b), which prohibits certain preferential and disparate treatment in

applying Title IX:

> Nothing contained in subsection (a) of this section shall
> be interpreted to require any educational institution to
> grant preferential or disparate treatment to the members
> of one sex on account of an imbalance which may exist
> with respect to the total number or percentage of persons
> of that sex participating in or receiving the benefits of
> any federally supported program or activity, in
> comparison with the total number or percentage of
> persons of that sex in any community, State, section, or
> other area.

20 U.S.C. § 1681(b).

The three-part test does not violate this provision "because the test does not *require*

preferential or disparate treatment for either gender." *Cohen v. Brown Univ*., 101 F.3d 155,

175 (1st Cir. 1996) ("*Cohen II*"). The test "does not. . . mandate statistical balancing." *Kelley

v. Bd. of Tr., Univ. of Ill*., 35 F.3d 265, 271 (7th Cir. 1994.) "[A] court assessing Title IX

compliance may not find a violation *solely* because there is a disparity between the gender

composition of an educational institution's student constituency, on the one hand, and its athletic programs, on the other hand." *Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993) ("*Cohen I*").

"Rather, the policy interpretation merely creates a presumption that a school is in compliance with Title IX and the applicable regulation when it achieves such a statistical balance." *Kelley*, 35 F.3d at 271. "The question of substantial proportionality under the Policy Interpretation's three-part test is merely the starting point for analysis, rather than the conclusion; a rebuttable presumption, rather than an inflexible requirement." *Cohen II*, 101 F3d at 171.

In assessing a Title IX claim, nothing in Section 1681(b) prohibits the Court from considering "whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments" pursuant to Prong One of the three-part test. UK's argument ignores the proviso in § 1681(b), which explicitly permits the Court to consider "statistical evidence tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex." The proviso "makes clear, the statute expressly allows for consideration of sex-based statistical imbalances in the course of enforcement proceedings." *Equity In Athletics, Inc.*, 639 F.3d at 102.

UK has also recently filed a motion to reconsider (DE 167) the Court's prior opinion that the three-part test will apply in this case. UK now argues that the Court should find the test inapplicable considering *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), a Supreme Court decision overruling *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *Chevron* "sometimes required courts to defer to 'permissible'

agency interpretations of the statutes those agencies administer – even when a reviewing court reads the statute differently." *Loper Bright*, 144 S.Ct. at 2254.

UK argues that, pursuant to *Loper Bright*, the Court must itself resolve any statutory ambiguities in Title IX instead of deferring to the agency's interpretation. UK points out that 34 C.F.R. § 106.41(c), set forth above, lists ten factors relevant to determining whether a university provides equal athletic opportunities for males and females. It argues that nothing in the regulatory text suggests that a university violates Title IX by simply failing to abide by the first factor: effectively accommodating the interests and abilities of females.

The Court will deny the motion to reconsider. As discussed, the Sixth Circuit has applied the three-part test in multiple cases, and those cases remain good law. In *Loper Bright*, the Supreme Court made this clear, stating:

> [W]e do not call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that specific agency actions are lawful . . . are still subject to statutory *stare decisis* despite our change in interpretive methodology. Mere reliance on *Chevron* cannot constitute a "special justification" for overruling such a holding, because to say a precedent relied on *Chevron* is, at best, just an argument that the precedent was wrongly decided. That is not enough to justify overruling a statutory precedent.

*Loper Bright*, 144 S. Ct. at 2273 (internal quotation marks and citations omitted).

Further, *Kisor*, not *Loper Bright*, controls UK's challenge to the three-part test. *Loper Bright* applies when a plaintiff challenges an agency regulation interpreting a statute. UK does not challenge the Title IX regulations. It challenges the three-part test, which interprets a regulation. Thus, *Kisor* governs.

For all the reasons stated here and in the Court's prior opinion (DE 134), the Court will apply the three-part test in this case.

8

**A. Prong One – Plaintiffs proved that UK does not provide female students with varsity participation opportunities that are substantially proportionate to female student enrollment.**

Under the three-part test, the first benchmark is "whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments." *Balow*, 24 F.4th at 1054 (quoting 44 Fed. Reg. 71,418). "[A] university which does not wish to engage in extensive compliance analysis may stay on the sunny side of Title IX simply by maintaining gender parity between its student body and its athletic lineup." *Cohen I*, 991 F.2d at 898.

When determining whether participation opportunities and student enrollment are substantially proportionate, the focus is on the "number" of participation opportunities. *Balow.*, 24 F.4th at 1057. Thus, the Prong One analysis "begins with a determination of the number of participation opportunities afforded to male and female athletes in the intercollegiate athletic program." *Biediger*, 691 F.3d at 93 (quoting the 1996 Clarification at 2-3). The Court then considers whether "the numbers are substantially proportionate to each sex's enrollment." *Id*. at 94; *see also Mayerova*, 346 F. Supp. 3d at 992.

At the bench trial, Sandra Bell, who is the executive associate athletic director in UK's Athletic Department and the person at UK in charge of Title IX compliance (DE 149 Tr. 94, 96, 102), conceded that UK did not meet substantial proportionality if it requires a comparison between female athletic participation opportunities and female student enrollment. (DE 149 Tr. 133, 134-35.) UK's counsel conceded the same in arguments after trial. (DE 150T r. 187.) Bell has been responsible for Title IX compliance at UK since 2012. (DE 149 Tr. 100.) She testified that, during that time, UK has never complied with Prong One. (150 Tr. 79-80.)

The parties agree that, during the 2022-23 academic year, UK's total student enrollment was 20,790 students. The female undergraduate enrollment was 12,009

9

students or 57.76 percent of the student enrollment. The male undergraduate enrollment was 8,743 students or 42.05 percent. (DE 155 Br. 12-13; DE 161 Response at 4; Jt. Ex. 83 at 1.)

