RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0015p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ELIZABETH NIBLOCK, individually and on behalf of all
similarly situated; ALA HASSAN, Class Representative,
*Plaintiffs-Appellants*,

*v.*

UNIVERSITY OF KENTUCKY,
*Defendant-Appellee*.

No. 24-6060

───────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Lexington.
No. 5:19-cv-00394—Karen K. Caldwell, District Judge.

Argued: December 10, 2025

Decided and Filed: January 20, 2026

Before: SUTTON, Chief Judge; MURPHY and BLOOMEKATZ, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Lori Bullock, BULLOCK LAW PLLC, Des Moines, Iowa, for Appellants. Bryan H. Beauman, STURGILL, TURNER, BARKER & MOLONEY, PLLC, Lexington, Kentucky, for Appellee. **ON BRIEF:** Lori Bullock, BULLOCK LAW PLLC, Des Moines, Iowa, Joshua I. Hammack, BAILEY & GLASSER, LLP, Washington, D.C., Jill Zwagerman, NEWKIRK ZWAGERMAN, PLC, Des Moines, Iowa, for Appellants. Bryan H. Beauman, STURGILL, TURNER, BARKER & MOLONEY, PLLC, Lexington, Kentucky, William E. Thro, UNIVERSITY OF KENTUCKY, Lexington, Kentucky, for Appellee. Caleb R. Trotter, PACIFIC LEGAL FOUNDATION, Sacramento, California, for Amici Curiae.

SUTTON, C.J., delivered the opinion of the court in which MURPHY and BLOOMEKATZ, JJ., concurred. SUTTON, C.J. and MURPHY, J. (pp. 15–22), delivered a separate concurring opinion.

_____

**OPINION**

_____

SUTTON, Chief Judge.  Several students sued the University of Kentucky under Title IX, arguing that it failed to provide Division I sports teams for women in three sports:  equestrian, field hockey, and lacrosse.  After a bench trial, the district court found that the plaintiffs had not shown that enough female students at the University wanted to and had the ability to compete in these sports at the Division I level, as opposed to the existing club team level.  Because the district court did not clearly err in making these findings and because the plaintiffs accept the validity of the interpretive guidance on which those findings are premised, we affirm.

I.

The Wildcats represent the University of Kentucky on the basketball court, the running track, the softball diamond, and the soccer field, among many other sports.  The University's varsity teams compete at the highest level of college athletics, Division I of the National Collegiate Athletic Association.  They vie for championships with fellow members of the Southeastern Conference (better known as the SEC), one of the most competitive and prestigious college athletics leagues in the country.

The University sponsors 25 varsity teams in total.  Of these, 13 are women's teams, 10 are men's teams, and 2 are co-ed teams.  The University also offers men and women the opportunity to participate on club teams that compete in a lower level of competition and whose members do not receive scholarships.  Those teams include women's equestrian, field hockey, and lacrosse.

As recently as thirteen years ago, women made up less than 38% of varsity student-athletes at the University.  The number rose steadily after that.  By the 2022–23 academic year, women made up a slight majority of varsity athletes.

The percentage of women in the University's student body also grew during that period.  In 2012–13, women made up about half of the student body, and by 2022–23 they made up

57.76% of the student body. That means that, despite the increased opportunities for female students to compete in varsity sports, they still made up a smaller share of the varsity team rosters than they do of the student body.

The number of men's and women's varsity sports teams is not static. The University regularly reviews whether its student body has demand for, and can supply players to compete in, new sports teams. The University has a Sports Review Committee designed to "understand whether the interests and abilities of women at Kentucky are being met athletically." R.149 at 155. The Committee regularly reviews statistics and other information to determine whether to add more women's varsity teams. It then passes along recommendations to University leadership.

As part of this review process, the University sends out a mandatory student survey each year to stay up to date on the sports its students want to participate in as well as their ability to compete at the club or Division I level. To ensure full participation, all undergraduate students (other than seniors) must fill out the survey before registering for classes. The survey asks students whether they have a "serious interest in competing in any" Division I sports regardless of whether the University currently offers them. Jt. Ex. 80 at 1. If so, students may report any relevant credentials or experiences that would qualify them to compete in their chosen sport and disclose whether they were recruited by other Division I programs. The survey asks students who meet the relevant talent and ability benchmarks if they would comply with the athletic department's, SEC's, and NCAA's regulations for student-athletes. Students may share their name, University email address, and answers about athletic credentials and experiences with the athletic department.

In recent years, the Committee considered elevating some women's club teams to varsity status. Committee members met with students on the field hockey club team in 2017 and with equestrian team representatives in 2023. The University's student body did not have enough interested students who could compete at the Division I level in those disciplines to field a team, the Committee determined. For field hockey, for example, only 13 students had the requisite skills and interest to play at a Division I level. Of these, only three of them provided a way for the University to contact them about trying out for a potential team.