As to the number of female varsity participation opportunities, there is a dispute as to whether that number should include the opportunities provided by the cheer, dance and junior varsity ("JV") soccer teams. The Court will address that issue later. Plaintiffs have shown, however, that, even including the cheer, dance and JV soccer teams, UK fails to meet Prong One.

If the cheer, dance, and JV soccer teams are included, the parties agree the total number of varsity participation opportunities during the 2022-23 school year was 770, of which 420 were allocated to females, or 54.55 percent of the opportunities. (Jt. Ex. 83 at 1; DE 155 Br. 13.) If cheerleading, JV soccer, and dance are not included, the parties agree that UK provided 661 varsity participation opportunities, with 333 of those allocated to females, or 50.38 percent. (Jt. Ex. 83 at 2.) Thus, there was a gap of either 3.21 percentage points or 7.38 percentage points between the percentage of females in the student enrollment and percentage of varsity participation opportunities allocated to female students. (Jt. Ex. at 1-2.)

Title IX does not require, however, that the percentage of female varsity opportunities be exactly equal to the percentage of female students. *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 856 (9th Cir. 2014). The three-part test requires only that those two numbers be "substantially proportionate." Opportunities are substantially proportionate "when the number of opportunities that would be required to achieve proportionality would not be sufficient to sustain a viable team." *Balow*, 24 F.4th at 1060 (quoting the 1996 Clarification). A "viable team" is "a team for which there is a sufficient number of interested and able students and enough available competition to sustain an

10

intercollegiate team." *Id.* at 1060 (quoting the 1996 Clarification). "As a frame of reference in assessing this situation, [the DOE's Office for Civil Rights ("OCR")] may consider the average size of teams offered for the underrepresented sex, a number which would vary by institution." *Id.* (quoting the 1996 Letter).

The parties agree that, even including the participation opportunities offered by cheer, dance, and JV Soccer, UK would need to offer 59 additional female athletic opportunities for the percentage of female varsity athletic opportunities to equal the percentage of female student enrollment. (Jt. Ex. 83 at 1.) That number is 116 if cheerleading, dance, and JV soccer are not included. (Jt. Ex. 83 at 2.)

UK calculates that the average size of its women's varsity teams is 32. (DE 161 Resp. 13, n. 54.) Using that number as a "frame of reference," since at least the 2012-13 academic year, there has been a participation gap sufficient to field at least one female varsity team even including cheer, dance, and JV soccer participation opportunities. *See Biediger v. Quinnipiac Univ.*, 728 F.Supp.2d 62, 112 & n. 27 (D. Conn. 2010) (determining that a participation gap of 38 positions and the fact that each of the university's varsity teams had 30 or few spots made it certain that the participation gap was large enough to field a viable new team). Most years between 2012-13 to 2022-23, the participation gap at UK was large enough to field several female varsity teams.

In *Balow*, however, the Sixth Circuit found that, in determining substantial proportionality, it is improper to compare the participation gap to the average team size at the university rather than the size of a "viable team." 24 F.4th at 1060. In doing so, it cited *Lazor v. Univ. of Connecticut*, 560 F. Supp. 3d 674, 682 (D. Conn. 2021), a case in which the district court also rejected using the average team size of the women's teams at the university to determine whether the University of Connecticut achieved substantial proportionality, noting that "a participation gap large enough to field a viable team – not

the average team size – is the benchmark for determining substantial proportionality." *Id*. There, in determining whether the university achieved substantial proportionality, that court looked at the participation gap and evidence regarding the average roster sizes of certain NCAA women's teams. *Id*.

Under that measure also, UK fails to meet substantial proportionality. The only women's varsity teams that Plaintiffs here have argued are viable that do not exist at UK are lacrosse, field hockey, and equestrian. The average roster size for a Division 1 varsity team is 40 for equestrian; 34 for lacrosse; and 25 for field hockey. (Pl. Ex. 27 at 8, Pl. Ex. 55 at 88.) Thus, using the average roster size of these NCAA female teams, since at least the 2012-13 academic year, there has been a participation gap sufficient to field at least one of these teams. Most years, the participation gap was large enough to field all three teams.

As discussed, at the bench trial, UK conceded that it does not meet Prong One.[1] In its post-trial briefing however, UK argues that "the Court may rely on the population in

---

[1]    In *Balow*, the Sixth Circuit indicated that no "strict numerical formulas" should be used to determine substantial proportionality. 24 F.4th at 1061. For this reason, the court rejected determining substantial proportionality by comparing the participation gap at a university to the average-size team at the university. *Id*. & n.6. The Sixth Circuit noted that participation opportunities are "substantially proportional" when the participation gap is not enough students to sustain a "viable team" and that a viable team is a team "for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team." *Id*. (quoting the 1996 Clarification). Thus, the court held that, in assessing substantial proportionality under Prong One, a court must look at qualitative factors like "interest and ability." *Id*. at 1061.

This indicates that plaintiffs must prove under Prong One, not just a participation gap large enough to field the average roster in a sport, but also that there are enough "interested and able" students at the university to form a viable team in the sport. *Id* The Sixth Circuit stated that the "average team size at institutions" should be used to determine substantial proportionality only "[i]n circumstances in which there is no information about interest, ability, and competition." *Id*. at 1060 n.6. On remand, to determine whether the participation gap was large enough to field a viable varsity swimming and diving team as the plaintiffs argued, the district court started with the smallest such team in the Big Ten Conference (21 members). *Balow v. Michigan State Univ.*, 620 F. Supp. 3d 694, 708 (W.D. Mich. 2022). In determining there was sufficient interest and ability among the university's female students to form a viable varsity team of that size, the court considered that a women's varsity swimming and diving team had existed in the recent past at the university; affidavits by 12 former team members who were still students stating they were interested in a varsity team; and the fact that a club swimming and diving team at the university won the national championship the prior year. *Id*.