Other club teams had more interest and more success. After discussions with members of the club stunt team, research into the requirements to field a viable team, and review of the annual survey results, the University formed a women's varsity stunt team in 2021. The team provided a varsity athletics experience for 56 female students the next year. Before that, the University added two other varsity sports teams—women's soccer and softball—over the prior 29 years.

The varsity sports offered by the University did not satisfy all of its students. One student, Elizabeth Niblock, competed on the varsity lacrosse team at Furman University before transferring to the University of Kentucky. Disappointed that the club team at Kentucky was "student-led" and offered "less of a commitment than [her] high school" team, she decided not to join it. R.149 at 12.

Niblock sued the University to try to create a varsity women's lacrosse team. She filed a class action on behalf of all female students at the University who wanted increased sports opportunities. Under Civil Rule 23, the district court certified a class of "[a]ll present and future female students at the University . . . who are harmed by and seek change of [its] allocation of athletic participation opportunities for female students." R.77 at 11. Niblock alleged that the University failed to provide substantially proportionate opportunities for women to play varsity sports, and violated Title IX's prohibition on sex discrimination in education, *see* 20 U.S.C. § 1681(a). Niblock argued that the University needed to offer three additional women's sports— equestrian, field hockey, and lacrosse—to comply with Title IX.

The district court held a three-day bench trial that included nine witnesses, over 72 exhibits, and more than 600 pages of testimony. The court accepted several premises of Niblock's claim but ultimately ruled for the University. It accepted the validity of interpretative guidance with respect to the meaning of a regulation promulgated by the Department of Education under Title IX. It agreed with Niblock that, under that guidance, the University did not provide "substantially proportionate" athletics spots for women because they constituted between 3.21 percentage-points and 7.38 percentage-points more of the student body than of the varsity roster spots. R.170 at 10, 14. And it agreed with Niblock that the University's efforts to increase participation opportunities for female students had not made up as much ground as they

should have.  Even so, the court found that the University had fulfilled the demand for varsity athletics spots by female students who had an interest in, and the skills required for, competing at a Division I level.  Because the University did not have enough female students who wanted to and could compete on varsity teams in equestrian, field hockey, or lacrosse, the court concluded that the University did not violate Title IX.

## II.

On appeal, Niblock maintains that the district court erred in finding that the University could not form a new varsity team from the female students interested in and able to compete in these sports.  We give clear-error review to the district court's fact findings and fresh review to its legal conclusions.  *DAGS II, LLC v. Huntington Nat'l Bank*, 865 F.3d 384, 388 (6th Cir. 2017).

## A.

Title IX of the Education Amendments of 1972 is "spending clause" legislation that requires the state recipients of federal funding to comply with its mandates.  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998).  "No person in the United States," the key mandate says, "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  At the same time, the law does not require proportional representation of students on sports teams.  It adds:  "Nothing [in this mandate] shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area."  *Id.* § 1681(b).

The law was "patterned after Title VI of the Civil Rights Act of 1964."  *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (quotation omitted).  Title VI parallels the meaning of the Equal Protection Clause.  *Id.* at 280–81.

A threshold question in this case is what to do about the rules promulgated under the statute and the interpretive guidance offered with respect to those rules. In 1975, the Department of Health, Education, and Welfare promulgated a rule under the statute that provided as follows: Schools that receive federal benefits "shall provide equal athletic opportunity for members of both sexes." 45 C.F.R. § 86.41(c); *see also* 34 C.F.R. § 106.41(c) (reissuance by the Department of Education in 1980).

In 1979, the Department interpreted this rule to create three safe harbors for colleges and universities trying to comply with Title IX. Here is how the interpretive guidance described each safe harbor:

> (1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or
>
> (2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or
>
> (3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

1979 Policy Interpretation, 44 Fed. Reg. 71,413, 71,418 (Dec. 11, 1979).

Niblock accepts the validity of this rule and the interpretive guidance provided under it. The University of Kentucky, in marked contrast, thinks that this guidance does not survive *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), or *Kisor v. Wilkie*, 588 U.S. 558 (2019). Its briefing below and on appeal leads with the claim that we must invalidate the guidance and assess Niblock's claim based on the statute and the equal protection principles it embraces. *See* 20 U.S.C. § 1681(a); *United States v. Virginia*, 518 U.S. 515, 532–33 (1996).

We appreciate the University's argument in view of the many developments in administrative law since 1979. This court, notably, has not looked at the validity of the guidance since *Loper Bright* and *Kisor*. But the reality that Niblock and her fellow claimants cannot

satisfy the third prong of the interpretive guidance, as the district court correctly concluded, suffices to resolve today's dispute.  We will resolve the appeal on that ground alone.