In the post-trial briefs in this case, however, neither party addressed interest and ability under Prong One. Both addressed them under Prong Three. The Court followed that pattern in these findings and conclusions. Under Prong Three, the Court finds that Plaintiffs have not proved there is sufficient interest and ability among UK's female students to field a viable varsity team in the only sports Plaintiffs have proposed: lacrosse, field hockey, and

Kentucky and Fayette County to assess substantial proportionality because the statute says it can." (DE 161 Br. 9.) And the statute that UK relies on for this argument is Section 1681(b) of Title IX discussed above. That is the provision that prohibits a court from requiring that a university "grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area." 20 U.S.C.A. § 1681(b).

UK's argument that this provision means that the comparison population for Prong One purposes is the state or community seems to be a variation of UK's argument discussed above that the three-part test violates Section 1681(b)'s "prohibition on quotas." (DE 155 Br. 35.) UK argues that it cannot be required to allot more than 50 percent of varsity participation opportunities to females because that exceeds the female population percentage of Kentucky and Lexington. (DE 155 Br. 80-81.) As discussed, however, the three-part test does not establish a quota. The test, on its face, is entirely consistent with § 1681(b) because the test does not require preferential or disparate treatment for either gender. *See Cohen II*, 101 F.3d at 175 ("Neither the Policy Interpretation's three-part test, nor the district court's interpretation of it, mandates statistical balancing; "[r]ather, the policy interpretation merely creates a presumption that a school is in compliance with Title IX and the applicable regulation when it achieves such a statistical balance."(quoting *Kelley*, 35 F.3d at 271.))

---

equestrian. Under *Balow*, that would mean that Plaintiffs have failed to meet their burden under Prong One because, even though the participation gap at UK consists of enough students to field a viable varsity team of average roster size in all three sports, Plaintiffs have not proved that there are enough interested and able students at the university to fill the roster in any of the three.

UK cites no cases holding that the comparison population for Prong One should be anything other than the student enrollment at the university under scrutiny. In contrast, every case the Court has reviewed has used the student enrollment as the comparison, including the Sixth Circuit in *Balow* and *Horner*.

For these reasons, the Court finds that Plaintiffs have proved that UK does not provide females students with intercollegiate varsity participation opportunities in numbers substantially proportionate to their respective enrollment.

### B. Prong Two – UK has failed to prove a history and continuing practice of program expansion that is demonstrably responsive to the developing interest and abilities of female students.

Of course, failing to provide substantially proportionate participation opportunities to females under Prong One is not by itself a Title IX violation. UK is entitled to a "safe harbor" if it satisfies Prong Two. *Mayerova*, 346 F.Supp.3d at 992. This prong "looks at an institution's past and continuing remedial efforts to provide nondiscriminatory participation opportunities through program expansion." *Ollier*, 768 F.3d at 857 (quoting the 1996 Clarification).

Under Prong Two, "so long as a university is continually expanding athletic opportunities in an ongoing effort to meet the needs of the underrepresented gender, and persists in this approach as interest and ability levels in its student body and secondary feeder schools rise, benchmark two is satisfied." *Cohen I*, 991 F.2d at 898. An institution must demonstrate *both* a history of *and* continuing practice of program expansion. *See Roberts*, 998 F.2d at 830.

UK argues that it has a history of program expansion, relying on the following:

- **Teams added**: UK has added three women's varsity teams since 1992: soccer in 1992, softball in 1998, and stunt in 2021. (DE 155 Br. 84; DE 161, Br. 11.)

14

- **Increased Participation Opportunities**: From the 2012-13 academic year to the 2022-23 academic year, including cheer, dance and JV soccer, the number of participation opportunities increased from 212 to 420, an increase of 208 participation opportunities. (DE 155 Br. 85; Jt. Ex. 83 at 1.) During that same timeframe, excluding the cheer, dance and JV soccer teams, the number of participation opportunities for females increased from 212 to 333, an increase of 121 participation opportunities. (Jt. Ex. 83 at 2; DE 161 Resp. 9, 13.)

The parties provided data regarding the number of female varsity athletic participation opportunities from the 2012-13 school year to the 2022-23 school year along with the numbers of females making up the student enrollment. In analyzing UK's history of adding female athletic opportunities, it is helpful to first look at the expansion that occurred prior to this lawsuit being filed at the beginning of the 2019-20 school year.

From the 2012-13 school year to the 2019-20 school year, female participation opportunities went up and down. There was growth for the first two years; followed by three years of decline; followed by two years of growth. (Jt. Ex. 83 at 1, 2.) During those years, UK consistently needed to add well over 150 female athletic participation opportunities to fill the participation gap with the number reaching as high at 203 women. (Jt. ex. 83 at 1, 2.)  Meanwhile, the percentage of female undergraduate student enrollment steadily increased every year from 50.75 percent in 2012-13 to 56.21 percent in 2019-20. (Jt. Ex. 83 at 1.)

After this lawsuit was filed, however, UK took three actions that led to significant leaps in the number of females it counted as varsity student athletes. In the 2020-21 school year, UK brought the cheer and dance teams, which already existed at UK, into the Athletic Department and counted those positions as varsity athletic positions. In the 2021-22 school year, UK added a women's JV soccer team and counted those positions as varsity

positions; and that same year, UK added a new women's varsity stunt team. (DE 149 Tr. 145-46; DE 155 Br. 10.)