The third prong, to repeat in material part, says that a university satisfies Title IX by providing athletics programs that "fully and effectively accommodate[]" the athletic "interests and abilities" of both sexes.  1979 Policy Interpretation, 44 Fed. Reg. at 71,418; *see Balow v. Mich. State Univ.*, 24 F.4th 1051, 1054 (6th Cir. 2022); *Horner ex rel. Horner v. Ky. High Sch. Athletic Ass'n* (*Horner I*), 43 F.3d 265, 274–75 & n.9 (6th Cir. 1994); *Horner ex rel. Horner v. Ky. High Sch. Athletic Ass'n* (*Horner II*), 206 F.3d 685, 695–96 (6th Cir. 2000).  This "safe harbor" provides a "high" but "not absolute" standard for schools to meet.  *Cohen v. Brown Univ.* (*Cohen I*), 991 F.2d 888, 898 (1st Cir. 1993); *see Horner I*, 43 F.3d at 275 n.9; *Portz v. St. Cloud State Univ.*, 16 F.4th 577, 581 (8th Cir. 2021).  A school is eligible for this safe harbor unless a claimant carries its burden of demonstrating "sufficient interest and ability among members of the statistically underrepresented gender, not slaked by existing programs." *Horner I*, 43 F.3d at 275 (quotation omitted); *see id.* at 277 (Batchelder, J., dissenting in part); *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 831 (10th Cir. 1993).

To overcome the safe harbor, plaintiffs must prove that "sufficient numbers of individuals" with "interest and ability" exist at the University "to form teams to compete." *Horner I*, 43 F.3d at 275 & n.9 (quotation omitted); *see Cohen I*, 991 F.2d at 898; *cf. Balow*, 24 F.4th at 1060–61 & n.6 (average team size is one factor in determining what is a viable team). Those "levels of interest and ability" must be "extant in the student body."  *Cohen I*, 991 F.2d at 900; *see also Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 858 (9th Cir. 2014).

Whether enough interest and ability existed to form a new team is a question of fact that we disturb only if clearly erroneous.  *See Pederson v. La. State Univ.*, 213 F.3d 858, 878 (5th Cir. 2000).  That is because it involves weighing the evidence to find whether students want to and can compete at a Division I varsity level, and determining from those facts whether the students can form a team.

Niblock has not carried that burden with respect to the three proposed sports teams: equestrian, field hockey, and lacrosse.  The district court found that she did not prove "there are

female students actually able to compete at a varsity level in [those sports] and that there are enough of them to form a team" in those sports. R.170 at 30. We find no clear error in that fact finding.

Start with the trial testimony from student athletes. It showed that one female student wanted to and could compete in equestrian and two in lacrosse. That by itself falls well short of the numbers needed to field each team. *See Horner I*, 43 F.3d at 275. Title IX does not require a school to attempt to form a new team in response to "the pleas of one talented softball player," for example, "if sufficient numbers of individuals to form teams to compete do not exist." *Id.* at 275 n.9 (quotation omitted).

Move to another type of probative evidence—the status and nature of the club teams in each sport and whether the members of those teams showed the requisite interest and talent to create a Division I varsity sport. The conditions of the existing equestrian, field hockey, and lacrosse club teams do not show that the University could "sustain a viable team" for varsity competitions in these women's sports. *See Cohen I*, 991 F.2d at 898 (quoting 1979 Policy Interpretation, 44 Fed. Reg. at 71,418).

Consider the club equestrian team. Its president thought that "maybe" five of its members could compete at a Division I level. R.149 at 219. Its coach made a more conservative estimate. She thought that only three of them could do it. Such teams require approximately 40 members. Thus, even if varsity-level coaching could enable several more students to compete at that level, the gap is sufficiently large to establish that, on this record, there are not enough students to field a viable team. This is not a sport by the way that a student could pick up overnight without taking on considerable physical risk. The national governing body for equestrian sets "a high level of success jumping fences over [three-and-a-half feet tall]" as one of several benchmarks for being able to compete at the varsity level. R.149 at 245–46.

The same holds true for field hockey. The official in charge of club sports described the field hockey team as not "particularly well-organized." R.150 at 98. And as of 2023, only nine students at the University reported Division I recruitment for field hockey. An average team, by contrast, requires around 25 members.

So also for lacrosse. As Niblock acknowledged, the club lacrosse team "seemed very lackadaisical" and its "commitment is a middle school level." R.149 at 23, 36. In 2020–21, the women's lacrosse club team had 20 members and 16 students reported Division I recruiting interest. Those numbers again fall short of the 34 players needed to field a typical team.

The only other piece of evidence—the annual student survey—cuts in the same direction when it comes to interest and ability. In 2023, the survey showed that 244 female students expressed interest in an equestrian team. Of those students, 122 believed that they could compete at a high-enough level, 34 reported that schools had recruited them for Division I teams, and 10 more reported credentials or skills needed to compete. Eleven passed all of the University's athletics requirements and agreed to abide by its student-athlete rules. Only nine individuals left contact information for the University to use in trying to assemble a varsity team beyond the existing club team. That falls far below the average team size of 40 student-athletes.

The survey results for field hockey tell a weaker story. While 60 female students expressed interest in field hockey, only 13 of them reported being recruited by a Division I program or claimed to have the requisite skills to play Division I varsity field hockey. Just three of the students gave contact information to confirm their interest. Roughly 25 students are needed to create a field hockey team.