Below is a chart depicting the female student enrollment and varsity participation opportunities including the cheer, dance, and JV soccer teams in the count, which shows the substantial leap in female student athletes beginning with the inclusion of the cheer and dance positions in 2020-21 and then the addition of JV soccer and varsity stunt in 2021-22:

| Participation Gap: UK Participation Counts Including Cheer, Dance, and JV Soccer | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Univ. of Kentucky Full-Time Undergrad Enrollment | | | | | Univ. of Kentucky Student-Athlete Participation | | | |
| Year | Male | Female | Total | % female | Male Student-Athletes | Female Student-Athletes | % of Female Student-Athletes | Participation Gap |
| 2012-13 | 9,445 | 9,733 | 19,178 | 50.75% | 354 | 212 | 37.46% | 153 women |
| 2013-14 | 9,627 | 10,258 | 19,885 | 51.59% | 397 | 225 | 36.17% | 198 women |
| 2014-15 | 9,857 | 10,833 | 20,690 | 52.36% | 385 | 239 | 38.30% | 184 women |
| 2015-16 | 9,860 | 11,339 | 21,199 | 53.49% | 352 | 237 | 40.24% | 168 women |
| 2016-17 | 9,446 | 11,387 | 20,833 | 54.66% | 363 | 235 | 39.30% | 203 women |
| 2017-18 | 9,238 | 11,419 | 20,657 | 55.28% | 331 | 226 | 40.57% | 183 women |
| 2018-19 | 9,042 | 11,442 | 20,484 | 55.86% | 338 | 257 | 43.19% | 171 women |
| 2019-20 | 9,031 | 11,591 | 20,622 | 56.21% | 354 | 280 | 44.16% | 174 women |
| 2020-21 | 8,688 | 11,551 | 20,239 | 57.07% | 399 | 355 | 47.08% | 175 women |
| 2021-22 | 8,469 | 11,360 | 19,829 | 57.29% | 388 | 428 | 52.45% | 92 women |
| 2022-23 | 8,743 | 12,009 | 20,790 | 57.76% | 350 | 420 | 54.55% | 59 women |

*In 2022-23, 38 full-time undergraduate students identified as not male or female.

**Athletic Participation Numbers for 2012-13 to 2019-20 are UK's self reported numbers to the NCAA for participants. (UK809-10, UK874, UK948-49, UK1028-29, UK1109-10, UK1190-91)

***UK includes in its count of "Female Student-Athletes" the Cheer, Dance, and a junior varsity soccer team. The participation gap calculated for 2020-21 to 2022-23 in this chart use the participation counts Univ. of Kentucky provided. (UK5077. UK5078. UK5206)

(Jt. Ex. 83 at 1.)

The cheer and dance team positions, however, should not be included in the count for UK's female varsity athletic positions. Neither cheer nor dance is sponsored by the NCAA. (DE 150 Tr. 43 (Bell stating cheer and dance are governed by U.S.A. Cheer); Pf. Ex. 55 at 88). Further, the DOE has never recognized cheerleading as a sport. *Biediger*, 691 F.3d at 103. The Court has located no cases that count cheer or dance as a varsity sport for Title IX purposes. These teams perform their activities on the sidelines or at halftime at

varsity competitions involving other teams. (DE 150 Tr. 19, 22.) This is not true of any varsity sport. (DE 150 Tr. 36.) Most importantly, cheer and dance are not offered the same competitive opportunities as the varsity sports teams at UK. Neither team has a regular competition season. (DE 150 Tr. 18, 22.) Both teams compete in only one competition each year, which is the national championship run by U.S.A. Cheer, one of the governing bodies of college cheer. (DE 150 Tr. 18, 22, 43.) No varsity sport at UK is provided only one competition opportunity. (DE 150 Tr. 22-23.) Every varsity sport has a regular season and then has the opportunity to compete in both a conference and national championship, with their ability to do so depending on their performance during the regular season. (Pf. Ex. 38.)

Nor is it appropriate for UK to count the positions on its *junior* varsity soccer team as *varsity* female athletic opportunities. "The number of 'participation opportunities' for women is defined by the number of female athletes who actually participate in varsity athletics . . . ." *Mansourian v. Regents of Univ. of California*, 602 F.3d 957, 965–66 (9th Cir. 2010). UK provides no scholarships to the JV soccer players. (DE 149 Tr. 180) None of the members of the UK JV soccer team have ever moved up to the varsity team. (DE 150 Tr. 15.) Members of the JV team are not eligible to participate in any championship game, and they do not compete against any of the SEC varsity teams that the varsity team competes against. (DE 149 Tr. 179.) The JV team is not always coached by the varsity team coach. It has been coached by a "volunteer coach" and by two varsity assistant coaches. (DE 149 Tr. 178)

If junior varsity opportunities counted as varsity opportunities for Title IX purposes, then a university could comply with Title IX by providing only junior varsity teams to women while providing men with the only varsity teams. This would clearly violate Title IX. "Counting new women's junior varsity positions as equivalent to men's full varsity positions flagrantly violates the spirit and letter of Title IX; in no sense is an institution

providing equal opportunity if it affords varsity positions to men but junior varsity positions to women." *Cohen II*, 101 F.3d at 186 (quoting district court opinion).

Below is a chart depicting the female student enrollment and varsity participation opportunities when cheer, dance and JV soccer are not included in the count:

| Participation Gap: UK Participation Counts w/o Cheer, Dance, and JV Soccer | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Univ. of Kentucky Full-Time Undergrad Enrollment | | | | | Univ. of Kentucky Student-Athlete Participation | | | |
| Year | Male | Female | Total | % female | Male Student-Athletes | Female Student-Athletes | % of Female Student-Athletes | Participation Gap |
| 2012-13 | 9,445 | 9,733 | 19,178 | 50.75% | 354 | 212 | 37.46% | 153 women |
| 2013-14 | 9,627 | 10,258 | 19,885 | 51.59% | 397 | 225 | 36.17% | 198 women |
| 2014-15 | 9,857 | 10,833 | 20,690 | 52.36% | 385 | 239 | 38.30% | 184 women |
| 2015-16 | 9,860 | 11,339 | 21,199 | 53.49% | 352 | 237 | 40.24% | 168 women |
| 2016-17 | 9,446 | 11,387 | 20,833 | 54.66% | 363 | 235 | 39.30% | 203 women |
| 2017-18 | 9,238 | 11,419 | 20,657 | 55.28% | 331 | 226 | 40.57% | 183 women |
| 2018-19 | 9,042 | 11,442 | 20,484 | 55.86% | 338 | 257 | 43.19% | 171 women |
| 2019-20 | 9,031 | 11,591 | 20,622 | 56.21% | 354 | 280 | 44.16% | 174 women |
| 2020-21 | 8,688 | 11,551 | 20,239 | 57.07% | 374 | 288 | 43.50% | 209 women |
| 2021-22 | 8,469 | 11,360 | 19,829 | 57.29% | 363 | 348 | 48.95% | 139 women |
| 2022-23 | 8,743 | 12,009 | 20,790 | 57.76% | 328 | 333 | 50.38% | 116 women |

*In 2022-23, 38 full-time undergraduate students identified as not male or female.