The survey results for lacrosse are of a piece. One hundred and thirty-six students expressed interest in lacrosse. But only 19 of them reported being recruited by a Division I lacrosse program or claimed to have the requisite skills to play Division I lacrosse. None of the students provided contact information. A lacrosse team requires 34 students.

Equal sports opportunities are an essential and valuable component of higher education. And the University has taken significant steps to ensure that it meets that standard, as shown by the addition of several women's club and varsity sports teams over the last 29 years. But Title IX does not require schools to manufacture interest in a team or field teams unable to compete at a meaningful level. The claimants have not shown that such an unmet demand exists, at least not on this record. It is not the role of the federal courts to make a university create varsity teams

when the evidence fails to show that its student body currently can fill their ranks.  No clear error occurred.

B.

Niblock objects to this conclusion along several lines.  She claims that the surveys prove her point.  As acknowledged above, the surveys by themselves permit the conclusion that sufficient interest exists for each of the three sports and, if self-reported talent suffices, it's possible that the University has enough students with the requisite ability to field each of these teams.  But as the district court found, and as we agree, self-reported ability on a largely anonymous survey does not make up for a lack of actual evidence of demonstrated capacity to field a Division I team.  That explains why the survey includes objective measures of ability—recruitment by other Division I schools, success on high school and other teams, or other measurable achievements.  The surveys by themselves cannot make up for the absence of evidence of individuals who want to play these varsity sports and have shown an ability to do so. Most glaringly absent on this front is any evidence that the three club teams in these sports have a sufficient number of athletes who can, and want to, compete on a Division I level.  The survey provides at best a "snapshot of students' self-reported interest and ability."  R.170 at 28.  The district court reasonably found that "responses to a written survey" do not demonstrate "actual physical ability to be placed on a varsity team."  R.170 at 28.  Surveys are not tryouts, and a student's self-reported assessment of ability lacks independent and objective evaluation.

Niblock insists that the district court's conclusions about whether enough interested and able students exist to form a viable new team answers a question of law that we review with fresh eyes.  Not so.  The "district court's finding" about whether "the requisite level of interest existed is a finding of fact subject to review for clear error."  *Pederson*, 213 F.3d at 878; *cf. Balow*, 24 F.4th at 1056–57 (reviewing for clear error the district court's finding that a university did not inflate its female athlete numbers or mischaracterize participation opportunities).  The same is true of findings about ability.  *Pederson*, 213 F.3d at 879 (findings "regarding the interests and abilities of its student body" are disturbed only if "clearly erroneous").  Determining whether students want to join a varsity team and have the skills to compete at a

Division I level requires a close examination of the evidence, credibility assessments, and weighing of conflicting testimony—all classic hallmarks of a question of fact.

Niblock argues that, at all events, the role of survey results in this analysis presents a question of law. We agree. Challenges to how the survey was conducted and whether it presents useful evidence raise legal questions that we review with fresh eyes. But that does not change our analysis. The district court considered the survey; it simply did not find it persuasive when it came to the plaintiff's burden to establish unmet interests and the existing ability of its students in these sports.

Niblock's challenges to how the University conducted the survey get her no further. Noting that the University administers the survey, Niblock faults the University for perceived inadequacies in its methodology and claims that the University does not show that it has met the needs of all interested and able students. But Niblock, not the University, bears the burden of showing unmet interest and ability, *Horner I*, 43 F.3d at 275; *Roberts*, 998 F.2d at 831, and it was Niblock, not the University, who introduced the survey to meet her burden.

 Niblock objects that "[r]equiring contact information for [an] anonymous survey . . . creates a 'false measure' of both interest and ability." Reply Br. 8. But surely one way to identify interest and ability in a team is to have the students let the university know who they are. The survey's final question asked students whether they "[w]ould [] like the UK Athletics Department to consider your information?" Jt. Ex. 80 at 21. If a student answered yes, the survey said that "your name," "UK email address," and "answers about your credentials and experience in the sport(s) in which you qualified to compete will be shared with the UK Athletics department," while the remainder of the survey remained "confidential." Jt. Ex. 80 at 21. The University could reasonably doubt that it could form viable teams from students who answered "no" to this question.

Niblock persists that Title IX does not require a claimant to point to the exact students who could join a new team or prohibit anonymous evidence of students' ability. We again agree. The existing legal standard simply asks plaintiffs to persuade the finder of fact that enough students have the interest and ability to field a viable team that can compete at a varsity level.

Testimony about three students' abilities and interests, descriptions of club teams whose own members did not think they could compete at a varsity level, and largely anonymous self-reported survey results did not suffice here, as the fact finder permissibly found.  We do not in the process create a blanket rule against anonymous accounts of ability or a prohibition on survey results in Title IX cases.  In a different case with a different record, this kind of evidence could play a part in persuading the fact finder that a school did not satisfy its Title IX obligations.  They just do not show that the district court committed clear error here.