**Athletic Participation Numbers for 2012-13 to 2019-20 are UK's self reported numbers to the NCAA for participants. (UK809-10, UK874, UK948-49, UK1028-29, UK1109-10, UK1190-91)

***UK includes in its count of "Female Student-Athletes" the Cheer, Dance, and a junior varsity soccer team. The participation gap calculated for 2020-21 to 2022-23 in this chart use the participation counts Univ. of Kentucky provided without those teams included in the total number of student athletes. (UK5077, UK5078, UK5206)

While the percentage of females in the student enrollment continually increased for the 11 years depicted on the chart, the participation gap persisted, even increasing some years. Moreover, the number of female student athletes went up and down through the years, as did the female percentage of varsity athletes. From the 2021-22 school year to the 2022-23 school year (the most recent years on the chart), the number of female student athletes decreased. This does not depict a history of program expansion for women.

Moreover, until the addition of stunt in the 2021-22 school year, the increase in the numbers of female student athletes for the years depicted on the chart came through adding positions to already existing varsity teams. UK does not explain how that was "demonstrably responsive to the developing interest and abilities" of its female students.

*See Mayerova*, 346 F. Supp.3d at 995 ("EMU has not, for example, explained how its goal to increase track rosters is responsive to the developing interests and abilities of women.") In the past 25 years, UK has added only one female varsity team despite a participation gap now large enough for at least triple that number. That itself suggests something short of a history of program expansion.

As to whether UK has demonstrated a continuing practice of program expansion that is demonstrably responsive to the interests and abilities of its female students, the Court will look at whether UK has a plan for program expansion that is responsive to developing interests and abilities. *Id.*

Since at least 2017, UK has had a procedure in place for monitoring the interests and abilities of its female students and for adding female varsity participation opportunities. Central to that procedure is the Sports Review Committee established in 2017. (DE 149 Tr. 158; Jt. Ex. 51.)  The committee is made up of five UK officials, including Bell, who is the chair. (DE 149 Tr. 155.)  The committee makes the initial determination as to whether a varsity sport should be added at the university. If the committee decides that the university should add a sport, then it makes that recommendation to university UK President Eli Capilouto and Director of Athletics Mitch Barnhart. (DE 150 Tr. 51; DE 149 Tr. 155; Def. Ex. 9.)

Also central to UK's procedure for monitoring interest and ability is an annual survey UK has conducted since 2006 and amended to its current form in 2017. (DE 150 Tr. 49-51; DE 149 Tr. 233-34, 237.) Students are asked on the survey if they have a "serious interest in competing in any sport(s) at a Division 1 level at UK, whether or not a varsity team for that sport currently exists." (Jt. Ex. 80 at 1.) If the student answers "yes" to that question, she is asked to select from a list of varsity sports those sports in which she has an

interest. In 2023, for example, the survey set forth a list of 27 sports. UK offers a varsity team in some of the sports listed, but not all.

If a student indicates a "serious interest in" participating in a particular sport, then the survey directs her to questions about her ability to do so. The survey first asks the student if the student herself believes she has the ability to compete at the Division 1 varsity level in her chosen sport. (Jt. Ex. 80 at 3; DE 149 Tr. 242.) If the student answers, "yes," then the survey asks the student to indicate "all the credentials, accomplishments, and experiences below that objectively demonstrate your ability to compete at UK's Division 1 varsity level." (Jt. Ex. 80 at 3.)

Here, the survey asks the student if she was recruited by another Division I school to compete in that sport or if she previously competed at the varsity level in that sport. (Jt. Ex. 80 at 3.) Students are then asked to indicate whether they achieved certain credentials or accomplishments in the sport, such as being nationally or regionally ranked or being otherwise recognized at a national or regional level. For example, for lacrosse, the student is asked if she was recognized as a United States Lacrosse All-American or international equivalent. (Jt. Ex. 80 at 11-12.) For equestrian, the student is asked if she was nationally ranked; or placed or won at year-end industry finals or a national event or other international equivalent. (Jt. Ex. at 8.) And for Field hockey the student is asked if she participated on the U.S. National team (or international equivalent), participated in FUTURES – USA Field Hockey Olympic Development Program, was an All-State Field Hockey Player, or an international equivalent to any of these.  (Jt. Ex. 80 at 9.)

For some sports, students are also asked if they have certain skills in the sport. For example, for lacrosse, the student is asked if she can run a 40-yard dash in under five seconds, run a mile in under five minutes, and run two miles in under 12 minutes. (Jt. Ex. 80 at 12.) For equestrian, the student is asked if she can ride multiple horses in competitive

settings and if she has a high level of success jumping fences over 3 feet 6 inches tall. (Jt. Ex. 80.)

Students indicating that they have the credentials and skills to compete at the Division 1 varsity level are asked if they would be willing to comply with a list of UK, SEC, and NCAA regulations. (Jt. Ex. 80 at 20.)  The student is then asked if she "were selected for varsity competition in the [27 listed] sport(s). . . and there were no scholarship funds available, would you still compete without funding?" (Jt. Ex. 80 at 20-21.) Finally, students are directed to leave contact information if they want the "UK Athletic Department to consider your information." (Jt. Ex. 80 at 21.)