Niblock maintains that this survey data should have persuaded the district court.  She proposes a hypothetical tryout, after which a coach would act irrationally to discount demonstrated ability just because an athlete did not leave names and numbers.  But this example illustrates the problem with her survey evidence.  Unlike the real-world skill shown at an in-person tryout, the online survey shows, at best, only what students believe about themselves.  Without the requested contact information, the University cannot follow up to assess their ability for itself.

The district court contradicted itself, Niblock says, by concluding that the survey could show interest but not ability.  We do not see any tension.  A fact finder could rationally credit subjective interest while requiring a student to demonstrate skill and ability in objective ways.

Invoking an out-of-circuit district court opinion, Niblock argues that she had to show only a "foundation upon which to build a varsity program."  *Cook v. Colgate Univ.*, 802 F. Supp. 737, 748 (N.D.N.Y. 1992), *vacated on other grounds*, 992 F.2d 17 (2d Cir. 1993).  Recruiting high school players could build upon that foundation to create a viable team, she says.  The pertinent question, however, "focuses on the levels of interest and ability extant in the student body."  *Cohen I*, 991 F.2d at 900; *see also Horner I*, 43 F.3d at 275.  That makes sense because Title IX does not require a school to attempt to form a new team unless the student body can field "teams to compete."  *See Horner I*, 43 F.3d at 275 n.9.

Niblock alternatively argues that the district court should not have required her to demonstrate that the existing students could form a viable team.  That, she says, conflates a question of liability about whether the University violated Title IX with a question of remedy

about what a court should do about it. But the district court applied Title IX and its regulations as understood by our existing precedent. We have said that plaintiffs must show "sufficient interest and ability." *Id.* at 275. That means "sufficient numbers of individuals to form teams to compete." *Id.* at 275 n.9; *accord Cohen I*, 991 F.2d at 898. Although this question may also prove relevant at the remedy stage, it remains independently salient at the liability stage.

Niblock raises the general point that the district court's approach does not square with the "exacting" standard that the interest-and-ability test places on schools. *Horner I*, 43 F.3d at 275 n.9. But the district court correctly applied our cases. And this approach sets an appropriately "high" standard for schools, *Cohen I*, 991 F.2d at 898—"full[] and effective[] accomodat[ion]." 1979 Policy Interpretation, 44 Fed. Reg. at 71,418.

At oral argument, Niblock questioned the estimated size of a viable equestrian team. Forty student-athletes, she said, could comprise a combined hunt-seat and western team. The district court found, thrice over, that the average equestrian team has 40 members, without distinguishing hunt-seat from western. And it grounded this finding on the National Collegiate Equestrian Association's report that 40 athletes make up the "average varsity equestrian roster size." Pl. Ex. 27 at 8. Niblock's principal brief not only failed to challenge that factual finding, but it also agreed that "the average varsity NCAA equestrian team has only forty participants." Appellants' Br. 49; *see also id.* at 36.

III.

Niblock separately challenges the district court's decision to exclude an expert witness, a decision that receives abuse-of-discretion review. *United States v. Sammons*, 55 F.4th 1062, 1072 (6th Cir. 2022). Evidence Rule 702 requires would-be expert witnesses to "qualif[y] as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702.

Niblock sought to introduce expert testimony to undermine the methodology of Kentucky's survey. The district court found that the witness lacked expertise on Title IX survey methodology and excluded the witness's testimony. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

*Niblock et al. v. Univ. of Ky.*

The district court permissibly excluded the expert.  The witness acknowledged that Title IX survey design falls outside the ambit of her expertise.  She explained that she also "run[s] [her] questions and surveys by a number of experts."  R.119 at 66.  Those "experts" include ones who specialize in "survey design."  R.119 at 66.  The witness contrasted that label with a description of her own expertise, which does not include being "a specialist in survey design."  R.119 at 66.  No abuse of discretion occurred in excluding this witness.

We affirm.

———————————

## CONCURRENCE

———————————

SUTTON, Chief Judge, and MURPHY, Circuit Judge, concurring.  This case could have been far simpler under Title IX's ordinary meaning.  With certain exceptions, that title's main provision bars universities from taking certain harmful actions "on the basis of sex":  "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]"  20 U.S.C. § 1681(a).  Title IX thus requires a plaintiff's "sex" to be the "*basis*" for the "exclu[sion]," "deni[al]," or "discrimination" challenged in litigation.  *Id.* (emphasis added).  That is, the plaintiff's sex must be the "main constituent" or "fundamental ingredient" of a university's decision to engage in the exclusion, denial, or discrimination. I Oxford English Dictionary 985 (2d ed. 1989); *see* American Heritage Dictionary of the English Language 111 (New Coll. Ed. 1975); Webster's Third New Int'l Dictionary 182 (3d ed. 1966). So at a minimum, the plaintiff's sex must qualify as the but-for cause of the harmful action— meaning that the school would not have taken the action if the plaintiff had been of the opposite sex.  *See, e.g.*, *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350 (2013); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).  And if anything, this language might convey that the plaintiff's sex must be the "*core*" reason for that harmful action—not just a *peripheral* one. *EPA v. Calumet Shreveport Refining, L.L.C.*, 145 S. Ct. 1735, 1750–51 (2025) (emphasis added).