UK employs various methods to ensure a high response rate on the survey. UK launches the survey each February and students have at least seven weeks to complete it. (DE 150 Tr. 179; DE 149 Tr. 164.) For a period of time, all students other than seniors are unable to register for classes until they complete the survey. (DE 150 Tr. 150, 174; Jt. Ex. 65.) The survey is not time-consuming. For most students, it takes a maximum of eight minutes to complete. (DE 150 Tr. 149-50.) Students meet with an advisor prior to registering for classes. UK instructs advisors to remind students of the need to complete the survey to lift the hold on their registration. (DE 150 Tr. 180.) UK also e-mails students to remind them that they must complete the survey to register. (Jt. Ex 78.) As a result of these measures, seventy to eighty percent of students respond to the survey prior to their individual class registration window opening. (DE 150 Tr. 179.)

UK proved that the survey is a nondiscriminatory assessment of developing interests and abilities. *See* 1996 Clarification. Plaintiffs disagree with some of the survey content. They argue that some of the skills and credentials listed on the survey are not actually required for the sports at issue. They also argue that the criteria are more demanding for some sports than others. (DE 156 Br. 39.) However, the credentials and

skills were derived from two sources. If UK has a varsity team in the sport, then those coaches provided the credentials and skills; if UK does not have a varsity team in the sport, then the credentials and skills were provided by the sport's national governing body. (DE 149 Tr. 243-44, 246.) UK reasonably relied on the judgments of these professionals.

The problem with UK's plan of program expansion is not with the content of the survey. The problem is that the Sports Review Committee relies on the survey to the exclusion of other measures of interest and ability. The committee meets only once per year – in the summer, after the survey ends in May. (DE 149 Tr. 155-56.) Members receive a survey report sometime in late July and then have the meeting in August. (DE 149 Tr. 156.)

Bell's explanation of the committee's purpose made at a committee meeting in August 2022 illustrates the centrality of the survey results to its work. She explained, "the purpose of the Committee was to analyze the survey results and engage. . . in a meaningful discussion about how those results might impact the competitive sports structure at UK." (Def. Ex. 9.) The notes from the committee meetings confirm its reliance on the survey results when deciding whether to recommend the addition of new varsity women's teams. (Jt. Ex. 53, 55, 56; Def. Ex. 9.)

In fact, the committee's decision as to whether to add a varsity sport rests primarily on one number from the survey: the number of students who self-report interest and ability in the sport and leave contact information. When students from the club equestrian and field hockey teams requested that UK establish varsity teams in those sports, members of the committee met with students. Those meetings took place in June 2017 for field hockey and January 2023 for equestrian. (DE 148 Tr. 146-47; DE 149 Tr. 218, 221-22.) Bell ended both meetings, telling the students that the committee would need to review the upcoming survey results. (DE 148 Tr. 156; DE 149 Tr. 73.) Bell's later e-mail to the students explaining why the committee would not recommend that UK sponsor a varsity team in

either sport relied entirely on the fact that the number of students who left their contact information was not sufficient to field a viable team. (Pf. Ex. 11; Pf. Ex. 28; Jt. Ex. 73.; Jt. Ex. 53; DE 149 Tr. 253.) The committee notes confirm that it is the number of students who leave contact information that the committee focuses on in assessing developing interest and ability. (Jt. Ex. 53 (stating "only 18 of the [students] provided contact information" and the committee "is focused on the 18 individuals.") Bell also confirmed this at trial. (DE 149 Tr. 253.)

UK's focus on the number of students who leave contact information ignores the other data the survey provides regarding developing interests and abilities. If many students report they were recruited by another Division 1 school in any varsity sport, that data should provoke additional research into the viability of a team in that sport, no matter the number of students who left contact information. For example, from 2019 to 2023, from 28 to 46 students who were seriously interested in competing in equestrian at the varsity level indicated they had been recruited by another Division 1 varsity program to ride equestrian. (Jt. Ex. 73.) The average varsity equestrian team is just 40 members. (Pf. Ex. 27 at 8.) These results indicate a general interest in and ability to compete at the varsity level in equestrian that would be expected to provoke additional research into the viability of a varsity equestrian team, regardless of the number of students who left contact information.

The focus on students who provide contact information to the exclusion of the other data on the survey makes sense if the purpose of the survey is not to assess general developing interest and ability but to place students on a new varsity team. In that case, the university must be able to contact the students. But a university cannot use written survey responses to decide eligibility to play a varsity sport. Instead, the university should

use the survey for what it can effectively provide: one measure among many of the developing interests and abilities of its female student body.

Since it was created, the committee has recommended only one female varsity team: the stunt team. It did not make that recommendation based on the survey results alone. Bell testified that, years before stunt was even added to the survey, the committee "did a lot of research" (DE 150 Tr. 2, 65), which included attending the 2019 stunt National Championship in Oklahoma; engaging in discussions with U.S.A. Cheer, stunt's governing body; (Def. Ex. 10; DE 150 Tr. 65; Jt. Ex. 55); meeting with the stunt club team president; (Def. Ex. 10 at 14; DE 150 Tr. 63-64); reviewing the number of high schools that were adding stunt teams across the country (DE 150 Tr. 65; Jt. Ex. 55); reviewing stunt's status in Kentucky high schools through communications with the Kentucky High School Athletic Association ("KHSA") (DE 150, Tr. 65-66; Jt. Ex. 55); talking to stunt coaches at other universities, including the coach of the reigning national champion (DE 150 Tr. 65); and reviewing stunt's status with the NCAA. (Jt. Ex. 55.)

UK cites instances of Bell sporadically considering one or another indicator of ability and interest other than the survey for field hockey, lacrosse, equestrian, and other sports. (DE 155 Br. 21-23 ¶ 55.) But it does not present evidence of a plan of program expansion pursuant to which the committee regularly reviews multiple measures of developing interest and ability, like those reviewed for stunt, to expand its varsity participation opportunities for females. For example, Bell testified that the last time she looked at any high school participation data for women's sports was three or four years ago. (DE 149 Tr. 191.)