Either way, the plaintiffs in this case—female students at the University of Kentucky— did not even try to prove this intentional sex discrimination.  They allege that the University violated Title IX because it refused to create a women's lacrosse team, field-hockey team, and equestrian team.  But no evidence suggests that their sex was the but-for reason—let alone the core reason—for the refusal to create these teams.  In fact, the University does not have a men's lacrosse team, field-hockey team, or equestrian team either.  Even if the plaintiffs had been male students, then, they would still have been "excluded from participation in" and "denied the benefits of" these sports.  20 U.S.C. § 1681(a).  And the district court found as a fact that the University refrained from creating the three teams for a neutral reason unrelated to sex:  it lacked

enough "female students actually able to compete at a varsity level" in any of the sports.  R.170 at 30.  That type of neutral, nondiscriminatory reason—the lack of sufficient ability within the student body—should doom claims of sex discrimination no matter the sex of the students suing.

How do the plaintiffs attempt to show a Title IX violation instead?  They point to a regulation that requires universities to "provide equal athletic opportunity for members of both sexes."  34 C.F.R. § 106.41(c); *see* 45 C.F.R. § 86.41(c).  They then rely on agency guidance interpreting this regulation issued by the Department of Health, Education, and Welfare in 1979.  This guidance has long told universities that they can comply with the regulation's equal-opportunity mandate in three ways.  Universities may first strive for a quota:  the athletic "participation opportunities" for each sex must be "substantially proportionate to their respective enrollments" at the university.  1979 Policy Interpretation, 44 Fed. Reg. 71,413, 71,418 (Dec. 11, 1979).  If universities do not satisfy this quota, they may alternatively show that they have tried to expand the athletic opportunities for the underrepresented sex in a way that "is demonstrably responsive to the developing interest and abilities of the members of that sex."  *Id.*  And if universities cannot satisfy this second factor, the guidance lastly asks whether the university has intentionally designed its current athletic "program" in a way that has "fully and effectively accommodated" "the interests and abilities of the members of" the underrepresented sex.  *Id.*

According to the plaintiffs, the University has violated Title IX because it cannot satisfy any of the three factors.  The University allegedly cannot satisfy the guidance's first (quota) factor because women made up 57% of its student body but only 50% of its student athletes during the last year in the record.  And the University allegedly cannot satisfy the guidance's second factor because it has not done enough to intentionally create athletic opportunities for women.  Lastly, the University allegedly cannot satisfy the guidance's third factor because the plaintiffs believe enough female students have the interest and ability to play on one of the three sports teams.

Suffice to say, we are skeptical of this guidance's validity.  The Department of Health, Education, and Welfare adopted the guidance in a different world, one where the modern Department of Education did not yet exist and one where courts routinely deferred to agency interpretations of statutes and regulations.  That explains why our circuit upheld the 1979

guidance in the past.  *See Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 615 (6th Cir. 2002); *Horner v. Ky. High Sch. Athletic Ass'n* (*Horner I*), 43 F.3d 265, 273 & n.6 (6th Cir. 1994).

But a lot has changed since 1979.  We no longer defer to agency interpretations of the statutes they administer.  *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024) (overturning *Chevron U.S.A. Inc., v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)).  We now treat all laws alike, "independently interpret[ing] the statute and effectuat[ing] the will of Congress subject to constitutional limits," without abdicating that responsibility to executive agencies.  *See id.* at 395; *Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 587 (6th Cir. 2025).

And we no longer lightly defer to agency interpretations of their own regulations.  *See Kisor v. Wilkie*, 588 U.S. 558, 573–80 (2019) (narrowing *Auer v. Robbins*, 519 U.S. 452 (1997), and *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945)); *id.* at 632 (Kavanaugh, J., concurring in the judgment) (*Kisor* "clarif[ies] and narrow[s]" *Auer*) (quotation omitted); *see also* Christopher J. Walker, *What* Kisor *Means for the Future of* Auer *Deference: The New Five-Step* Kisor *Deference Doctrine*, Yale J. On Regul.: Notice & Comment (June 26, 2019).  We must interpret a regulation according to our best lights unless the regulation remains "genuinely ambiguous" after "exhaust[ing] all the traditional tools of construction."  *Kisor*, 588 U.S. at 574–75 (quotation omitted).  Potential deference to an agency's interpretations of its own rules comes into play relatively infrequently these days, because we usually can identify "the best interpretation of the regulation" and thus "have no need to adopt or defer to an agency's contrary interpretation."  *Id.* at 632 (Kavanaugh, J., concurring in the judgment).

The fate of these erstwhile deference-to-agency regimes remains linked.  One reason that an agency's interpretations of its own rules received deference under *Auer* was that its views of the relevant statute also received deference under *Chevron*.  Knock out *Chevron*, and the scope of *Auer* deference narrows considerably, if indeed it remains meaningful at all.