For these reasons, UK has not proved either a history or a continuing practice of program expansion that is demonstrably responsive to the developing interests and abilities of its female students.

24

### C. Prong Three: Plaintiffs have failed to show sufficient unmet interest and ability among UK female students.

Thus, Plaintiffs have proved that UK is not providing female students with varsity athletic participation opportunities in numbers substantially proportionate to their enrollment. UK has failed to prove that it has a history and continuing practice of program expansion that is demonstrably responsive to the developing interests and abilities of its students. Even where the evidence shows that a university falls short under Prongs One and Two, however, "the mere fact that there are some female students interested in a sport does not ipso facto require the school to provide a varsity team in order to comply with the third benchmark." *Cohen I*, 991 F.2d at 898. "Rather, the institution can satisfy the third benchmark by ensuring participatory opportunities at the intercollegiate level when, and to the extent that, there is 'sufficient interest and ability among the members of the excluded sex to sustain a viable team and a reasonable expectation of intercollegiate competition for that team . . . .'" *Id*. (quoting 44 Fed. Reg. at 71, 418.)

This prong of the three-part test "sets a high standard: it demands not merely some accommodation, but full and effective accommodation. If there is sufficient interest and ability among members of the statistically underrepresented gender, not slaked by existing programs, an institution necessarily fails this prong of the test." *Horner*, 43 F.3d at 275 (quoting *Roberts*, 998 F.2d at 831-32). On the other hand, "[w]hile the institution's burden under subsection (3) is an exacting one, an institution is not required to field a team in response to, e.g., the pleas of 'one talented softball player,' if sufficient numbers of individuals to form teams to compete do not exist." *Id*. at 275, n.9 (citing *Roberts*, 998 F.2d at 831 n.10 and *Cohen I*, 991 F.2d at 898).

As with Prong I, the focus here is again on the numbers. Under this prong, "institutions are not required to create an intercollegiate team or elevate a club team to

intercollegiate status unless there are a sufficient number of interested and able students to sustain a team." 2010 Letter at 12. "Title IX does not require an institution to create a new team unless there is interest, ability, and a reasonable expectation of competition for that team." *Wieker v. Mesa Cnty. Valley Sch. Dist. #51*, No. CIVA05CV806-WYD-CBS, 2007 WL 595629, at *6 (D. Colo. Feb. 21, 2007).

Plaintiffs argue that the interests and abilities that are unmet at UK are in varsity lacrosse, field hockey, and equestrian. They ask that the Court "order UK to elevate to varsity status" a team in at least one of these sports. (DE 156 Br. 51) Thus, Plaintiffs must point to evidence that there are enough female students interested in competing and able to compete at the varsity level in these sports to form a team. Plaintiffs note in their brief, such evidence of interest may include:

- requests by students and admitted students that a particular sport be added;
- requests for the elevation of an existing club sport to intercollegiate status;
- participation in club or intramural sports;
- interviews with students, admitted students, coaches, administrators and others regarding interests in particular sports;
- results of surveys or questionnaires of students and admitted students regarding interests in particular sports;
- participation in interscholastic sports by admitted students; and
- participation rates in sports in high schools, amateur athletic associations, and community sports leagues that operate in areas from which the institution draws its students

(DE 156 Br. 27 citing OCR, U.S. DOE, Dear Colleague Letter, (Apr. 20, 2010) ("2010 Letter"); https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-20100420.pdf.

Plaintiffs note that evidence of unmet ability may include:

- the athletic experience and accomplishments—in interscholastic, club or intramural competition—of underrepresented students and admitted students interested in playing the sport;
- opinions of coaches, administrators, and athletes at the institution regarding whether interested students and admitted students have the potential to sustain an intercollegiate team;

- if the team has previously competed at the club or intramural level, whether the competitive experience of the team indicates that it has the potential to sustain an intercollegiate team;
- participation in other sports, intercollegiate, interscholastic or otherwise, that may demonstrate skills or abilities that are fundamental to the particular sport being considered; and
- tryouts or other direct observations of participation in the particular sport in which there is interest.

(DE 156 Br. 27-28 (citing 2010 Letter).)

Plaintiffs easily meet the burden of proving unmet interest pointing to the survey results. (DE 156 Br. 42-43.) From 2019 to 2023, the survey consistently revealed that female students well beyond the number needed to field viable teams were seriously interested in competing on varsity field hockey, lacrosse, and equestrian teams. For field hockey, that number ranged from 44 to 72. For equestrian, that number ranged from 195 to 244. For lacrosse, the number ranged from 111 to 146. (Jt. Ex. 73.) Thus, Plaintiffs have proved a sufficient number of female students currently enrolled at the UK are interested in competing at the varsity level in lacrosse, field hockey, and equestrian to field a varsity team in each sport.

The next issue is whether Plaintiffs have produced sufficient evidence that there are enough female students at UK who can compete at the varsity level in field hockey, lacrosse, or equestrian to field a team. This is not a case where a university recently eliminated a successful varsity team. In those cases, proving that sufficient interest and ability exist on campus to field a team is likely not difficult to prove. *Cohen I*, 991 F.2d at 904. Proving interest and ability is more complicated where, as here, the plaintiffs seek to force a university to create a completely new varsity team. *Id*. *See also Cohen II*, 101 F.3d at 180; *Roberts*, 998 F.2d at 832 ("Questions of fact under this third prong will be less vexing when plaintiffs seek the reinstatement of an established team rather than the creation of a new one.")