*Loper Bright* and *Kisor* should prompt us to revisit the 1979 guidance in an appropriate case.  Of most note, many indicators show that Title IX likely "prohibits only intentional

discrimination." *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001); *see Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74 (2005); *Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 240 (6th Cir. 2019). As we have explained, the "on the basis of sex" text points that way. 20 U.S.C. § 1681(a). So does Congress's decision to borrow from Title VI's ban on race discrimination when drafting Title IX's ban on sex discrimination. *Compare id.*, *with* 42 U.S.C. § 2000d. The Supreme Court has read Title VI to bar only intentional discrimination—not neutral policies that have a disparate impact on one race. *See Sandoval*, 532 U.S. at 280–81. It thus would make little sense to interpret Title IX's nearly identical language as permitting such disparate-impact claims. *See Poloceno v. Dallas Indep. Sch. Dist.*, 826 F. App'x 359, 362 (5th Cir. 2020) (per curiam); *see also Horner ex rel. Horner v. Ky. High Sch. Athletic Ass'n* (*Horner II*), 206 F.3d 685, 692 (6th Cir. 2000). If anything, Title IX provides the easier case for this conclusion. Congress expressly said not to interpret its ban on sex discrimination as requiring universities "to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating" in an educational program or activity such as athletics. 20 U.S.C. § 1681(b).

Under this interpretation, though, the 1979 guidance puts the regulation's "equal opportunity" mandate on a collision course with the statute's intentional-discrimination ban. Consider the guidance's first factor. It encourages universities to "evaluate the [sex-based] outcomes of their [athletic] policies, and to make decisions based on . . . those [sex-based] outcomes." *Ricci v. DeStefano*, 557 U.S. 557, 594 (2009) (Scalia, J., concurring). How else could universities ensure that the number of varsity athletic spots they offer to both sexes remain "substantially proportionate to their respective enrollments"? 44 Fed. Reg. at 71,418. And to achieve this proportionality, universities might not have the budgets to *increase* the number of opportunities available for women. They might instead achieve compliance by *reducing* the number of opportunities available for men—such as by cutting varsity teams. *See Miami Univ.*, 302 F.3d at 611, 615–16; *Neal v. Bd. of Trs. of Cal. State Univ.*, 198 F.3d 763, 769–70 (9th Cir. 1999). Yet one might view this decision to "den[y]" males the "benefits of" the eliminated teams "on the basis of [their] sex" as the very discrimination that Title IX prohibits. 20 U.S.C. § 1681(a); *cf. Ricci*, 557 U.S. at 594 (Scalia, J., concurring). And how is this quota consistent

with the statutory ban on requiring universities "to grant preferential or disparate treatment" to one sex because of a disparate impact?  20 U.S.C. § 1681(b).  In short, the guidance appears to create a safe harbor contrary to the safe harbor provided by the statute itself, incentivizing universities to adopt a proportionality requirement that Congress explicitly rejected.

The second and third safe harbors create the same tension with Title IX's text.  These factors ask schools to (1) "show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex" or (2) show "that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program."  44 Fed. Reg. at 71,418.  Both safe harbors thus seem to eliminate liability so long as a school's athletics program *intentionally* strives to avoid a disparate impact for one sex or the other.  That approach does not match the one Congress took in the statute.

Recall too that the Supreme Court has never evaluated the validity of the 1979 guidance or the regulation that it interprets.  Lacking any precedent upholding these sources under *Chevron* or *Auer*, the Court would likely feel free to give fresh review to them using the "change in interpretive methodology" that *Loper Bright* and *Kisor* adopted.  *Loper Bright*, 603 U.S. at 412.  And it would likely give no "statutory *stare decisis*" effect to the *circuit* decisions that have upheld the guidance under the now-outdated deference regimes.  *Id.*; *see Miami Univ.*, 302 F.3d at 615.  If so, circuit courts likely should reevaluate their own precedent using the changed approaches.  After all, we will reevaluate our own precedent even based on Supreme Court dicta.  *See United States v. Fields*, 53 F.4th 1027, 1048 n.13 (6th Cir. 2022).  And the refusal to reevaluate our precedent under the new interpretive approaches would set us up for reversal at the Supreme Court—which would undoubtedly apply those approaches when it considers these issues.

Nor, for what it is worth, does the 1979 disparate-impact guidance inevitably arise from the relevant regulation that the Department of Education issued under Title IX.  One might interpret that regulation—which requires schools to "provide equal athletic opportunity for members of both sexes," 34 C.F.R. § 106.41(c)—to comport with the statute by prohibiting only *intentional* discrimination.  And the factors that the regulation lists—such as an athletics

department's "provision of equipment and supplies" or its "[p]rovision of locker rooms, practice and competitive facilities"—might represent *evidence* about whether a university has engaged in this prohibited discrimination. *Id.*; *cf. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–67 (1977). Likewise, the statutory text permits courts to "consider[]" an alleged "imbalance" between male and female athletic opportunities as further *evidence* of that discrimination in a "proceeding" under Title IX. 20 U.S.C. § 1681(b); *cf. Vill. of Arlington Heights*, 429 U.S. at 266.

All this said, we are content to resolve this case narrowly because the University's briefing ignores the complexity that would arise from replacing the 1979 guidance with an intentional-discrimination approach. A few questions that the University did not even confront—let alone try to answer—prove this point. How, for example, should courts address the reality that schools have long separated the sexes into distinct men's and women's sports teams? Nobody would suggest that Title VI would permit similar racial classifications. *See Brown v. Bd. of Educ.*, 347 U.S. 483, 493–95 (1954). Yet a few clues in the Title IX context suggest that this longstanding practice comports with the statute's commands. *See* 34 C.F.R. § 106.41(b). In particular, the statute tells courts that "nothing contained herein shall be construed to prohibit" universities "from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. This section shows that courts cannot "construe[]" Title IX's ban on sex "discrimination" as barring all sex-based classifications. So if a university separates the sexes into comparable men's and women's teams for a specific sport based on their biological differences, one might say that neither males nor females have been "excluded from participation in, . . . denied the benefits of, or . . . subjected to discrimination" in the sport "on the basis of [their] sex." 20 U.S.C. § 1681(a); *see O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 449 U.S. 1301, 1306–07 (1980) (Stevens, J., in chambers).

But what happens if a university offers a sport (say, football for men or field hockey for women) to members of one sex and does not have an equivalent team for the opposite sex? Must members of the opposite sex "be allowed to try-out for the team" in some circumstances—as the regulation suggests? 34 C.F.R. § 106.41(b). Might universities have an exception to this "try-out" requirement for "contact" sports? *Id.* Might universities justify this differential treatment

based on a neutral factor:  the lack of interest and ability to field a competing team made up of members of the opposite sex?  Or might universities respond that their overall athletics department should qualify as the relevant "education program" for Title IX purposes and that the department offers a comparable number of one-sex-only teams for both sexes?  20 U.S.C. § 1681(b).  All told, difficult questions may well exist under an intentional-discrimination approach—which makes caution the order of the day in a case in which the parties have not briefed the questions.

Also calling for caution, we do not know whether the Department of Education even stands by its 1979 guidance today.  It would be strange to "defer" to agency guidance that the agency itself has disavowed.  So when the time comes to assess the validity of this guidance, courts would do well to call for the views of that department.  Or the federal government might try to clarify its own views by amending its Title IX regulations.  *Cf.* Rescinding Portions of Department of Justice Title VI Regulations, 90 Fed. Reg. 57,141, 57,141 (Dec. 10, 2025).

The federal government, notably, now appears to embrace an intentional-discrimination reading of Title IX.  In a recent brief to the Supreme Court, the Solicitor General argued that Title IX's ban on "discrimination" prohibits schools only from treating "similarly situated [individuals] differently without sufficient justification for the difference in treatment" or subjecting students "to less favorable treatment than similarly situated members of the other sex."  Brief for the United States as Amicus Curiae Supporting Petitioners at 12, *Little v. Hecox*, No. 24-38 (U.S. Sept. 19, 2025) (quotations omitted).  In another brief last term, it put the point concretely:  "[The Supreme] Court's decisions interpreting Title IX" impose "[a] discriminatory-intent requirement for damages claims."   Brief for the United States as Amicus Curiae Supporting Petitioner at 15–16, *A.J.T. ex rel. A.T. v. Osseo Area Schs.*, 605 U.S. 335 (2025).

One last uncertainty.  The plaintiffs sued the University for "violation[s] of Title IX and 34 C.F.R. § 106.41(c)(1)."  R.72 at 20.  Title IX, the Supreme Court has held, creates an implied private right of action for violations of the statute itself—and the equal protection principles it adopts.  *Cannon v. Univ. of Chi.*, 441 U.S. 677, 690–93 (1979).  That implied right of action, however, would not seem to extend to violations of regulations (and still less to guidance) issued under it, just as the Supreme Court found in the related Title VI context.  *See Alexander*, 532

U.S. at 285–87.  Because "plaintiffs may not assert claims under Title IX for conduct not prohibited by that statute," *Jackson*, 544 U.S. at 178 & n.2, Title IX likely does not provide a private cause of action for conduct proscribed only by the Department's regulations and interpretive guidance.  That is because the private right of action under Title IX extends only to "intentional sex discrimination."  *Id.* at 173; *see also Horner II*, 206 F.3d at 692.  As under Title VI, we should be careful not to revise Congress's work by extending a right of action to nonintentional disparate-impact claims.  *See Alexander*, 532 U.S. at 285–86.  That care is particularly necessary here because Congress must give states clear notice when it exercises its spending power.  *See Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 374 (2025).

\* \* \*

At day's end, the current caselaw applying Title IX in the athletic context does not appear to comport with the statute's text and instead rests on now-outdated views of agency deference.  But much about the proper approach to Title IX in this sensitive area remains open to debate.  With these observations, we concur in the majority decision resolving this case on narrow grounds.