As proof that enough female students have the ability to compete at the varsity level in lacrosse, field hockey, and equestrian, Plaintiffs point to the survey results. As discussed, the survey provides only an annual snapshot of students' self-reported interest and ability. The results can be relied on as a measure of student interest because a student is the person best able to assess her own interest in a sport. Whether a student has the actual physical ability to be placed on a varsity team at UK, however, cannot be determined by the student's responses to a written survey. UK would not be expected to place any student on a varsity team or find any student qualified to play a varsity sport based on the student's survey responses alone. Nor can the Court do that.

The OCR recognizes the limitation in the usefulness of a written survey for measuring individual physical ability under Prong Three. The 2010 Letter states that survey questions about a student's "experience in sports generally is one indicator of ability." 2010 Letter at 9 & n.19. But a university cannot be expected to find a student able to compete at the varsity level based on that one indicator.

If, on the other hand, a university is expected to use the survey responses to identify able players to be placed on a new varsity team, then the contact information becomes crucial. UK cannot form a new team based on anonymous responses. It needs real players who it can contact. From 2019 to 2023, not nearly enough students who indicated an interest and ability in equestrian, field hockey, or lacrosse provided contact information to field a team in any of those sports. In equestrian, at most 9 students left contact information during that timeframe. In field hockey, the highest number was three. In lacrosse, it was 2. The average roster size is 40 for equestrian, 25 for field hockey, and 34 for lacrosse. (Jt. Ex. 73; Pl. Ex. 27 at 8; Pl. Ex. 55 at 88.)

As evidence of students with the ability to compete at the varsity level, Plaintiffs point to the three current or former UK students who testified at the bench trial. (DE 156

Br. 29-33.) Ala Hassan testified that she has the ability to compete at the Division 1 level in lacrosse (DE 148 Tr. 205.) Elizabeth Niblock testified that she was recruited by five to ten schools to play varsity lacrosse and played one semester of Division 1 varsity lacrosse at Furman University before transferring to UK. (DE 149 Tr. 5-6.) Georgia Murray is president of the hunt seat equestrian club team. (DE 149 Tr. 53.) While in high school, she won state championships and placed third in the country at the National College Equestrian Association Midwest junior hunter finals. (DE 149 Tr. 49.) But even if there is evidence that all three students are able to compete at the varsity level, that would not make a viable team in any of the three sports.

Plaintiffs also point to the numbers of female students on the lacrosse, hunt seat equestrian, and field hockey club teams since the 2019-20 season. (DE 156 Br.34). These numbers may prove an interest in various sports, but they are not evidence of the numbers of female students at UK who can play at the varsity level or even have the interest in doing so. Not all members of a club team have the ability for or interest in varsity competition. For example, Bell testified that several members of the stunt club team joined the sunt varsity team at its formation but dropped out because it was "too hard," "took too much time," or was "too competitive for their ability level." (DE 140 Tr. 174-75, Def. Ex. 9.)

Neither the club lacrosse nor field hockey club teams has won any championships or otherwise obtained recognition for the skill level of the team or its individual players. Mark Lattin, who oversees club sports at UK, testified that "over the years, field hockey has not been particularly well organized." (DE 150 Tr. 98) As to the club lacrosse team, Plaintiff Niblock testified that "it seemed very lackadaisical" and was "less of a commitment than high school." (DE 149 Tr. 23.)

The club equestrian team, on the other hand, has placed in the top ten teams at nationals and includes members who have won individual national championships while on

the club team. (DE 149 Tr. 66; Pf. Ex. 27 at 4.) As Bell explained, however, the club equestrian teams accept "people who have never ridden a horse before or who are beginning riders." In the hunt seat discipline of equestrian, club teams must have beginner, intermediate, and advanced level riders. (DE 149 Tr. 91-92, 223, 227-28.) Everyone on a varsity college equestrian team, in contrast, is at the "expert level." (DE 149 Tr. 223.) Thus, most of a club equestrian team's members necessarily fall below the skill level required for a varsity team. The hunt seat coach confirmed this, telling Bell a maximum of three members of the club team could compete at the varsity level. (DE 150 Tr. 69-70; DE 149 Tr. 228.)

The accomplishments of the club equestrian team and the survey numbers indicating significant interest and self-reported ability to compete at the varsity level in the sport should motivate the committee to research the viability of a varsity hunt seat equestrian team. Bell testified that she would present the committee with the latest survey numbers, and it would decide whether to recommend the addition of a varsity equestrian team based on that evidence. (DE 150 Tr. 71.) As discussed, the committee's research should include measures of interest and ability beyond the survey.

Under Prong Three, however, the question is not whether there is sufficient evidence of interest and ability to merit further research by UK into the viability of a new team. The question under Prong Three is whether UK is meeting "the *actual* interests and abilities of its students and admitted students." 2010 Letter at 6, n. 15. Plaintiffs must prove that there are female students actually able to compete at a varsity level in a sport and that there are enough of them to form a team. Plaintiffs confine their argument to field hockey, lacrosse, and equestrian. For the reasons stated, Plaintiffs have failed to meet their burden in any of these particular sports at this time.

## II.     Equal Protection Claim

In their complaint, Plaintiffs asserted a claim for violation of their equal protection rights against UK President Eli Capilouto and UK Director of Athletics Mitch Barnhart in their official capacities. This was the sole claim asserted against Capilouto and Barnhart. At the bench trial and in their post-trial brief, however, Plaintiffs withdrew this claim. (DE 150 Tr. 185-86; DE 156 Br. 4, n.1.)  Accordingly, the Court will dismiss this claim.

## III.     Conclusion

For all these reasons, the Court hereby ORDERS and ADJUDGES as follows:

1) Plaintiffs have failed to prove that the selection of sports and levels of competition at UK do not effectively accommodate the interests and abilities of UK's female students;

2) Judgment will be entered in favor of UK on Plaintiffs' Title IX claim;

3) Plaintiffs' Equal Protection claim against Mitch Barnhart and Eli Capilouto in their official capacities is DISMISSED with prejudice; and

4) UK's motion to reconsider (DE 167) is DENIED.

This 28th day of October, 2024.

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY